# EXHIBIT

# 4

STATE OF NEW JERSEY
OFFICE OF ADMINISTRATIVE LAW
OAL DOCKET NO. EDS 4902-08

---

R.M. AND B.M. O/B/O H.M.,  :
                  :
      Petitioner,     :
                  :      TRANSCRIPT
-vs-              :        OF
                  :  RECORDED PROCEEDINGS
HADDON HEIGHTS BOARD OF  :
EDUCATION,           :
                  :
      Respondent.     :

---

December 8, 2008

BEFORE:

      THE HONORABLE JOSEPH F. MARTONE, A.L.J.

APPEARANCES:

      REISMAN CAROLLA, LLP
      By: Catherine Merino Reisman, Esq.
      Attorney(s) for Petitioner

      CAPEHART & SCATCHARD, P.A.
      By: Joseph Betley, Esq.
      Attorney(s) for Respondent

                         CRT SUPPORT CORPORATION
                         Transcriber: Kelly Sellers

I N D E X                                              2

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BARBARA WILLIAMS | | | | |
| By Mr. Bentley | 6 | | 109 | |
| By Ms. Reisman | | 54 | | |
| JAYNE ELFRETH | | | | |
| By Mr. Bentley | 120 | | | |
| By Ms. Reisman | | 128 | | |
| GEORGE RAFFERTY | | | | |
| By Mr. Bentley | 135 | | | |
| By Ms. Reisman | | 142 | | |

E X H I B I T S                          3

| NO. | DESCRIPTION | I.D. | EVID. |
|-----|-------------|------|-------|
| P-20 | Powerpoint presentation | 97 | |
| P-21 | St. Joseph's report | 142 | 148 |
| R-33 | C.V. of Dr. Williams | 16 | 17 |
| R-34 | Report | 22 | 25 |
| R-35 | June 16, 2008 letter | 138 | 139 |

Colloquy                                          4

1          THE COURT:  All right.  Good morning.  We're

2    now on the record.  My name is Joseph F. Martone.  I'm

3    an Administrative Law Judge assigned by the Office of

4    Administrative Law to hear this matter.  This is a case

5    entitled R.M. and B.M. o/b/o H.M. v. Haddon Heights

6    Board of Education.  This has an OAL docket number EDS

7    4902-08 and agency reference number 2008-13674.

8          May I have your appearances for the record,

9    please?

10         MR. BENTLEY:   Good morning, Judge.  Joseph

11   Bentley of -- representing Haddon Heights Board of

12   Education.

13         THE COURT:   Thank you, Mr. Bentley.

14         MS. REISMAN:  Katherine -- Reisman of Reisman

15   Corolla, LLP representing petitioners.

16         THE COURT:   Thank you, ma'am, Ms. Reisman.

17   Let me state that the Office of Administrative Law is

18   an independent state agency.  Our function is to hear

19   and decide matters such as this in a fair and impartial

20   manner.  We are neither employed by nor are we

21   associated with the Haddon Heights Board of Education

22   or any of the parties to this proceeding.

23         The only other announcement I'll make is that

24   I -- the first day of hearing I entered an oral order

25   to the effect that I will redact -- or ordering,

Colloquy                                    5

1    rather, that if there's ever a transcript made of this

2    proceeding that transcript will be redacted or amended

3    to reflect the parents' and child's name by initials

4    only.

5           All right.  So with that, Mr. Bentley, is

6    there any other housekeeping matters we need to deal --

7    no.

8           MR. BENTLEY:    No.

9           THE COURT:   Okay.  Mr. Bentley, if you --

10          MR. BENTLEY:    I'd like to call Dr. Barbara

11   Williams to the stand, please.

12          THE COURT:   Dr. Williams, good morning.

13          THE WITNESS:   Good morning.

14          THE COURT:   Will you please come to the

15   witness stand?  If I -- if I can ask that you remain

16   standing and raise your right hand to be sworn?

17   B A R B A R A   W I L L I A M S, RESPONDENT'S WITNESS,

18   SWORN.

19          THE COURT:   You may be seated.  Give me your

20   full name, please.

21          THE WITNESS:   Barbara Boll (phonetic)

22   Williams.

23          THE COURT:   All right, Dr. Williams.

24   Counsel, you may proceed.

25          MR. BENTLEY:   Thank you, Judge.

1    DIRECT EXAMINATION BY MR. BENTLEY:

2         Q    Good morning, Dr. Williams.

3    A    Good morning.

4         Q    What is your current position?

5    A    I'm an associate professor in the Special

6    Education Department of Rowan University.

7         Q    Previously Glassboro?

8    A    Previously Glassboro State College.

9         Q    Okay.

10   A    Now Rowan University.  Yes.

11        Q    Okay.  Tell us a little bit more about what

12   your role is as an associate professor at Rowan.

13   A    Okay.  I -- I coordinate the school psychology

14   program so that I work with graduate students who are -

15   - I teach them, coordinate and advise them, who are

16   seeking to become school psychologists.

17        Q    And do you also teach classes?

18   A    I do.  I teach classes in educational assessment,

19   psychological evaluations.  I coordinate the --

20        Q    Okay.  Slow down a little bit.

21   A    Okay.

22        Q    I don't think Judge Martone's --

23   A    Okay.

24        Q    -- shorthand is that good.

25   A    Okay.

Williams - Direct                    7

1          Q    (Laughing.)

2               THE COURT:    Not at all.

3               MR. BENTLEY:    (Laughing.)

4               THE WITNESS:    (Laughing.)  Sure.  I do teach

5      -- I have taught classes in educational assessment.

6      I'm currently teaching classes in psychological --

7      psychological assessment, the part of the -- the --

8      teaching students how to do complete psychological

9      assessments as well as consultation and interventions

10     and I supervise the internship which is the 1,200 hour,

11     year long experience that students have to go through

12     to become school psychologists.

13     BY MR. BENTLEY:

14          Q    And these are graduate students?

15     A    All graduate students.

16          Q    Okay.

17     A    Yes.

18          Q    And how long have you held this position at

19     Rowan?

20     A    This is my eighth year.

21          Q    Now since you started at Rowan have you held

22     the same titles and had the same duties --

23     A    (Coughing.)

24          Q    -- or -- eight years?

25     A    Well I had a promotion from an assistant to an

Williams - Direct                    8

1    associate and I'm currently applying to be promoted to

2    a full professor.  It's a matter of time and

3    experience.

4         Q    Are you tenured?

5    A    Oh, yes.

6         Q    Now what is -- tell us about your state

7    certifications.

8    A    Okay.  I'm certified as a school psychologist.  I

9    began my career, my undergraduate degree was in -- as a

10   teacher.  I'm certified as a teacher in New Jersey.

11   And then have graduate work in -- as a counselor and as

12   a school psychologist, as an administrator, so I've

13   done a lot of things prior to going to Rowan.

14        Q    Now your duties at Rowan, are you involved in

15   any way in -- in teaching or -- or providing guidance

16   for these graduate students in terms of determining

17   eligibility for special education?

18   A    Sure.  Yeah.  As part of the assessment process

19   when you're -- you're teaching students how to gather

20   data, to evaluate youngsters and then of course the

21   next step would be -- and -- and what do we do with

22   that, what -- what and what is the decision making

23   process that you would use in order to make a

24   determination of whether a child would be eligible for

25   special education or whether they would be not eligible

Williams - Direct                               9

1    for -- not eligible for special education.

2         Q    And have you been involved in that aspect of

3    it for over the past eight years at Rowan?

4    A    Yes, I have.

5         Q    Okay.  Tell us about your education.

6    A    Okay.  I have an undergraduate degree in education

7    and from Muskingum College and --

8         Q    What college?

9    A    Muskingum College which is a smaller college in

10   Ohio.  And then I taught for a very short time but then

11   went back to graduate school.  So I have then first

12   initially a certification in school psychology and

13   counseling and then I have my Ph.D. in educational

14   psychology from Temple.  And I actually have a post-

15   doctoral specialty in clinical psychology.

16        Q    Your --

17             THE COURT:    So your Ph.D. was in educational

18   --

19             THE WITNESS:    Yes.  Psychology.

20             THE COURT:    Psychology.  Oh.

21   BY MR. BENTLEY:

22        Q    Were -- dissertation?

23   A    My dissertation was -- the title was "Learned

24   Helplessness, Explanation of Children's Reaction to

25   Divorce" in 1989.

1          Q    You said 1989?  That was from Temple, you

2     said?

3     A    Yes, it was.

4          Q    Your -- your graduate degree, you said you

5     had a masters?

6     A    Yes.  I have two masters degrees.

7          Q    Okay.

8     A    Yeah.  A masters degree in educational psychology

9     and one in counseling psychology prior to the

10    certification as a school psychologist.

11         Q    And where were those --

12    A    They -- they were from Glassboro.

13         Q    Glassboro as well.

14    A    Yeah.  Yeah.  Then I went to Temple.

15         Q    Okay.  Tell us about prior to becoming a

16    professor at Rowan.  Tell us about your employment

17    experience.

18    A    Okay.  I worked as -- initially was working part-

19    time as a school psychologist and then that position

20    grew into more than full-time.  It went from being a --

21         Q    At what school?

22    A    Audubon Public Schools.  I was --

23         Q    In Camden County?

24    A    Yes.

25         Q    Okay.

Williams – Direct                          11

1    A    I was there for 25 years until the opportunity

2    came along to move into higher education.  So I

3    functioned as a school psychologist and then for many

4    of those years, I want to say all but three or four of

5    those years, about 21 years I was also the director of

6    special education.  But I also -- I continued to

7    function as a school psychologist to have the direct

8    contact with kids.

9        Q    Okay.  And in your capacity as a school

10   psychologist and as a director were you involved in

11   determinations of eligibility -- special education?

12   A    Yes, but actually only as a school psychologist

13   because it's really the team, the child study team that

14   has along with the parent, the teachers that makes the

15   recommendation or arrives at the -- the decision in

16   terms of eligibility.

17       Q    But in your role as a director have you had

18   the opportunity to supervise teams in --

19   A    Yes.  Yes.

20       Q    For -- for how many years and about how many

21   evaluations -- eligibility?

22   A    Oh, wow.  That's a hard question.  I would say for

23   about 22 of those years I was working as a director and

24   I -- it would be very hard to estimate how many

25   decisions there would be.  Perhaps, I don't know, 65,

Williams - Direct                    12

1    70 a year.  You know, I'm -- I'm estimating.

2         Q    Okay.

3    A    So over that 25 years I was --

4         Q    Now in your capacity as the -- a professor at

5    Rowan in -- the program there --

6    A    Right.

7         Q    Were you involved in helping the students in

8    terms of, especially interns --

9    A    Right.

10        Q    -- in determination decisions?

11   A    Yes.

12        ~~Q    Okay.  In what capacity?~~

13   A    Well we have a seminar which is called Colloquium

14   which students come to once --

15        Q    What is it --

16   A    It's called Colloquium in School Psychology.  So

17   while students are out in the field working in

18   respective districts throughout, you know, throughout

19   the area, then we come together at least once a month

20   and one of the topics that we discuss is, you know,

21   what are the kind of things that you-re -- situations

22   that you're encountering that would be -- that would --

23   we could discuss, of course, you know, just without

24   names, anonymously, that would be helpful to you as

25   well as the individual opportunity for supervision so

Williams - Direct                    13

1    that there -- the students that I actually supervised

2    in the field where I go to visit them at their schools,

3    because there's other people -- there's another

4    professor who works with me with this.

5        But when I visit them that's frequently what we

6    talk about because I go out and say, you know, "What

7    are some of the issues facing you?  How can I help

8    you?"  And we often talk about, you know that -- the

9    eligibility issues.

10       Q    Okay.  Now you're -- in addition to your

11   duties at Rowan, are you still involved in -- in doing

12   evaluations for school districts?

13   A    I am.  Yes, yeah.  I continue to work for

14   Educational Services Commission where they provide

15   services to non-public schools so that I'm working in a

16   parochial school at this point as on an as needed

17   basis, but working as a child study team member.

18            THE COURT:   What is the name?  Educational?

19            THE WITNESS:   Educate -- Camden County

20   Educational Services Commission.

21            THE COURT:   Okay.

22            THE WITNESS:   So I'm currently at Christ the

23   King School in Haddonfield.

24   BY MR. BENTLEY:

25       Q    So they -- they -- the Commission, the

1    Educational Services Commission provides services --

2    A     Yes.

3          Q     -- to who?  I -- I don't want to lead you.

4    A     Okay.  Okay.  Through -- through -- also through

5    federal funding that there are services provided to

6    children in -- who attend non-public schools.  So that

7    in Camden County, it's done differently in each county

8    or can be done, but in Camden County there is a

9    commission --

10         Q     Right.

11   A     -- which then is funded through public money to

12   provided services to children who attend parochial

13   schools.

14         Q     And you're involved in that -- that --

15   A     I am.

16         Q     In that process?  In what capacity?

17   A     As a school psychologist.  So I do the --

18         Q     Doing evaluations?

19   A     Yes.  And determining eligibility.

20         Q     Okay.

21   A     Yeah.

22         Q     And how long have you worked with the Camden

23   County Educational Services Commission?

24   A     I want to say 20 years.  Estimate at 20 years.

25         Q     Any other duties at -- at the present time in

Williams - Direct                    15

1    addition to Rowan?

2    A     I continue to be a consultant for Voorhees Public

3    Schools and Haddonfield Public Schools when they need

4    me.  You know, when there's an opportunity, either a

5    difficult case or just the workload is -- is -- is

6    needed.

7         Q     And again in what capacity?

8    A     As a school psychologist.

9         Q     Okay.  You -- you worked your whole life with

10   school districts.

11   A     Yes.

12        Q     How would you describe yourself in terms of

13   your -- your -- your -- your -- any alleged biases or

14   prejudices or anything along those lines?

15   A     Well I think that throughout my career what I've

16   attempted to be is, although -- is -- is really to be a

17   child advocate because I think it's important that we

18   have the -- the luxury when we're evaluating children

19   individually to say what is ideal, what would be the --

20   what would be the best situation for this child?  You

21   know, we -- we can have an individual prospective.  So

22   I'm attempting to say within -- you know, within reason

23   what would be the best situation.

24        Q     Okay.

25   A     Which is not only the most popular situation or

Williams - Direct                          16

1    popular recommendation.

2         Q    Right.  That's why we're here, I assume.

3    A    Right.  Right.

4         Q    In essence.  All right.  Okay.  Did you

5    prepare a -- a C.V.?

6    A    Yes.

7         Q    I'd like to move the -- Dr. Williams' C.V. in

8    evidence.  This is -- do you have a copy?

9              MS. REISMAN:    Your Honor --

10             THE COURT:   R-30.

11             MR. BENTLEY:    I have -- I have --

12             THE COURT:   R-33 is my next marking, I

13   believe.

14             MR. BENTLEY:    R-33 for identification.

15                              (R-33 marked for

16                              Identification.)

17   BY MR. BENTLEY:

18        Q    Dr. Williams, could you take a look at that

19   particular document?

20   A    Yes.  This was the -- it looks like the -- the

21   C.V. that I provided.  Not completely up to date, but

22   basically up to date.  Yeah.

23        Q    Can you take a -- I don't want you to -- it's

24   a rather lengthy C.V.  Just -- if you could just scan

25   to make sure this is the actual C.V. that you provided?

                              Williams - Direct                    17

1       A     It does.  It looks like it.  Yes.

2             Q     And do you recall when you prepared this?

3       A     It would have been in September, I believe.

4                   MR. BENTLEY:    I'd like to move R-33 in

5       evidence.

6                   THE COURT:   Any objection or voir dire?

7                   MS. REISMAN:   No.

8                   THE COURT:   All right.  R-33 in evidence.

9                                          (R-33 received in

10                                         Evidence.)

11                  MR. BENTLEY:    Okay.  I'd like to move --

12      present Dr. Williams as a expert witness on the issue

13      of eligibility for special education.

14                  THE COURT:   Any objection?

15                  MS. REISMAN:   No.

16                  THE COURT:   Wasn't that one of the functions

17      of a school psychologist?  I mean I'm just trying to

18      determine if that's a -- a separate category of

19      expertise.

20                  MR. BENTLEY:    I believe it is.

21                  THE COURT:   Eligibility?

22                  MR. BENTLEY:    Yeah.  I mean -- I mean I --

23      there's no separate certifications from the State.

24                  THE COURT:   Yeah.

25                  MR. BENTLEY:    She does -- I believe she can

1   give an expert opinion regarding the particular

2   situation here.  I think that's -- that's the general

3   area I would like to have her classified as an expert

4   in.

5              THE COURT:   Okay.  Okay.

6              MR. BENTLEY:   You are right.  School

7   psychologists are involved in that.

8              THE COURT:   Yeah.

9              MR. BENTLEY:   That's true.

10             THE COURT:   Yeah.

11             MS. REISMAN:   And that's why I don't object.

12   She's clearly an expert in the area of school

13   psychology and school -- student -- in that decision,

14   although you probably have -- as being an expert in

15   eligibility.  She's an expert in school psychology.

16             MR. BENTLEY:   Well, I -- move is to have

17   her be an expert on eligibility determinations for

18   special education.

19             THE COURT:   All right.  I'll accept her as

20   an expert in that field.

21             MR. BENTLEY:   Can -- second.

22             THE COURT:   Okay.

23   BY MR. BENTLEY:

24       Q    Okay.  You've never met H.M. before?

25       A    No, sir.

1        Q     Okay.   Tell us what your first involvement

2    was in these proceedings.   How did you -- how did you

3    become involved in this -- in this issue?

4    A     I got a call from Mr. Rafferty asking me would I

5    consider becoming an expert witness in this case.

6        Q     And what was your understanding of your role

7    as an expert witness?

8    A     My understanding was to review the record, the

9    child study team -- child study team record and to --

10   in order to determine whether procedures had been

11   followed, whether there had been a comprehensive

12   assessment that would -- that -- and -- and did I see

13   there was any problem with the eligibility decision

14   that was made.

15       Q     Okay.   Are you being compensated by Haddon

16   Heights?

17   A     Yes, I am.

18       Q     Okay.   And what is your -- how are you being

19   compensated?

20   A     The amount?

21       Q     Whatever -- whatever is the --

22   A     An hourly rate.

23       Q     -- the transaction.   Okay.   What -- what

24   rate?

25   A     One hundred dollars an hour.

Williams - Direct                                20

```
 1          Q     And is your compensation dependent upon the

 2    result of this hearing?

 3    A     No.

 4          Q     Did -- I take it you did not do any

 5    evaluations of H.M.?

 6    A     No, I did not.

 7          Q     Okay.  It was strictly a record review?

 8    A     Absolutely.  Yes.

 9          Q     Any -- anything else you recall being said to

10    you by Mr. Rafferty regarding your -- your -- your --

11    A     No, I asked questions.  He gave me an idea about,

12    you know, some of the issues, but I think Mr. Rafferty

13    really said to me, "I want your honest opinion as to

14    what -- you know, your honest opinion as to this issue

15    of eligibility."  So I --

16          Q     And did you in fact review E.M.'s educational

17    --

18    A     Yes, I did.  And I noted that in there was a

19    signed release from the parents that I had permission

20    to do that.

21          Q     Okay.  Do you recall when you -- strike that.

22    What -- what time period were you looking at in terms

23    of your role of --  determining whether the --

24    A     Okay.  Well, it's always critical to go back and

25    look at history, look at background.  I really focus my
```

Williams - Direct                    21

1    efforts and my time looking at the current reevaluation

2    that was done during last school year, the 2007/2008

3    school year.

4        Q    Okay.

5    A    I did review other information that was in the

6    file, it's a very thick file, just in order to get

7    additional background so I understood the case.

8        Q    Okay.  Now the -- I think the evidence so far

9    is that there was a decision made in May of 2008.

10   A    Right.

11       Q    That's why we're here.

12   A    Yes.

13       Q    Okay.

14   A    Yes.

15       Q    Did you review any type of documents that

16   were generated or any evaluations that occurred after

17   May of 2008?

18   A    No, I didn't.

19       Q    So I take it your -- your evaluation was

20   simply looking at what the team had in front of you?

21   Is that -- is that an accurate statement?

22   A    Yeah.  There were others -- there were other --

23   there was other documents in there, in the file that --

24   there had been an evaluation that was not done by the

25   child study team.  I think that the parent had done

1    with -- from St. Joe's University, a reading evaluation

2    that was done.  I believe that was in the file.

3         Q    Do you remember looking at that file -- at --

4    A    Yes.

5         Q    -- that document at all?

6    A    Yes, I do.  Yes, I do.

7         Q    Okay.  And did you prepare a report based

8    upon your review of those records?

9    A    Yes.

10        Q    This is going to be R --

11             THE COURT:    34.

12             MR. BENTLEY:    R-34?

13             THE COURT:    Yes.

14                              (R-34 marked for

15                              Identification.)

16   BY MR. BENTLEY:

17        Q    Doctor, I have the report but the copies that

18   I have, I don't have the back page that was signed.

19             MS. REISMAN:    That's okay.

20             MR. BENTLEY:    Okay.  I'm going to give her

21   a copy of the one that was signed.  Okay.  Let me --

22   let me have that.

23             MS. REISMAN:    Yeah.  Actually I can't.  I

24   can't -- do you have an extra --

25             MR. BENTLEY:    Yeah.  Okay.  Judge, I'm

Williams - Direct                              23

1    showing the witness document R-34 for identification.

2              THE COURT:    Okay.

3              MR. BENTLEY:    Judge, the document I've

4    shown the witness is a three page document.  The last

5    page --

6    BY MR. BENTLEY:

7         Q    First of all, Dr. Williams, do you recognize

8    R-34?

9    A    Yes, I do.

10        Q    And what is R-34?

11   A    It's the three page report that I prepared

12   following my review of the record.

13        Q    Okay.  I believe the document I showed you is

14   not signed on the last page.

15   A    Right.

16        Q    The last page is not signed.

17   A    Right.

18        Q    Do you recall signing that document?

19   A    Yes, I do.

20              MR. BENTLEY:    Okay.  Judge, I have the last

21   page that's signed but I only have one -- I have two

22   copies.  Judge --

23              THE COURT:    Well the witness --

24              MR. BENTLEY:    If it's okay -- substituting

25   the last page.

1          THE COURT:   Okay.

2          MR. BENTLEY:   For the witness.

3          THE COURT:   Yes.

4          MR. BENTLEY:   -- you so you have a complete

5     --

6          THE COURT:   Right.  Thank you.

7          MR. BENTLEY:   -- signed document.

8          THE COURT:   Thank you.

9          MS. REISMAN:   I -- I have the --

10    BY MR. BENTLEY:

11         Q    And if you could, Dr. Williams, just -- or

12    substitute in the last page.

13    A    Sure.

14         Q    Is there any other differences in the last

15    page other than it was signed?

16    A    No.  I think when I sent electronically, I faxed

17    -- electronically but one was faxed and one was --

18         Q    Okay.

19    A    Yeah.  No.  It looks fine.

20         Q    Again, that's the report that you prepared?

21    A    Yes.

22         Q    Okay.  Everything in that report is true and

23    accurate to the best of your knowledge and belief?

24    A    Yes, it is.

25         MR. BENTLEY:   I'd like to move R-34 into

```
 1    evidence.
 2              MS. REISMAN:    No objection.
 3              THE COURT:    R-34 in evidence.
 4                              (R-34 received in
 5                              Evidence.)
 6    BY MR. BENTLEY:
 7         Q    Okay.  Okay.  Dr. Williams, I'm -- I'm not
 8    going to ask you to read the report, it's in evidence
 9    and the Judge can look at it at his leisure.  The first
10    part of the report -- oh, I do want to highlight some
11    -- some -- some of the -- some of your findings.  The
12    first paragraph on page one you talk about the initial
13    2005 child study team evaluation.  Do you recall
14    anything that struck you as -- as relevant in terms of
15    reviewing those records?
16    A     In terms of the 2005 you're discussing now?
17         Q    Yes.
18    A     Yeah.  Yeah.  I reviewed that they were -- I think
19    the psychological had been completed by -- there was a
20    psychological that had been done by Cooper Learning
21    Center, I believe, and then there were other -- other
22    evaluations that had been completed by the Haddon
23    Heights child study team and the decision had been to
24    -- the ultimate decision was that there was a
25    discrepancy between the youngster's verbal
```

Williams - Direct                                26

1    comprehension index and current achievement in reading

2    and math computation.

3         Q    Okay.  Do you -- in that particular

4    paragraph, and in particular the fourth line down, you

5    refer to H.M.'s initial individual education program --

6    A    Right.

7         Q    -- also dated May 31, 2008.

8    A    That may be an error.

9         Q    Is that accurate?

10   A    No.  I believe that probably should say 2005.

11        Q    Okay.

12   A    It would have been done the same day as her

13   eligibility.  It was just a typo.  Yeah.

14        Q    Okay.  Anything of -- okay.  Strike that.

15   Now the rest of your document review focused on the

16   assessments that were done in 2008, is that correct?

17   A    Yes.

18        Q    Tell us what you recall about your findings.

19   Any highlights or low lights or anything --

20   A    Okay.

21        Q    -- that you felt was significant?

22   A    Okay.  I did use -- I did review the evaluations.

23   The teacher completed assessments that were in the file

24   which included DIBELS, the DIBELS assessment that was

25   done by a teacher and a developmental reading

1   assessment also done by a teacher and the evaluation

2   that was done at St. Joe's University graduate reading

3   specialist program, the critical reading inventory

4   which noted that -- again, I think all of these were

5   done -- these assessments were done in order to get a

6   better idea about an instructional level for H.M. and

7   in terms of reading assessment.

8        And these are frequently used measures which are

9   -- the former are really progress monitoring measures.

10       Q    Okay.  Let's -- let's -- let's stop right

11  there.

12       A    All right.

13       Q    We have had a lot of testimony here that you

14  had not seen or heard --

15       A    Right.

16       Q    -- regarding DIBELS.  Are you familiar with

17  --

18       A    Yes.

19       Q    -- with the -- DIBELS?

20       A    I am.  Yes.

21       Q    Okay.  What is -- what is -- first, what does

22  DIBELS stand for?

23       A    Dynamic Indicators of Basic Early Literacy Skills.

24       Q    Okay.  And I think you said a little bit

25  about what -- what that type of assessment is all

1     about.

2     A     Okay.

3           Q     Tell us what your understanding of what

4     DIBELS is all about.

5     A     Actually, DIBELS is -- I -- the way I describe it,

6     it's a downward extension of what we think of as DIBS

7     which are dynamic indicators of basic skills and which

8     was the original type of assessment which is much like

9     taking any kind of intermittent progress monitoring,

10    like you would have your blood pressure monitored, you

11    would have as a child height and weight monitored.

12    We're taking repeated measures of -- of a child's

13    growth in the skill -- reading, spelling, math,

14    whatever it might be.

15          And then the DIBELS is really looking at the early

16    literacy skills initially from kindergarten to --

17    kindergarten, first, second and third grade, and are

18    the building blocks and the -- and the skills --

19    developing a rate of progress because we typically do

20    at least four -- four assessments per year so that we

21    can grasp these results and indicate whether the child

22    is moving in the appropriate direction.

23          Q     How -- how -- what's the relevance -- how --

24    how weighty -- how -- how pertinent would a DIBELS

25    assessment be for a fifth grader in -- in isolation?

1    A    Okay.

2         Q    Meaning one --

3    A    Well, I think the way it was used at -- and is

4    being used now with older students who were just -- as

5    a fifth grader.  So that -- it's purpose is really

6    screening.  It's purpose is progress monitoring to

7    really assess is -- are the youngster's reading skills,

8    in this case, continuing to progress as they should?

9    If we can look at that line of trajectory we use these

10   basic indicators which would be oral reading fluency,

11   spelling skills, math skills, and if we see that

12   they're not then it really informs instruction so that

13   if the -- if the progress is not being made then we

14   know we have a consistent line to say that we're going

15   -- we're plateauing or the child's skills are declining

16   then we know we have to adjust the intervention.

17        Q    Okay.  How pertinent would the DIBELS test be

18   in terms of determining eligibility for special

19   education?

20   A    It's not typically used as -- to determine

21   eligibility.  It's information which can be considered

22   as anything would be, and if I were doing the

23   psychological evaluation, any child study team

24   evaluations they would -- that kind of information

25   would be reviewed in order -- as part of the background

Williams - Direct                    30

```
 1    information.  But again, it's basic function is that of

 2    progress monitoring, not determination of eligibility.

 3         Q     Okay.  Now you -- and you recall reviewing

 4    the DIBELS assessment for H.M. in this case?

 5    A     Yes, the actual assessment.

 6         Q     Okay.  And the -- what about the DRA?  We've

 7    hard, again, a lot of testimony --

 8    A     Right.

 9         Q     -- in this -- and -- about the DRA?

10    A     The developmental reading assessment?

11         Q     Yeah.

12    A     Yeah.

13         Q     Tell us about that.

14    A     Well, it's also a teacher administered assessment

15    and in -- in some --

16         Q     Can I interrupt you?  I just remembered one

17    thing before I forget.

18    A     Yeah.

19         Q     The DIBELS assessment, is that a norm

20    testing?

21    A     Normed itself?  There are benchmarks for each --

22    there are indicators that -- what you expect at each

23    level, at each grade level.

24         Q     Is this -- is this a standardized test?

25    A     It's standardized in its procedures meaning that
```

Williams - Direct                    31

1    you have to follow the standardized method of -- of

2    administering it, but the youngsters actually then just

3    get -- get -- were getting data which would be, again,

4    to be plotted.  Not to compare them against other --

5    other children that are taking the -- the test at the

6    same time, but to compare that to the expectation for

7    that grade level which would be more a criterion

8    referenced test.

9         Q    Okay.  I -- I interrupted you.  Back to the

10   DRA.

11   A    Right.  A DRA is also a teacher-administered test

12   which is basically done for the purpose of assessing

13   where the youngster is and if we talk about reading,

14   where the youngster is in the area of reading.  It's

15   individually administered and it is typically done by

16   somebody who is going to be planning the instruction so

17   that they have a sense of where the -- the child is.

18        Q    Is that what you mean by a curriculum-related

19   assessment?

20   A    Well DIBELS -- DIBELS -- yeah.  DIBELS is

21   certainly a curriculum-based assessment and meaning

22   that it's actually taken from the -- the child's

23   curriculum.  If we're talking about a child at a fifth

24   grade level then we would be using fifth grade material

25   that would not come directly from their books or their

1     textbooks, their materials --

2          Q     Right.

3     A     -- but would be similar to.  So that it's related

4     to the curriculum that the child is being taught in.

5     It is not something completely difference from what

6     they have not seen.  The DRA is again similar and at

7     times if the DRA's are being used then DIBELS is not.

8     I mean, it's sometimes one or the other, at times both,

9     but it's, again, it's administered by the teacher in

10    order to be able to direct and -- and plan instruction

11    for that child.

12          Q     Is the DRA similar to -- the question about

13    the DIBELS.  Is a DRA something that is -- that is

14    pertinent to a determination of eligibility in special

15    education?

16    A     No.  It's again more for progress monitoring and

17    determining at what level the youngster -- for example,

18    there are benchmark assessments that you would be doing

19    with -- if you sat down for the first time with a child

20    and used a DRA, first time in that school year, and

21    then from that the results would -- would direct where

22    the teacher would begin to instruction.  And you

23    typically in any classroom there are a variety of

24    levels of -- of reading material such that one child

25    may begin in one level and one book, another child

Williams - Direct                     33

1    might begin in another.  So it helps differentiate the

2    instruction.

3         Q    All right.  Is -- is it completely worthless

4    in determining eligibility criteria?

5    A    I -- I consider background material, background

6    information.  You want to know is the child

7    progressing, is this something we feel is -- you know,

8    we would take that into account but it is not data that

9    is directly used to make that -- that final

10   determination of eligibility, but certainly relevant

11   data in terms of background.  If we -- a child who

12   would be declining, declining, declining in their types

13   of -- in the -- in the DRA or in DIBELS then we would

14   say something different has to be done.

15        Q    Okay.

16   A    This is not sufficient.

17        Q    All right.  Do you recall anything that was a

18   concern, any red flags regarding the DIBEL assessments

19   and the DRA assessments in your review of H.M.?

20   A    No, I did not.  I thought it was pretty typical of

21   what a teacher might do.

22        Q    In your -- in your background, in your

23   experience as an educator, the number of years, what's

24   the most important thing about reading?  Is it reading

25   out loud or is it something different?

1    A    There are a lot of important things about reading.

2    You know, the National Reading Panel has -- has

3    determined that they are -- we have these important

4    things that kids need to do to be good readers and one

5    is to be able to read fluently.  And the way that we

6    typically assess reading fluency, because we can hear

7    it, is we ask children to read out loud.

8         Q    Okay.

9    A    Yeah.  And in a typical curriculum-based

10   assessment we would ask the child to read three one

11   minute passages and then we would throw out the -- the

12   top, throw out the bottom and we would use what would

13   be the mid point or what would be the -- considering

14   that may be the typical because we know that sometimes

15   depending on the passage and depending on the

16   vocabulary and some of the things in that reading

17   passage it might be more difficult for the child.

18        So we -- so we strive to get what would be

19   consistent or mid point in terms of their skill and

20   then we -- and since we're doing this over time,

21   repeatedly over time that we then have a consistent

22   estimate of how a child is -- is doing.

23        Q    Did you reach any conclusions or make any

24   determinations as to H.M.'s abilities regarding

25   regarding out loud?  Do you recall --

Williams - Direct                35

1    A      Looking at the documents, it seemed that she was

2    doing acceptably for her age.  Of course, I didn't hear

3    her, I didn't see her.  I think we had an actual DIBELS

4    protocol or information that came, written work that

5    came right from the DIBELS and -- and the information

6    that was reported in -- actually her rate of reading or

7    her -- it is usually done in words read per minute and

8    then with any correction for errors or words -- or

9    words -- accurately.

10         Q      Okay.

11   A      Yeah.  But she seemed to be on -- on target.

12         Q      What about -- what about comprehension?

13   A      Well I --

14         Q      Reading --

15   A      Right.  The DRA really does a better job looking

16   at comprehension.

17         Q      Forget about --

18   A      Okay.

19         Q      -- here.  Just in general.

20   A      Oh, sure.

21         Q      About --

22   A      In reading?  Okay.

23         Q      Yeah.

24   A      Of course, it's -- I mean, we do have youngsters

25   who can read fluently, they sound great, but they can't

1    -- they're not understanding what they read.  So we

2    have to assess their understanding of the meaning of

3    what they read so that we have to ask them questions.

4    We do it one of two ways: we ask them questions about

5    what they've read or we ask them to retell what they've

6    read.  So if they can 1) answer questions correctly; or

7    2) be able to tell us with some reasonable bit of

8    accuracy and detail what they have read then we have --

9    we have a sense that they have comprehended what

10   they've read, they have not just read words without

11   meaning.

12       Q    Okay.  You've heard the terms -- terms

13   "learning to read" and "reading to learn?"

14   A    Yes.  I've used those terms with my students.

15   Yes.

16       Q    How would -- using those terms how would you

17   describe H.M. --

18   A    All right.

19       Q    -- based upon your -- your --

20   A    Okay.  Well, typically in general we would say

21   that from grades kindergarten or first grade to third

22   grade we learn to read, kids learn to read.  So they're

23   learning the -- the critical skills of reading.

24       Q    Okay.

25   A    And then beginning fourth through -- from them on

1    is that we use those skills in order to learn more

2    difficult material like science and social studies.  So

3    we use those reading skills in order to be able to --

4    to master the content.

5         Q    Okay.

6    A    The -- the focus is then not on specific isolated

7    skills but more on more complex comprehension --

8    situation.

9         Q    Where would H.M. fall in?

10   A    Well, it looked to me like she was -- she had --

11   she was in the reading to learn.  As a fifth grader

12   that's where I would expect her to be.

13        Q    Do you know what her instructional reading

14   level was in fifth grade?

15   A    Well, from what I could see in the latest thing --

16   the latest information came from that critical reading

17   inventory that was done through St. Joe's reading

18   specialist program is that they said she was -- "She

19   would benefit from instruction at the fifth grade level

20   with emphasis on oral and written task replaced --

21   related to her response to text as -- to development of

22   greater language abilities."  That last part was a

23   quote.

24        Q    In terms of what?

25   A    The last -- in terms of the report that was

1    written from the critical reading inventory.  So from

2    that information it was indicated, which was done in

3    May of 2008, that she was instructional at a fifth

4    grade level.

5        Q    Okay.  What about the information that was

6    available to the team when -- when it made its decision

7    --

8    A    Okay.

9        Q    -- in May of -- about H.M.'s instructional

10   reading level?

11   A    Okay.  Well, and I guess that kind of moves into

12   the second part of the --

13       Q    Yeah.  Good segue.

14   A    Right.  As part of the reevaluation there was a

15   comprehensive, there -- there were three evaluations

16   completed one of which was the learning evaluation,

17   learning assessment which looked at -- an in-depth look

18   at her reading skills.  And I think if I'm not mistaken

19   because of the concerns and the questions that parents

20   and teachers had about her skills, about her reading

21   skills, that the learning assessment was tailored to

22   address the questions that were done.

23       There's a variety of standardized tests and norm-

24   referenced tests that could be used to assess a

25   youngster's reading and these -- the learning

Williams - Direct                        39

1    assessment was -- you know, the tools were chosen to

2    help address some of the questions.

3         Q    Let's focus on the learning assessment --

4    A    Okay.

5         Q    -- based upon your review of -- what was your

6    opinion as to the -- the -- the choices of the

7    assessment given the -- the suspected disabilities?

8    A    Okay.  Again, my first comment was I thought it

9    was very comprehensive and that I was glad to see that

10   not only were standardized tests reported which was the

11   Woodcock-Johnson test of achievement, but there was

12   ~~also   there were some other instruments used.  Plus~~

13   there was a very good functional assessment done,

14   meaning that, you know, we're looking at how kids -- a

15   point in time when they're being assessed.  So you --

16   you go through a -- a testing session and the results

17   are -- the -- the best assessment tools we have during

18   a learning assessment.

19        And -- and all assessment, you know, is not

20   perfect but then -- but also -- did a very good, nice

21   job of looking at how she was functioning in the

22   classroom, what her grades were on her report card,

23   what her -- how she had done on the State -- the New

24   Jersey "ASK."

25        Q    Okay.

Williams - Direct                    40

1    A    And the various assessments.  So it was

2    comprehensive in my -- to my thinking that they had not

3    just relied upon the assessment results which were done

4    in April -- on April 1st and April 8th, but a

5    comprehensive look at her entire functional skills.

6         Q    So were you satisfied with the --

7    A    I was.

8         Q    -- with the choices of assessment tools?

9    A    Yeah.  My first -- honestly, my first thought was

10   why the Gray Oral Reading Test but it was selected

11   because that was a concern that was expressed with her

12   reading fluency.  And so that again, you have a choice

13   of what instruments do you use?  We typically don't

14   want to test children for hours and hours and hours, we

15   select what we thinking will get the -- the most --

16   that will be the -- give us the most knowledge, the

17   best results in terms of what we -- addressing the

18   issue.

19        Q    Okay.  How about the -- again, based upon

20   records review, you didn't talk to any of the child

21   study team?

22   A    No, I did not.

23        Q    Correct?  Based upon your review of the

24   records --

25   A    Right.

1      Q      -- was there any kind of concerns in your

2    mind as to the manner in which the tests were

3    administered?

4    A      No.  I did not see anything that would not be --

5    that I would consider irregular.  I thought they were

6    -- they were fine.  They were done well.

7      Q      Okay.  The -- on the learning assessment as

8    well, was there anything found of a concern in terms of

9    how the test results were interpreted?

10   A      No.

11     Q      Okay.  Same questions regarding the

12   psychological evaluation.  Any concerns about the tests

13   that were chosen to be administered and the -- the

14   manner in which they were administered?

15   A      No.  None.

16     Q      Okay.  What's the -- given all the assess-

17   ments and the -- the material that the team had based

18   upon your review, the team reached a conclusion

19   regarding -- that H.M.'s not eligible.  Do you agree or

20   disagree with that decision?

21   A      From the information that I saw I would agree.

22     Q      Okay.  Why -- why do you agree with that?

23   Why do you believe that it was a proper determination?

24   A      Well, I thought that they did a very comprehensive

25   assessment and that they had not just, and I'm

Williams - Direct                                    42

1    restating this, that they had not just included the

2    information that came from that assessment session,

3    that they really had taken a look at how this youngster

4    was functioning in the classroom, what her teachers had

5    to say.  There were teacher interviews, both special ed

6    and general education teachers.  They looked at those

7    indicators as in the -- you know, the New Jersey ASK.

8        They looked at which would be the measure of the

9    core curriculum content standards and she had met all

10   of those.  She was doing well with that.  She was

11   earning A's and B's on her -- on her report card and

12   ~~thought that, you know, the question in eligibility as~~

13   -- as I see it is that not is this child perfect at

14   this point, not are all skills -- but is this an

15   educational disability?

16       Q    Okay.  Tell us about that.

17       A    Well, you can have kids who have issues that are

18   --  or concerns or strengths and weaknesses, and I

19   would submit that all children, all people have

20   strengths and weaknesses.  If all of us were assessed

21   at this point, there are things that we do better than

22   others.  And any time that you do an assessment of a

23   youngster, we recognize that our decision is, does this

24   child require special education in order to progress

25   appropriately and as we would expect them to do in

1      their grade level?

2           So that while there can be issues that are still

3      existing as in specific skills that the child has, the

4      question becomes is special education required or is

5      there an educational disability?  And I think that's

6      one of the most weighty decisions that we make because

7      as a -- someone like myself and I'm sure other -- other

8      people that do the same thing I do is we want the best

9      for every child.  We want the -- we want the child to

10     have all the supports they need in order to be

11     successful.

12          And in my experience when we see a child who has

13     been successful and who is progressing and all of our

14     indicators say that they are progress, that it's an

15     opportunity to say, "This is terrific, this is

16     wonderful, let's celebrate this success," and also say

17     to the child that "You've worked very hard," and

18     there's all indications that from what I've read that

19     H.M. is a hard worker, she's very motivated, she tries

20     hard and that she indeed has been able to -- to

21     progress nicely in a great, appropriate way.

22          So are there other things that could be -- that

23     she could benefit from?  Perhaps, and I know that, you

24     know, Haddon Heights has other services.  Is there an

25     educational disability?  And my conclusion was in

Williams - Direct                          44

```
 1      looking at what the team had provided, what the

 2      background information was, is that it was not to the

 3      degree that required -- educational disability that

 4      would require special education.

 5          Q    Now you mentioned a St. Joe's assessment.  I

 6      believe you testified that that was performed after the

 7      team's decision --

 8      A    I would have --

 9          Q    -- had been reached?

10      A    Yeah.  That was done May 2nd and the team

11      recommended -- the date of -- well their evaluations

12      were done in March and April.

13          Q    Let me ask you this.  Do you know whether the

14      team had the St. Joe's evaluation in its hands when it

15      made its decision to declassify H.M.?

16      A    I do not.  I have no certainty that they did.

17          Q    Okay.  Given that response, do you -- is

18      there anything you can recall in the St. Joe's

19      evaluation that made you take a second look or would

20      cause you to second guess the team's decision?

21      A    No.  What I saw, and as far as having written many

22      reports myself is that, you know, you -- you include

23      all of the information, all of the child's behaviors,

24      all of the test results, and what I saw is the bottom

25      line was that she would benefit from instruction at
```

1    fifth grade level which -- which she was -- which she

2    was doing at this point.

3         Her I.E.P. was -- she was included in a general

4    education fifth grade setting.  She was getting pullout

5    support from the special ed teacher, which support is

6    not primary instruction.  Support is just some

7    additional help.  But not -- her -- primary instruction

8    was coming -- was being delivered in fifth grade.

9         Q    Was that relevant in terms of the -- the --

10   the scope or degree of services that were -- that was

11   in H.M.'s IEP, fifth grade.  Was that a determination

12   ~~in terms of eligibility?  Was that a factor, how much~~

13   support she's getting?

14   A    Oh, I think something has to be considered, it's

15   just that, you know, you would not take a youngster

16   whose entire program is being provided in special

17   education and suddenly withdraw that -- that

18   instruction.  But the fact that our goal is to educate

19   youngsters within the least-restrictive environment so

20   that we would like them to be in -- in general

21   education for as much of the time as they can be

22   successful.  And H.M. was being successful with -- with

23   a half hour a day, I think, of support.

24        Q    Okay.  You made some recommendations that --

25   in your report.  I think -- is a bad word.  You talked

Williams - Direct                          46

1    about -- your last paragraph.

2    A    Okay.

3         Q    You talked about her specific areas of

4    strengths and weaknesses.  Do you recall what those

5    strengths and weaknesses are?  You may -- H.M. is not a

6    perfect student.

7    A    I haven't met a perfect student yet.

8         Q    Right.

9    A    No.  I thought certainly her strengths, she has --

10   she's achieving, she's doing what's expected of her as

11   a fifth grader, you know, just -- although I didn't

12   ~~meet H.M., the fact that's motivated, that's she's a --~~

13   she's a -- she works very hard, you know, she gets

14   credit for that.  Does she have some areas of -- that

15   she could benefit from?  I never like to see a child

16   removed from services when there's not something put in

17   as a fail safe or as a -- you know, we think of it as,

18   you know, what's going to take the place of what she's

19   -- of what she is currently receiving because in this

20   case we don't want to withdraw some help that -- that

21   she may need.

22        There are other services available in general

23   education.  You know, there's reading -- reading

24   specialists, people who have special training that

25   area.  Classroom teachers are -- are having to take on

Williams - Direct                                    47

1       increased amount of differentiation in their

2       instruction because we know that kids are certainly

3       what is average is a huge range.  You know, if we look

4       at percentile scores between the 25th and the 75th

5       percentile is -- is average.  So all children are not

6       reading and doing things at the same level at the same

7       time.

8           Q    In a -- in a typical fifth grade class, there

9       is --

10      A    Yes.

11          Q    -- various levels of readers?

12      ~~A    Yes.  Absolutely.  It's a huge task for teachers~~

13      but they -- we've -- you know, I think we're developing

14      the kinds of instructional materials, the kinds of

15      training for teachers that will allow them to do that.

16          Q    Do you know if H.M. received any type of

17      accommodations on her New Jersey ASK report that they

18      -- and -- what level?

19      A    Honestly, I don't recall that there was anything

20      that was -- that I saw that that would have indicated

21      that she was given any kind of accommodations.  There

22      could have been.  I may have missed it.

23          Q    Okay.

24      A    Oh, I was going to say I think she had been

25      consistently through fourth and fifth grade.  I saw a

1   consistent pattern that indicated, you know, she is --

2   she was able to get a handle on and meet those

3   benchmarks.

4        Q    Would it affect your opinion one way or

5   another if the evidence suggested that H.M. received

6   very little support, very little accommodations from

7   the New Jersey ASK?

8   A    Well, there are youngsters who -- who even through

9   a 504 plan can be given some accommodations, so not

10  really.  No.  Not --

11       Q    Okay.  All right.

12                 MR. BENTLEY:    I'm -- I'm -- I think I'm

13  pretty close to finishing, Judge.  I just -- do you

14  want me to just --

15            THE COURT:    Right.  Off the record or --

16            MR. BENTLEY:    No.  We can --

17            THE COURT:    Okay.

18            MR. BENTLEY:    -- that on.

19            THE COURT:    Sure.

20  BY MR. BENTLEY:

21       Q    Did you receive any directions or

22  instructions from Mr. Rafferty or anyone else from

23  Haddon Heights regarding what your final determination

24  should be?

25  A    My recollection was I was just asked to render an

Williams - Direct                          49

1    opinion, whatever that be.  It didn't -- an honest

2    opinion of what I -- I was -- I thought.

3         Q    The -- are you familiar with the term "severe

4    discrepancy," I assume?

5    A    Yes.

6         Q    What is that?

7    A    Well, it's -- it's the current system that we're

8    using and continue to use in New Jersey, although there

9    is -- there is movement throughout the country that

10   there would be another way of looking at things that --

11   a learning disability is determined by a severe

12   discrepancy between a youngster's academic abilities

13   and their potential for learning which would -- we

14   think of as cognitive or intellectual abilities.

15        Q    And did you -- do you recall, based upon your

16   record review whether or not there was a finding of any

17   severe discrepancy with H.M.?

18   A    I looked at this as -- in terms of a severe

19   discrepancy is that the other caveat that I didn't

20   mention is that there also needs to be an educational

21   deficit.  There needs to be -- you could have a severe

22   discrepancy, you can have 135 I.Q. and be -- depending

23   on how you -- how you define "severe," every district

24   has a different method of -- of -- or a different -- is

25   it one standard deviation?  Is it one and a half?  Is

1   it two standard deviations?

2        Q    Right.

3   A    So if I had a -- if a youngster had a 135 I.Q. but

4   yet was achieving at 110, say, achievement, there might

5   be a difference, however, there's no educational

6   disability because everything is within the average

7   range.  Okay.  So I looked at it from those lense and

8   looking at it is that she continues to demonstrate on

9   all indicators at least average ability achievement in

10  relationship to, you know, her expectation.  I believe

11  in the last evaluation, psychological evaluation, that

12  ~~her intellectual ability was within the high average~~

13  range.

14       Q    And her ability was -- strike that.  Back up.

15  In terms of looking at her intellectual ability, what

16  scores are you looking at, if that's the right term?

17  A    Right.  I'm looking at the Wexler Intelligence

18  Scale for Children that was -- the fourth edition that

19  was administered March 31, 2008 by Mena Maddie, of

20  which her full scale I.Q. was 114.

21       Q    And that you say was in the high average

22  range?

23  A    That's the high average range.  Yes.

24       Q    Anything -- compare that with what?

25  A    With the information that was in the learning

Williams - Direct                          51

1    assessment which would indicate that again we have many

2    different scores.  You have to sort through this.  That

3    she's also within the average range with -- for her

4    basic reading skills and -- and broad reading, math,

5    broad math, broad written language all were within the

6    average range.

7         Q    And how does the functional assessment that

8    we talked about, the classroom teachers, the

9    standardized testing, the New Jersey ASK, how does that

10   --

11   A    I thought that was --

12        Q    -- into the equation?

13   A    -- even stronger supporting information because I

14   don't believe we can just look at the discreet numbers

15   for a significant discrepancy.  I mean, that -- that --

16   I think that's one test we can go through but then we

17   look at how is she functioning.  And that was even --

18   my way of thinking, you know, she's earning A's and B's

19   in her major subjects in her report card, she's passing

20   all indicators that are set by the State of New Jersey,

21   and again she's -- you know, she's -- she's moving

22   along very nicely.

23        Q    Do you recall reviewing the Lindamood Bell

24   assessment?

25   A    I did see that.  Yes.  That was done, but I don't

Williams - Direct                                    52

1    recall when that was completed, the day in which it was

2    completed.

3         Q    Do you recall any type of -- of information

4    from the Lindamood Bell assessment that would be

5    contrary to what the team's findings were?

6    A    I -- I would have to know who -- who -- who

7    administered the Lindamood Bell.  What -- what was --

8    who was the -- was there a report?  In order to recall

9    that --

10        Q    You -- you don't recall right now what that

11        --

12   A    No, I don't.

13        Q    Do you recall that -- any kind of red flags

14   being raised regarding the Lindamood Bell report?

15   A    I -- not to my knowledge.  No.  And I guess I have

16   to preface that by saying that any time we evaluate a

17   child we get many over time, we get a lot of indicators

18   of where that child might be academically or whatever

19   area we're looking at and that while -- I think we have

20   -- we have to use multiple measures in order to, you

21   know, we have to look at the big picture and try to say

22   given all the data we have, what's the consistent

23   pattern here?

24        We can all have bad days, we can all have good

25   days where we are over achieving or we just did

1      exceptionally well, but looking at the big picture at

2      the multiple measures.  But I don't recall -- I can't

3      -- I can't recall anything that would be specifically

4      concerning from the Lindamood Bell.

5          Q    And you're looking at that big picture, that

6      global --

7      A    Well I'm looking at multiple measures of

8      indicators and as I -- as I tell students we never make

9      decisions based on one piece of data.  You know, we

10     have substantiate that across time and look at, you

11     know, you develop hypothesis.  Especially initial

12     evaluations, you develop a hypothesis and then -- but

13     then you look to support that so that you're not making

14     a decision about a child based on one piece of

15     information, one assessment, you're looking for

16     patterns, and is that pattern -- what -- what is the --

17     what does that tell you about what the child's needs

18     are.

19         Q    And again, based upon your review of the team

20     looking at all that information and its determination

21     of eligibility, do you concur with that decision?

22     A    I do.  I thought that the -- the ultimate, you

23     know, the evaluation, the re-eval was done in March --

24     in April of 2008 was very comprehensive.

25         Q    And -- and the results?

Williams – Cross                                    54

1    A      I agreed with.

2              MR. BENTLEY:    Nothing further, Judge.

3    Thank you.

4              THE COURT:   All right.  Do you need a few

5    minutes or do you want to get into cross?

6              MS. REISMAN:   Five minutes?

7              THE COURT:   Fine, I can use it also.  Five.

8              MR. BENTLEY:    And we can talk about the --

9              THE WITNESS:   Can I ask -- this?

10             THE COURT:   Yes, certainly.

11             THE WITNESS:   (Laughing.)

12             THE COURT:  We'll go off the record.

13                         (BRIEF RECESS)

14             THE COURT:   All right.  We're now back on

15   the record.  Counsel, you may cross examine.

16   CROSS EXAMINATION BY MS. REISMAN:

17       Q    Dr. Williams, you're not a reading

18   specialist, correct?

19   A    No, I'm not.

20       Q    I'm sorry.

21   A    No, I'm not.

22       Q    So your area of expertise is in school

23   psychology which -- rely on the assessments done by

24   others to determine eligibility?

25   A     No.  School psychologists also can assess in the

1    area of reading and are trained to do that.  I've been

2    trained on a national model so it's only the State of

3    New Jersey where school psychologists really don't do

4    direct assessment of reading.  In any other state they

5    would.  So my responsibility and also being training

6    students who are -- graduate students, is to train them

7    in the full scope of assessment.  But no, I'm not a

8    reading specialist but I know a lot about reading.

9         Q    You're not -- you're not certified in -- to

10   do reading assessments in New Jersey?

11   A    Not specifically.

12        Q    And in terms of this particular case you

13   didn't do any assessments?

14   A    I did not.

15        Q    Did you?

16   A    No, I did not.

17        Q    So you relied upon the data that were given

18   to you?

19   A    Yes, I did.  Yes, I did.

20        Q    And your completion -- only be -- state?

21   A    Correct.

22        Q    And as a school psychologist you are aware of

23   the importance of fluency in reading, correct?

24   A    Yes, I am.

25        Q    And in fact the New Jersey Administrative

Williams -- Cross                              56

1      Code that --

2      A      (Shuffling papers.)

3             Q      -- defined a specific learning disability

4      when there's a discrepancy between ability and

5      achievement, specifically in reading fluency, is that

6      correct?

7      A      That has been added.  Yes.

8             Q      Yes?  That has been added?

9      A      Hmm-hmm.

10            Q      So -- and that was added recently after 2004?

11     A      Hmm-hmm.

12            Q      Yes?

13     A      Yes.

14            Q      Sorry.  (Laughing.)  And while it's true that

15     the ability to read orally in front of a class is -- is

16     not the ultimate goal in assessing fluency, we do need

17     to assess fluency for readers, correct?

18     A      Yes.

19            Q      And would you agree that fluency is the

20     accurate, rapid, expressive oral reading that's applied

21     during and makes possible silent reading comprehension?

22     A      That would be one definition.  Sure.  Yes.

23            Q      Do -- do you have a different definition you

24     would use?

25     A      No.  It's been defined, I think, a variety of

Williams - Cross                                        57

1     ways.  The accurate piece is very important because,

2     again, we can have people who can read rapidly but not

3     accurately.  So it's a combination of speed and

4     accuracy.

5          Q    And the reason that speed and accuracy is

6     important is that you need automaticity as you go to

7     higher levels in comprehension, correction?

8     A    Yes.

9          Q    And that --

10              THE COURT:    What is that word?

11    Automaticity?

12              MS. REISMAN:    Automaticity.

13              MR. BENTLEY:    Is that a word?

14              THE WITNESS:    Yes.

15              MS. REISMAN:    It is a word.

16              THE WITNESS:    It is a word.  It is.

17              MS. REISMAN:    (Laughing.)

18              THE WITNESS:    The automatic -- performing

19    automatically.  You can say the alphabet automatically.

20    You have it at the automatic level.

21    BY MS. REISMAN:

22          Q    And -- and the reason that's important is

23    that although we're able to do things we alternate our

24    attention between one activity and another, as in

25    reading we can alternate between trying to decode and

Williams - Cross                              58

1    trying to comprehend.  That's correct, right?

2    A    Hmm-hmm.

3         THE COURT:    That's -- you have to answer

4    "yes" or no."

5         THE WITNESS:    Yes.  Oh, sorry.

6         MS. REISMAN:    (Laughing.)

7         THE WITNESS:    Yes.

8    BY MS. REISMAN:

9    Q    But as you get to higher level text you need

10   the decoding to be more automatic in order to

11   comprehend, correct?

12   A    If you're unfamiliar with the word.  If you are --

13   many times what happens with good readers is that --

14   you know, and we say this is just the, you know, the

15   process of learning to read is that, you know, you use

16   your decoding skills when you come to an unfamiliar

17   word.  Many times the automaticity is just you know it

18   by sight because you've read it many, many times

19   before.

20   Q    And then students move into fourth and sixth

21   grade, the middle school grades, isn't it true they --

22   they see a large number of new words every year?

23   A    Yes, they do.  The estimate is -- is huge and

24   typically that's why any kind of lesson that is taught

25   in science or social studies it usually begins with

Williams - Cross                           59

1    vocabulary because this would be something that would

2    not have been introduced in a typical reading

3    instruction.  So we begin with new words so that when

4    you meet them in the course of reading you are able to

5    be familiar with them.

6         Q    Okay.  Is it like on the order of 10,000 new

7    words, would you say?

8    A    Yeah.  I've seen certainly even -- if I had my

9    Powerpoints with me I could tell you.  It's a lot of

10   new words that kids have to incorporate.

11        Q    Okay.  And isn't -- isn't it the automaticity

12   of decoding a critical component of fluency?

13   A    It helps you read more quickly.  But again, as

14   kids -- as children become more proficient readers it's

15   less the deliberate use of skills it's more that the --

16   you know, that the familiarity.  That's why when

17   children are read to, when children practice reading

18   that -- that the reading skills typically, that's how

19   we improve readings kills by practice and exposure.

20        Q    All right.  And you're expected by fifth

21   grade to have a certain level of fluency, correct?

22   A    There would -- it would be make reading easier.

23   It would -- and I think that if you're still relying

24   upon your decoding skills to do that it does slow you

25   down.

Williams - Cross                              60

1        Q     If you're -- if the way you're reading when

2    you're in fifth grade and sixth grade, the -- those

3    level -- and the way that you're reading is still using

4    those early strategies of going back and trying to

5    figure out the context or doing actual decoding, that

6    is -- that's -- that will slow you down?

7              MR. BENTLEY:     Judge, I'm going to object.

8    I'm not -- I'm not seeing the relevancy of discussions

9    regarding speculative natures of what's happening in

10   sixth grade or even in fifth grade.   I mean, this is

11   all very nice academically, I'm not sure how it's going

12   to help you in your approach of whether the decision

13   made in May of 2008 was a proper decision.   You know,

14   how many words are going to be in sixth grade?   How

15   many new words is there going to be, the -- skills and

16   what they have in sixth grade.   I'm not sure where

17   we're going with this, Judge.

18             MS. REISMAN:     In May of 2008 the team

19   determined that H.M. did not have a discrepancy in the

20   area of fluency and I think that the -- the need to be

21   able to be a fluent reader to achieve what's necessary

22   to achieve functionally in school is absolutely

23   relevant.

24             MR. BENTLEY:     Judge, the team determined

25   that H.M. is not eligible for special education and

Williams - Cross                              61

1      related services.  The determination of whether there

2      was a severe discrepancy is one part of that -- of that

3      equation.  So I -- I disagree with -- with an

4      objection.

5                THE COURT:  All right.  (Clearing throat.)

6      I -- excuse me.  I think Counsel is inquiring into an

7      area which may -- which may be theoretical in nature in

8      -- in order to make a point and I'll permit her to

9      continue, again, to a point.  (Laughing.)  Objection's

10     overruled.

11               MR. BENTLEY:    Thank you.

12               ~~MS. REISMAN:    Excuse me one second.  I just~~

13     need to --

14     BY MS. REISMAN:

15         Q    Would you agree that progress in reading

16     beyond -- stages is dependent upon reading words

17     fluently and is dependent on familiarity with the words

18     in their oral form?

19         A    Familiarity with words in their oral form.  I --

20     it's not typical language that we would use.  Dependent

21     upon the rate and accuracy of your ability to decode

22     words.

23         Q    And how do you measure someone's rate of

24     accuracy of the ability to decode words?

25         A    It's a variety of ways, but typically if you're

Williams - Cross                    62

1    doing it on a -- as we talked about earlier if you're

2    doing it as a progress monitoring, in other words, if

3    you're taking those periodic, those DIBELS, dynamic

4    indicator of basic skills without using that particular

5    format, but we're going to ask them to read orally for

6    one minute and then we're going to indicate, we're

7    going to note, as a trained person, you note whether

8    they have been able to read accurately, they pronounced

9    the words correctly and you note how many words per

10   minute they've read within that minute.  And then, you

11   know, we throw out the top, throw out the bottom and

12   look at the middle.  We typically do that, have three

13   indicators.

14       Q    And so in order to determine rate and

15   accuracy --

16   A    (Coughing.)  Excuse me.

17       Q    -- to determine fluency you have to do that

18   orally, correct?

19   A    Yes.  Yes.  And in many of the instruments that

20   were used during the learning evaluation that -- that

21   would be the way it would have been done.  There's also

22   silent reading but we can't -- we don't have a way of

23   listening to that.  We can only ask questions about

24   what the youngster has read in order to determine if

25   they've read.

Williams - Cross                        63

1          Q     Right.  And you can ask questions about

2     whether or not a youngster has read to determine their

3     comprehension, correct?

4     A     Right, and with the assumption is that they would

5     have to have been able to read -- read fluently in

6     order to comprehend.  But silent -- but with silent

7     reading we don't have that evidence.

8          Q     Right.  You can't tell through silent reading

9     how many steps the learner is going through to

10    comprehend?

11    A     Well, if it's timed then we can because what we --

12    whenever a youngster has to -- has to use another step

13    -- close them down.  We can't say that's an error, we

14    just know that at the end of a -- a -- a timed interval

15    that depending on how much they've accomplished, how

16    far they've gotten, that a slower reader is going to

17    accomplish less.  A more fluent reader is going to get

18    through more.

19         Q     Okay.  The -- the assessments that were used

20    in this case were untimed assessments, were they not?

21    A     It depends on which -- what you're using.  If

22    you're using -- if you're looking at some of the

23    informal measures they were probably timed.  If you're

24    looking at the -- the information in the learning

25    evaluation they would have been untimed.

Williams - Cross                        64

1            Q      So the results in --

2     A      For the eligibility.

3            Q      -- in Ms. Woodland's report --

4     A      Correct.

5            Q      -- those were based on tests that were not

6     timed?

7     A      To my recollection.  Yes.

8            Q      So the -- the -- the learner would have time

9     to do whatever was necessary to extract meaning from

10    the text, correct?

11    A      As far -- yes.  As far as I recall.

12           Q      And that wouldn't give you   that wouldn't

13    give you information about how fluent she was if it was

14    an untimed test?

15    A      No.  If you're looking at ready fluency then

16    you're going to have to measure it the same way that we

17    talked about before with rate and accuracy.

18           Q      And you can only do that orally?

19    A      That's the most effective way of doing it.

20           Q      Or -- or you could do it -- are you -- what's

21    the other way you can do it, if not orally?

22    A      Well, the -- the only -- the only -- I would say

23    that probably orally would be the most effective way of

24    doing it otherwise you would have a lot of information.

25    You have to make some -- some judgment based on if you

Williams - Cross                    65

1     can't hear the child read.  Yet we understand that not

2     all kids are -- are good oral readers.  They -- they

3     get nervous.  Other things interfere when they're asked

4     to perform kind of on -- on cue.

5          Q    In rendering your report I believe you said

6     that you testified that one of the -- was -- was the

7     functional information in the evaluations that you were

8     given by the District, is that correct?

9     A    Yes.

10         Q    And that includes the -- both the psycho-

11    logical assessment and the learning assessment?

12    A    Actually, the learning assessment was probably, I

13    think, had more relevant information in terms of

14    achievement.

15         Q    Okay.  Did you rely upon the information in

16    the assessments that H.M. was -- independently at the

17    fourth grade level?

18    A    I'm not sure which assessment you were referring

19    to.

20         Q    That's R-32.

21              MR. BENTLEY:    The psychological?

22              MS. REISMAN:   Yes.

23              THE WITNESS:   Right.  One of them by Mena

24    Maddie, March 2008.  Okay.

25              MR. BENTLEY:   I'm sorry.  What was the

Williams - Cross                             66

1    question?

2    BY MS. REISMAN:

3        Q    The question was did she rely upon the

4    information -- independent -- grade levels.

5    A    Well, as I recall reading this, and I see here

6    that this was part of the background information so

7    that would be the information which came from --

8    someone reported to -- it was not directly assessed by

9    Ms. Maddie.  H.M.'s classroom teacher and resource

10   teacher note that H.M. is a motivated, social young

11   woman.  She participate independently and completes --

12   work.  Maybe --

13       Q    I'm asking -- I'm looking at -- if -- if that

14   weighed at all in terms of your determination --

15   reading level -- grade?

16   A    Honestly, that did not weigh as much as the

17   information that was reported in the St. Joe's report

18   because that was a reading assessment that was directly

19   done by, you know, a reading specialist and the other

20   was information more -- anecdotal information coming

21   from the teacher.

22       Q    Okay.  You -- and that's the critical reading

23   -- report?

24   A    Yes.

25       Q    Have you ever administered the critical

Williams - Cross                          67

1    reading --

2    A    No, I have not.  It's not a widely administered --

3    it's one I believe that the woman who -- who -- who

4    evaluated H.M., it was her mentor, her professor who

5    developed it.  So it may be specifically used in that

6    area but I'm not -- I have never administered it.  No.

7              THE COURT:   You've never (clearing throat)

8    -- never what?

9              THE WITNESS:   I've never administered it.

10             THE COURT:   Thank you.

11   BY MS. REESEMAN:

12        Q    Have you -- have you read a number of CRI,

13   Critical Reading Inventory reports?

14   A    No, I have not.

15        Q    So you relied upon the information there?

16   A    Well, again, I would say that this was part of the

17   pattern that I saw that she was -- when she was

18   functioning in a fifth grade classroom and doing well,

19   A's and B's on her report card, seemed to be responding

20   well to the intervention and the instruction that her

21   teachers were giving her.  So I was just -- again, it

22   was more consistent with what the full picture of H.M.

23        Q    Given your lack of experience with the CRI

24   would you feel comfortable basing conclusions about

25   H.M.'s reading ability on the results of that

                              Williams - Cross                    68

1    instrument?

2    A    I have no reason to doubt the credentials of the

3    person who administered it.  I have respect for

4    colleagues who are, you know, trained and -- and in

5    their field of expertise.  But again, it was consistent

6    information.  If -- to be as -- to be as successful as

7    she's been in -- in her grade level placement it did

8    not surprise me that that -- that fit in with all of

9    the other information I was getting in terms of -- in

10   order to be successful in the fifth grade with the

11   material she was being taught, she would need to have a

12   degree of competency at that level.

13        Q    And did you -- did you speak to the person

14   who administered the CRI?

15   A    I did not.

16        Q    And you -- you've never spoken to the

17   individuals who designed the CRI, correct?

18   A    I have not.  No.

19        Q    And would you defer to the interpretation of

20   the person who administered the assessment as to what

21   it meant in terms of reading --

22   A    I had no reason to doubt the credibility and the

23   credentials of the individual.

24        Q    So you would defer to that person?

25   A    Unless I found other -- other information that

Williams - Cross                                  69

1    would suggest that they -- you know, that I should

2    question it.  I -- I had no reason not to do that.

3         Q    You indicated that you reviewed a diagnostic

4    reading assessment?

5    A    There was something in her file.

6         Q    Did you review one diagnostic reading

7    assessment or two?

8    A    I believe there were two, but again I would have

9    to take a look at that again.

10        Q    And the -- I believe you said the diagnostic

11   reading assessment is a progress monitoring tool,

12   correct?

13   A    It's the developmental reading assessment.

14        Q    Oh, I'm sorry.

15   A    Yes.  Yes.  Yes.  But DRA is typically -- referred

16   to.  Yeah.  Yes.  It informs instruction typically done

17   by the teacher in order for the teacher to have a sense

18   of how -- to establish goals and -- and objectives for

19   reading instruction.

20        So again, there are different levels of --

21   teachers are trained to do a certain level of -- of

22   assessment and then you move up to, you know reading

23   assessments.  People are trained to do reading

24   assessments, people are trained to learning

25   evaluations, psychological.  You know, it's all at

Williams – Cross                                70

1    different levels of expertise but it's a commonly used

2    method by teachers.

3        Q    And the teachers are trained to use the --

4    A    Dibbles.

5        Q    The developmental reading assessment to

6    monitor progress, correct?

7    A    And to inform instruction.

8        Q    And -- and to inform instruction.  And are

9    you familiar with the term "inter-rater reliability"?

10   A    Yes.

11       Q    And how is -- how do the authors of an

12   instrument such as the developmental reading assessment

13   ensure inter-rater reliability?

14   A    It -- as they would in any --

15       Q    Let's back up.  What is inter-rater

16   reliability?

17   A    Inter -- inter-rater reliability means that if you

18   have a standard of training that every person -- if --

19   if every person in this room were trained a similar way

20   and we held to that training protocol and to assess

21   whatever it might be we should get similar results

22   because we are following a standardized method.  So

23   that we look for -- for example, in an -- an

24   experimental study, if we were doing an experimental

25   study of children's reading abilities we would look for

Williams - Cross                                    71

1      high inter-rater reliability such as it wasn't

2      dependent upon the rater, the variabilities were not

3      dependent upon the rater, rather that the variabilities

4      would be dependent upon the actual performance of the

5      youngster.

6              Q       And do you know how the authors of diagnostic

7      reading assessment ensure inter-rater reliability?

8      A       Well, as a -- as a more informal measure if there

9      are less stringent criteria -- criteria for it because,

10     for example, and I'll go back to what I do which is

11     training students to do psychological evaluations, is

12     ~~that we have to ensure a high degree of standardization~~

13     because the variability should never be -- for example,

14     with an I.Q. test or any kind of assessment the -- the

15     difference is not whether I give it or another school

16     psychologist gives it, that -- so the higher degree of

17     training, the more specified the training, the more

18     degree we have of confidence in that person.

19             Q       So with a -- with the developmental reading

20     assessment the teachers are expected to basically

21     follow the directions on the form?

22     A       Yes.  And it would depend on what kind of

23     instruction they have had, what kind of supervision

24     they have had, what kind of feedback they've gotten as

25     to -- and -- and I'm not aware of the individual

Williams - Cross                                    72

1    teachers and what that would have been.

2         Q    What do you mean it would depend on what kind

3    of instruction?

4    A    Well, if I'm in --

5         Q    It would depend on the instructions the

6    teachers have had?

7    A    Yes.  The teachers are -- are trained in -- and

8    once you are -- once you're a certified teacher you

9    have in service training, you have professional

10   development and typically what happens when there's a

11   new skill that a teacher is going to be using there has

12   to be training on that.  So again, was that training

13   that was given with a lot of degree of supervision,

14   with a lot of degree of feedback.  The more -- the more

15   effort that's put into that the more reliable it's

16   going to be because you may interpret it somewhat

17   differently than the person sitting next to you.  The

18   more frequently you do it the better you get at doing

19   it.

20        Q    I'm going to hand you what's previously been

21   marked P-8.

22              MR. BENTLEY:    Is it --

23              MS. REISMAN:    Yes.  It's --

24              MR. BENTLEY:    DRA?

25              MS. REISMAN:    DRA.

Williams - Cross                    73

1    BY MS. REISMAN:

2         Q    Did you review P-8 in preparing your report?

3    A    Hmm-hmm.

4         Q    Yes?

5    A    Yes, I'm sorry.

6         Q    And this was a -- this was a DRA administered

7    by -- it -- it states on the document administered by

8    -- and -- correct?

9    A    Hmm-hmm.

10             MR. BENTLEY:    You have to say "yes" or

11   "no."

12             THE WITNESS:    Yes.

13             MR. BENTLEY:    We can't hear the --

14             THE WITNESS:    Slow learner.   Yes.

15   BY MS. REISMAN:

16        Q    And at the top of that the note says that

17   she's at a beginning second grade reading level but a

18   fifth grade -- level, correct?

19   A    That's what I'm reading.   Yes.

20        Q    So this DRA established a second grade --

21   beginning second grade level, correct?

22   A    I would say this was one indicator, but again I'm

23   not -- in my record review, and there were many other

24   indicators that -- that there were -- that in this

25   particular time she may not have done as well, and that

Williams - Cross

74

1    was a notation made by the examiner, Linda or Al

2    Gutfreund (phonetic), and it made -- but I would not

3    accept that as that was the definitive reading level at

4    this point because of the nature of the instrument.

5    It's more of a screening device.  It's more of a

6    progress monitor.  She did -- I'm sorry.

7        Q    Go ahead.

8    A    I was going to say as I look at the results of

9    this, you know, she did rather well in this particular

10   area but I don't have an indication of what she would

11   have done in a more difficult passage, you know, a

12   third grade passage.  If this was -- she said second

13   grade reading level.

14       Q    Okay.

15   A    Are we looking at then a different -- either a

16   follow up assessment or a different assessment on --

17   before I would accept that.

18       Q    And when you say this is a screening device,

19   it screens this device -- this particular device is

20   designed to screen for both fluency and comprehension,

21   correct?

22   A    Yes.  Reading -- oral reading fluency is measured

23   and then they have the number of words, number of

24   miscues and then there were -- where she had to answer

25   some questions about what she had read.  And then it

1    there was some written.  And after reading she had to

2    write a summary or a retell of what she had read.

3         Q    So when the examiner follows the directions

4    on the instrument they should get an accurate picture

5    of both comprehension and fluency, correct?

6    A    Assuming that -- yes.  Assuming that if they

7    followed the directions.  That's what we don't know.

8         Q    I'm now going to hand you what's been marked

9    as exhibit R --

10   A    Okay.  Which looks to have been done --

11        Q    R-11 is --

12   A    January 22nd.

13        Q    January 22nd.  It's another DRA.  Do you want

14   to take a minute to look through it?

15   A    Okay.  (Shuffling papers.)  Okay.

16        Q    Did you -- have you had a chance to look at

17   R-11?

18   A    Yes.  I skimmed it.

19        Q    And did you review R-11 when you were

20   rendering your report?

21   A    Yes.

22        Q    And if you look at the second page of R-11

23   there's a -- at the bottom there are instructions for

24   the person who is administering the evaluation,

25   correct?

Williams - Cross                              76

1    A    You're referring to "Use the student's oral

2    reading time to circle the words per minute?"

3         Q    Yes.  Yes.

4    A    Okay.  Yes.

5         Q    And then it says, "Count the number of

6    miscues that are not self-corrected."  And then right

7    below that what does it say?

8    A    Below the -- the grid there?

9         Q    Yeah.

10   A    Yeah.  "If the students were false in one or both

11   of the shaded areas below stop this assessment, assess

12   with a lower DRA, too.  Next level at another time."

13        Q    Reassess with a lower DRA to text level at

14   another time.  So you're supposed to drop down to --

15   A    Right.

16        Q    -- another text level if the student has

17   miscues or words per minute that fall in the shaded

18   area.  And H.M. had 12 or more miscues, correct?

19   A    Correct.  Yes.

20        Q    Okay.  In fact, if you turn to the next page

21   she had 22 miscues that were not self-corrected.

22   A    Yes.

23        Q    She had six miscues that were self-corrected.

24   A    Yes.

25        Q    Correct?

Williams - Cross                          77

1      A      Yes.

2           Q      And the miscues included omissions,

3      insertions, substitutions of a visually similar -- not

4      visually similar.   Correct?

5      A      Yes.

6           Q      Okay.   And then in the far left column "The

7      student problem solves words using..."   It has -- lists

8      some strategies.   These are strategies you can use if,

9      you know, you don't have automaticity, correct?

10     A      Yes.

11          Q      Okay.   So H.M. was using strategies because

12     she didn't have automaticity with the test?

13     A      It would appear so.   Yes.

14          Q      Okay.   In -- in this case the evaluator

15     continued to administer the assessment, although the

16     instruction on the instrument said to stop the

17     assessment and to reassess with a lower DRA test level,

18     correct?

19     A      Yes.

20          Q      So based on your earlier testimony this --

21     this evaluator didn't follow the instructions, correct?

22     A      Possibly yes.   It appears what she did here is she

23     continued.   I don't know what her level of -- of

24     training in this or -- or to complete a DRA is nor do I

25     know what the other individual's level of training was.

Williams - Cross                                  78

1          Q     Is anyone's level of training going to allow

2     them to actually disregard the actual instructions on

3     the page?

4     A     There is a -- there are times, depending on the

5     person's level of training, when we suggest they test

6     the limits, which means that although you're not going

7     to -- you're not going to continue to give credit for,

8     you're going to continue to administer something in

9     order to see where the youngster -- get more

10    qualitative information.

11         Q     But if you were to test the limits, this --

12    doing that with this instrument would not give you an

13    accurate, independent reading level if you ignored the

14    -- the explicit instruction to stop if there are a

15    certain number of miscues, isn't that right?

16    A     Well, we -- we may not be able again to

17    quantitatively look at that, but we can qualitatively

18    look at because there's a lot of other things that she

19    did beyond this which was written expression because we

20    have some children who did better in one -- on area

21    than the other.

22         Q     I'm not asking about anything but --

23              MR. BENTLEY:   Objection.   The witness is in

24    the middle of responding to the question.

25              MS. REISMAN:   Well, she wasn't -- move to

1    strike.  It's non-responsive.  I asked a very specific

2    question.

3              THE COURT:   All right.

4              THE WITNESS:   Okay.  Would you like --

5              THE COURT:   Sustained.  Sustained.  Why

6    don't you ask the question again.  Listen to the

7    question asked.

8              THE WITNESS:   Okay.

9              THE COURT:   And answer that question only.

10   BY MS. REISMAN:

11        Q    Given that the person administering this

12   assessment did not follow the explicit instructions on

13   the assessment, isn't it correct that you can't use

14   this particular assessment to establish H.M.'s

15   independent reading level?

16   A    (Coughing.)

17        Q    Or would you defer to a reading specialist on

18   that question?

19   A    Perhaps.  But what I'm thinking -- what I'm saying

20   is in general there are times when we do want to get

21   more information while, as I said, testing the limits.

22        Q    Right.  I understand you might want to get

23   more information, but the information you would get

24   wouldn't be her independent reading level.

25   A    We could not look at that in the same way we did

Williams - Cross                              80

1    had -- had -- if -- if the directions were followed to

2    reassess at a lower level then we would look at that --

3    if we did that we would look at that as -- with more --

4    in -- in a way that we originally set out, is what I'm

5    saying.  Okay.

6         If this -- the original -- the original purpose

7    for the DRA was to determine independent reading level

8    frustration and -- and instructional level, okay, so

9    then to inform instruction.  The fact that -- I would

10   not make that completely that if the person disregarded

11   this direction, I think that was what I was trying to

12   answer, the person disregarded the directions, I don't

13   know if it was because she was attempting to test the

14   limits or she just didn't know to stop.  I -- I would

15   need to ask her.

16        Q    But if she was attempting to test the limits

17   it wouldn't give us H.M.'s independent reading level.

18   It might give us other information.

19   A    Yes.  It might tell us --

20        Q    And it would not --

21   A    Help us understand where the difficulties are.

22        Q    Right.  It would not give us her independent

23   reading level.

24   A    If that was the only criteria, no.

25        Q    Now you testified that part of what went into

Williams - Cross                                81

1   your conclusion was the fact that H.M. was getting A's

2   and B's in her classes.

3   A     Part of my -- yes.

4        Q    Do you -- do you have any idea whether when

5   H.M. took tests if she was allowed to retake them?

6   A     I believe I read in the records that part of her

7   resource center support was that she could take -- she

8   could take tests in the resource center which is a very

9   common modification that youngsters are given.

10       Q    Do you know whether she was allowed to take a

11  test, and then if she didn't do well, retake the test?

12  ~~A     I don't recall if I saw that in her I.E.P. but~~

13  that -- that's possible.

14       Q    Okay.  So she -- she was definitely getting

15  the modification of taking tests in the resource

16  center, correct?

17            MR. BENTLEY:    Objection.  She just said she

18  didn't know.

19            MS. REISMAN:    She said she -- said she did

20  know that she was allowed to take tests in --

21            THE WITNESS:    I said it is a common -- it is

22  a common modification.

23            THE COURT:    That was --

24            THE WITNESS:    I don't recall whether I saw

25  that on the IEP or not but it would not surprise me at

Williams - Cross                          82

1     all.

2     BY MS. REISMAN:

3          Q    Okay.  So --

4     A    That's part of --

5          Q    So the grades that H.M. was getting reflected

6     in part the modifications that she was receiving,

7     correct?

8     A    That could well -- well be.  Yes.

9          Q    And then what, in part, whatever instruction

10    she was receiving?

11    A    Absolutely.  Yes.

12         Q    Are you familiar with the New Jersey Core

13    Curriculum Content Standards?

14    A    Yes.

15         Q    And there are Core Curriculum Content

16    Standards that directly relate to reading fluency, are

17    they not?

18    A    Yes.  They're within the language arts literacy

19    component.

20         Q    Okay.  And when you reviewed H.M.'s IEP's you

21    -- I believe you said you reviewed the most recent IEP,

22    correct?

23    A    There were many in the file so I do generally --

24    had looked at them.

25         Q    Did you review all of the IEP's?

Williams – Cross                              83

1      A     Yes, but not with great detail because it was --

2      there were minimal services being offered.

3          Q     Okay.  Did you review the IEP's to determine

4      whether the goals and objectives were in line to

5      current Core Curriculum Content Standards?

6      A     I reviewed the IEP's specifically because in --

7      if a youngster is receiving replacement instruction,

8      meaning that the primary instruction is coming through

9      special education, then -- then the goals and

10     objectives in the IEP should reflect that.  In other

11     words, it's different from -- perhaps based on the Core

12     Curriculum Standards but different from what typical

13     fifth graders are getting.  What I saw was a youngster

14     who was expected to achieve the Core Curriculum

15     Standards of a fifth grader, therefore many of those

16     things do not have to be included in the IEP.  It's the

17     exceptions that have to be included.

18         Q     Right.  And -- and there were some goals and

19     objectives included in the IEP, correct?

20     A     I believe so.

21         Q     I'll -- I'll get you a copy of that.

22     A     Thank you.

23         Q     (Laughing.)  Actually, I have -- got that.

24             MR. BENTLEY:     The --

25             MS. REISMAN:     That's the --

1          MR. BENTLEY:    The offer of proof for --

2          THE COURT:   No.  It is -- it's in evidence.

3          MR. BENTLEY:    But -- but --

4          MS. REISMAN:   2007/2008 I.E.P.

5          MR. BENTLEY:   I understand, but what's the

6    reasons why it's being showed to the witness.

7          MS. REISMAN:   So that she can look at the

8    goals and objectives on the document to refresh her

9    recollection.

10          MR. BENTLEY:   The witness was only offered

11    in terms of the -- and eligibility.

12          ~~THE COURT:   Well, I'll permit it to see --~~

13    I'm not sure what the question is yet.  So --

14          MR. BENTLEY:   Right.  I'm sure it's -- that

15    -- that's what she's being offered for.

16          THE COURT:   And you want her to --

17          MS. REISMAN:   I would like for her to look

18    at the -- under "Reading skills."

19          THE WITNESS:   Which would be?  Right --

20          MS. REISMAN:   There's one -- there's writing

21    and then the --

22          THE WITNESS:   Following that?  Okay.  I see

23    it.

24          MR. BENTLEY:   Again, Judge, I object.  Why

25    is this witness outside the scope of direct?  I never

Williams - Cross                                  85

1     asked her one question about the IEP.  We had other

2     people who testified about the IEP.  We didn't need

3     this witness to determine the IEP.  We didn't ask her

4     to look at the IEP.  It's outside the scope of cross.

5     If they want to call her back and -- her and pay her,

6     that's fine, but --

7              THE COURT:   Well, I want to find out what

8     the question is before I rule on it so --

9     BY MS. REISMAN:

10         Q    Your determination that the decision to

11    declassify H.M. was correct was in part based upon your

12    conclusion based upon documentation that she was

13    achieving consistent with the Core Curriculum Content

14    Standards, correct?

15    A    Yes.

16         Q    Okay.  And in making that determination did

17    you look at the goals and objectives that were aligned

18    to the Core Curriculum Content Standards in the IEP?

19    A    I did not spend a lot of time looking at the --

20    the -- the IEP goals and objectives because she was

21    being -- all of the other documentation was -- in the

22    general ed setting.

23         Q    Did you look at the progress reporting on the

24    goals and objectives in the IEP?

25    A    What I'm looking at right now?

Williams - Cross                    86

1          Q      Yeah.   Yes.

2      A    I don't recall looking directly at this.   But

3      again, the exception to what is not being -- if

4      whatever is being instructed through the special

5      education program should be -- what I was looking, what

6      I would have been more interested in as far -- when

7      determining is this program necessary for this

8      youngster.

9          Q      But isn't the goal that's on her IEP what is

10     being instructed through the special education program?

11     Given the fact that there's a goal on her IEP, doesn't

12     ~~that indicate that she needs -- that's where she needs~~

13     support?

14     A    She is needed -- support by -- by definition is

15     just supporting the general education curriculum.   So

16     that my expectation is that she's following the Core

17     Curriculum Content Standards upon which the goal is

18     perhaps based.   And it says right here, "Goals and

19     objectives benchmarks," but it's -- and I would more --

20     we -- as you know, the Core Curriculum Content

21     Standards are huge.   They're -- you know, we're not

22     going to include them in every child's IEP.   We only

23     include what might be the exception.

24          If a youngster is being supported in special

25     education, instructed primarily in general education,

Williams - Cross                                    87

1      then my -- my belief is that their goals and objectives

2      come from the Core Curriculum Contents Standard.

3           Q     So she should -- H.M. should be meeting all

4      the goals and objectives in the Core Curriculum Content

5      Standards for literacy?

6      A     If she is with whatever supports are being offered

7      to her.  But again, what is -- what is expected of a

8      fifth grader is quite varied from, as I said, 25th to

9      75th percentile.  So we're not expecting all children to

10     be on the same page at the same time.

11          Q     But the Core Curriculum Content Standards do

12     set up minimum levels of expectation for -- for reading

13     fluency, correct?

14     A     Correct.

15          Q     You -- you testified that of particular note

16     to you is Ms. Woodland's report which is the --

17     A     Learning evaluation.

18          Q     Learning evaluation.  That is --

19     A     I don't have a copy of that.  I went to my

20     summary.

21               MR. BENTLEY:    It's not -- it's not up

22     there?

23               THE WITNESS:    No.  I have the psychological,

24     but not the learning.

25     BY MS. REISMAN:

Williams - Cross                                88

1          Q    It's exhibit R-31.

2               MR. BENTLEY:    I --

3               MS. REISMAN:    Oh -- okay.  Oh, yeah, yeah,

4     yeah.

5               THE WITNESS:    Well --

6               MS. REISMAN:    That's -- (laughing) --

7               THE COURT:    Are you going to refer to a

8     specific area or --

9               MS. REISMAN:    Well, she's testified of

10    particular note -- was the learning assessment.

11    BY MS. REISMAN:

12         Q    What in particular in this learning

13    assessment was important to you?

14    A    Whether -- standardized assessment -- standardized

15    assessment that Ms. Woodland had done.

16         Q    That would be the Woodcock-Johnson?

17    A    The Woodcock-Johnson Three, test of achievement.

18         Q    Okay.  Which is a -- and would not tell you

19    anything about reading fluency, correct?

20    A    I -- I don't recall if there's anything timed

21    within that.  It's a -- it's a complete battery and it

22    may say in Ms. Woodland's report.

23         Q    What in particular, besides the Woodcock-

24    Johnson --

25    A    Well the Grey Oral Reading Test.  I think that was

1     selected specifically because of the question being

2     asked.  This was -- this was a -- the instruments were

3     chosen to address the questions and that specifically

4     does, you see that on page five where she's given a

5     series of graded passages and read aloud and then the

6     examiner records the numbers of deviations from print

7     and that made it -- that are made in notes in time in

8     seconds that it takes to read the passage.  So we --

9     that goes to fluency, rate and accuracy are derived

10    from this procedure.

11         Q    Right.  And -- and further down she says,

12    "H.M. experienced difficulty with oral fluency

13    accuracy."

14    A    The paragraph, "Reading sub-tests, received a

15    standard score of eight and eight -- 25 and a grade

16    equivalent score of 5.0."

17         Q    Right.

18    A    Okay.  Because again, the graded passages mean

19    they get more difficult as you go -- as you go along.

20    Am I missing --

21         Q    Keep going down.  "While H.M. experienced

22    difficulty in -- fluency accuracy."

23              MR. BENTLEY:    And the rest of the sentence?

24    BY MS. REESEMAN:

25         Q    "-- be impacted."  Correct?

Williams - Cross                                    90

1     A     Yes.

2           Q     But if your oral fluency accuracy is low it's

3     going to take you longer and reading is more laborious,

4     is that right?

5     A     I think if you say in general, but yet in -- in

6     whatever -- and this is what we don't understand about

7     individual children is how they compensate for the --

8     the areas.  As I said, any -- any of us, any of the

9     weaknesses that we might have.  The bottom line was

10    that she was able to read and comprehend.

11          Q     Did you review any input from the parents on

12    how long it was taking her to do her homework or how

13    long it was taking her to get to read and comprehend?

14    A     Yeah.  I do recall there was some -- because there

15    was some correspondence in the file from the parents

16    and I -- I could not quote it, but the fact that she's

17    a very motivated, hard-working student who works hard

18    to get the grades that she does.  I understand that.  I

19    admire that.

20          Q     Right.  And wouldn't you agree that if it's

21    taking the student three or four hours to do homework

22    that's taking other students a half an hour then

23    there's an educational deficit?

24          MR. BENTLEY:   Objection.  I see -- I see no

25    foundation for that question.

Williams - Cross                         91

1              MS. REISMAN:    Assuming that the parents --

2      the parents were complaining about the amount of time

3      it was taking H.M. to do her homework.

4              MR. BENTLEY:    There -- there's no evidence

5      of that and there's -- that's all --

6              MS. REISMAN:   She -- she --

7              MR. BENTLEY:    Let me finish my objection.

8      No evidence of that particular state of facts or -- or

9      to the facts on the record.  It -- ask this witness

10     about something that the parents may testify to?

11             THE COURT:   Well, you're asking the witness

12     if there is that indication somewhere in the record?

13             MS. REISMAN:   She said that there was an

14     indication in the record that the parents had concerns

15     about the amount of time it was taking H.M. to do her

16     homework.

17             THE COURT:   Okay.

18             MS. REISMAN:    I can withdraw the way the

19     question is phrased.

20             THE COURT:   Right.

21             MS. REISMAN:   And I will phrase it this way.

22     BY MS. REISMAN:

23         Q    Isn't -- doesn't -- does the fact that the

24     parents were reporting that it was taking H.M., what

25     they seemed to think was extensive time to complete her

Williams - Cross                    92

1    homework, doesn't that indicate an educational deficit?

2    A     No.

3              MR. BENTLEY:   I'm going to object.  All we

4    have is -- the witness said she was aware of the

5    parents expressing concerning about something.  We

6    don't know about what the -- was, what the objective

7    amount was and so the question is unfair.

8              THE COURT:   All right.

9              MR. BENTLEY:   I think we should ask the

10   witness what her understanding is of what the parents

11   concerns were --

12             THE COURT:   Yeah.

13             MR. BENTLEY:    -- and then go from there.

14   BY MS. REISMAN:

15        Q    What's -- what's your understanding of what

16   the parents' concerns were?

17   A     Like many parents I think that, you know, kids

18   have different -- parents get concerned when they see

19   their children seated for hours doing their homework.

20   I understand that.  I don't know how -- how frequent

21   that was.  I don't -- I just recall seeing something in

22   terms of the parents' concern.

23        I find that many children who are high achievers

24   who do well, who earn A's and B's in school do it as a

25   result of a lot of effort.  It did not surprise me.

Williams - Cross                          93

1    Yeah.  It happens all the time.  Probably all of us

2    have taken a long time to -- not everybody moves very

3    rapidly and quickly through what they do.  They work

4    hard for it.

5         Q    You stated before that if I had -- if you had

6    a copy of one of your Powerpoints you would be able to

7    speak more about what -- what's expected in fourth,

8    fifth and sixth grade.

9    A    Sure.

10        Q    H.M. was in fourth and fifth grade during the

11   years in question.  She's in sixth grade -- sixth grade

12   now.  Would you like a copy of your Powerpoint to

13   refresh your recollection?

14   A    No.  I think -- I responded to that in terms of

15   how many words -- new words children learn per year.

16   It's astounding.  It's astounding how much, you know,

17   and we -- we have lots of research to support that

18   those children, and I was thinking about, you know,

19   children who come from a rich language background who

20   are early kids -- early childhood who were spoken to or

21   talked to, I mean they have a huge advantage because so

22   much of what they learn is based on understanding

23   words.

24        And in this case once they get to be in fourth

25   fifth and sixth grade they have to read those words,

Williams - Cross                          94

1    not just, you know, hear them in their conversation

2    with their -- in their home environment or in school.

3    Vocabulary is very important is what I was referring

4    to.

5         Q    Isn't it true that's it's difficult to

6    correctly guess the identity of the words with context

7    in fourth, fifth, sixth grade passages?

8    A    I don't know that I could say that.  Depending --

9    depending upon the word.  You know, depending upon your

10   understanding of words -- similar words to it, you

11   know.  I couldn't make that generalization.

12        ~~Q    Okay.  If you said that in a Powerpoint, it~~

13   was a mistake?

14   A    No.  I'm just saying how many new words, and I did

15   say that if -- if you're in a science lesson, in a

16   social studies lesson, anything more technical that you

17   have to introduce the -- typically the way children are

18   taught is that you introduce new vocabulary words first

19   because they wouldn't have encountered them in their

20   reading, you know, in their -- their reading

21   instruction, you know, things that relate to

22   photosynthesis or whatever it might be, whatever the

23   topic you're teaching.

24             MS. REISMAN:    Move to strike.  Non-

25   responsive.  I asked if she said that in the Powerpoint

Williams - Cross                          95

```
 1    if it was a mistake.

 2              MR. BENTLEY:   I'm kinda lost as to --

 3              THE WITNESS:   I'm lost.

 4              MR. BENTLEY:    -- the relevancy here but --

 5              THE COURT:   All right.  If that -- if that

 6    was the question the response, you're correct, was not

 7    responsive and I will not consider it.  You can re-ask

 8    the question.

 9              THE WITNESS:    Okay.

10    BY MS. REISMAN:

11         Q    If you stated that it's very difficult to

12    correctly -- the identity of new words just from the

13    context of passage in fourth, fifth and sixth grade

14    texts in a Powerpoint, was that an error?

15    A    If I said -- I think what I referred to, and I

16    said if I had my Powerpoint here, you said that many

17    new words are introduced 10,000, I believe you used, to

18    students within a year.  And I said it is astronomical

19    and that's something that -- that the information that

20    I didn't recall but I would agree with that.

21         Q    Okay.

22    A    Yes.

23         Q    What about the sentence that I just said?

24    A    Please repeat that.

25         Q    The sentence that I just said was -- I -- if
```

Williams - Cross                                96

1    you would like to look at your Powerpoint I have it

2    here.  If there's no objection from Mr. Bentley I can

3    let you look at it.

4    A    My Powerpoint?

5               MR. BENTLEY:    I'm not sure the relevancy,

6    Judge, but --

7               THE WITNESS:    I didn't -- I didn't submit a

8    Powerpoint.

9               MS. REISMAN:    It's available on the

10   internet.

11              THE WITNESS:    Oh, from the National

12   Association of School Psychologists.

13              MS. REISMAN:    Yes.

14              THE WITNESS:    Okay.  Reading Rockets.  Okay.

15              MS. REISMAN:    Yes.

16              THE WITNESS:    Yes, I would like to see it.

17              THE COURT:    All right.  Show -- show the

18   witness the Powerpoint.  If you have the specific

19   passage or --

20              MS. REISMAN:    Yes.

21              THE COURT:    -- whatever then let's --

22              MS. REISMAN:    It's very long.  It's on page

23   -- on page seven.  I'm just asking about this sentence

24   here on the bottom.

25              THE WITNESS:    Okay.

Williams - Cross                              97

1           MS. REISMAN:  Should we mark this for

2    identification?  I'm not going to move to --

3           THE COURT:  Probably should.  Yes.  Why

4    don't you mark it was R-30?

5           MS. REISMAN:  P --

6           THE COURT:  I'm sorry.  P -- P-20.

7                              (P-20 marked for

8                              Identification.)

9           THE WITNESS:  Okay.

10          MR. BENTLEY:  I'm sorry.  Is the witness

11   being asked to read the entire Powerpoint?

12          MS. REISMAN:  No.

13          THE COURT:  No.  No.  Just the one --

14          MS. REISMAN:  I'm asking her to look at --

15          THE COURT:  Page seven.

16          MS. REISMAN:  Page seven.  Sorry.  I didn't

17   give you a copy.

18          THE COURT:  And the --

19   BY MS. REISMAN:

20       Q    In the middle slide on the second column.

21   A    Yes.

22       Q    Okay.

23   A    This information was -- this was a training that I

24   had done with two other colleagues and as we noted on

25   the -- the first slide there was additional information

Williams - Cross                      98

1    was from Joseph Torguson (phonetic) and I'm just trying

2    to recall whether this was either my original slide or

3    from Dr. Torguson's.

4         Q    Well, do you disagree with the statement?

5    A    "State -- correctly guess the identity of these

6    new words just from the contents of the passage."  No,

7    I don't disagree with that.

8         Q    And I believe this indicates fourth, fifth

9    and sixth graders encounter about 10,000 words they

10   have never seen before during a year's worth of

11   reading?

12   A    Yeah.  I think it was referring to the previous

13   point.  If you look at the -- the previous slide which

14   was -- you could read -- if you -- if you just try to

15   actually read that, that -- that it's actually -- you

16   can't even understand that even though there's some

17   non-sensical words written in there.

18        Q    Right.  This is the slide that says, "These

19   are interesting and challenging-- you can understand

20   that but it takes longer to understand it and it's

21   harder to do because of the way certain words are --"

22   A    Yeah.  You're using something called the close

23   technique which means you're filling in what -- you

24   have to fill in by nature of -- of your intellectual

25   abilities.

1                THE COURT:   All right, Counsel.  Let's move

2      on.

3                MS. REISMAN:    Okay.

4      BY MS. REISMAN:

5          Q    You also testified that the Dibbles is -- it

6      is being used now with fifth graders to assess oral

7      reading and fluency, correct?

8      A    Uh hmm.

9                THE COURT:    That's a yes?

10     BY MS. REISMAN:

11         Q    Yes?

12     A    Yes.

13         Q    And you testified that really what that's

14     designed -- the Dibbles is designed to plot a line of

15     trajectory, correct?

16     A    Yes.

17         Q    And that's because the way the DIBELS is used

18     is you assess at the beginning of the year and the end

19     of the year and you see if the student is progressing.

20     Is that correct?

21     A    That is correct.  You assess at whatever interval.

22     There -- there is no standard method to do that but you

23     typically do it at regular interval -- intervals as you

24     would any other kind of height, weight measurement to

25     see are we moving in the right direction.  They use

1    graded passages to do that.

2        But as I mentioned inherent in any kind of

3    curriculum based assessment, which is what DIBELS is,

4    is that you -- we understand that this is a -- a more

5    informal measure.  We take -- we do three one minute

6    samples, throw out the top, throw out the bottom and --

7    and go with the middle.  Because it can vary with

8    familiarity with words, as we just said, as I just

9    mentioned, or what the text is all about.

10       Q    And there is no line of trajectory for H.M.,

11   correct?

12   A    I do not see one.

13       Q    Because there -- you -- you only saw the one

14   assessment, the one --

15   A    My recollection was that it was a request that she

16   be -- that DIBELS be -- someone made that request that

17   a -- a DIBELS measure be done.  Yet so that we didn't

18   have pre -- we didn't have information before or since.

19       Q    Okay.

20   A    That I saw.

21       Q    So her -- from what you could see there was

22   no criteria -- records -- records on -- for oral

23   reading?

24   A    Other than what was built into the reading -- the

25   reading program that was in the classroom.  There would

1    naturally be something that I did not -- it would not

2    necessarily be in the file but if you looked at the

3    fifth grade reading program they have to have some way

4    of assessing progress.  I mean, that's -- that's good

5    education.

6         Q    That would be her grades?

7    A    It could be her grades.  It could be her -- her

8    tests of -- you know, her -- her unit tests.  Whatever

9    the particular measures are that the teacher would do.

10        Q    Did you see anything besides her grades that

11   showed any kind of ongoing progress monitor?

12   A    Well the thing that when we -- and I wanted to

13   mention this about Core Curriculum -- the Core

14   Curriculum Content Standards is that the State -- the

15   State Department of Education has developed the New

16   Jersey ASK in order to assess that.  Again, that was

17   one other thing that I looked at that she was

18   proficient or, you know, average to above average in

19   areas that she was assessed.

20        Q    That's right.  If she's taking the ASK under

21   untimed conditions, though, it's not going to tell you

22   anything about her fluency, is it?

23   A    No, but it's going to tell me a lot about her

24   overall achievement which is I guess -- and I think the

25   basic difference if I can, and I don't know, Judge, if

1    I can do this, but the basic difference I see is that

2    when I look at a youngster's reading ability it's the

3    overall picture of how well can they read, the

4    component parts to reading.  If we don't focus -- if --

5    if we have a competent reader then I don't go back to

6    focus to say is there one area that's still weak

7    because for whatever happens she has compensated for

8    that.

9        Q    Do --

10   A    I may not be a fluent reader.  I may read more

11   slowly.  I may work harder.  I may, you know, I may be

12   ~~a tremendously fluent reader but I don't comprehend.~~

13   All right.  But if the bottom line is I can achieve or

14   I or any youngster can achieve, then we stop looking at

15   individual progress indicators.  We say we've achieved

16   a basic level of competency.  And we -- as we said we

17   reaped -- the reading -- the learning to read we

18   perceive to reading to learn and grow in our knowledge.

19       Q    The Core Curriculum Content Standards for the

20   State of New Jersey specifically state that students

21   will understand and apply the knowledge of sounds,

22   letters and words in written English to become

23   independent and fluent readers?

24   A    That's the goal.  Sure.  Sure.  Yes.

25       Q    So fluency is part of the Core Curriculum

1    Content Standards?

2    A    Yes, but it's by far not the only part.

3         Q    Of course it's not the only part, but my

4    question to you was whether the -- taking the New

5    Jersey ASK under untimed conditions would give you

6    information about fluency.

7    A    No, but it's not specifically designed just to

8    measure fluency is what I'm saying.  There's a bigger

9    picture there when we talk about a group administered

10   paper and pencil standardized test.  We can only

11   measure fluency individually when we assess it

12   individually, which would either be through Dibbles,

13   the DRA or the Grey Oral Reading Test or many other

14   measures.

15        Q    When you say there's a big picture, part of

16   the big picture includes, according to the Core

17   Curriculum Content Standards, fluency?

18   A    Sure.  And comprehension and many other things.

19   Yes.

20        Q    Right.

21   A    Yes.  I agree.

22        Q    When -- when you look at the NJ ASK scores do

23   you consider whether or not they've gone up or

24   declined?

25   A    I look to particularly the fourth and the fifth

```
 1    grade levels, which I was the most -- the most current

 2    and saw that she was --

 3        Q    Actually, I believe that the third and fourth

 4    were the ones that you looked at.

 5    A    Let me re-read that then.  Whatever it was, the

 6    fourth.  Okay.  What was the fourth was in -- but then

 7    I believe I'd have to clarify.  I didn't put in my

 8    report as referenced by NJS-4 and NJS-5.

 9        Q    Okay.

10    A    It was a report and learning evaluation which is

11    four, but subsequent to that when I was sent the file

12    they had the fifth that was in -- that was new -- new

13    data.

14        Q    Okay.

15    A    Yes.

16        Q    So that was -- the team didn't --

17    A    No, but they would have had previous.  Correct.  I

18    don't know what date that they were available.  I know

19    that the date that Ms. Woodland had -- she had April 1st

20    and 8th, it's likely that they -- they did not have

21    this.

22        Q    Okay.  Was there -- was -- do you use NJ ASK

23    -- progress from one year to the next?

24    A    No.  We look at whether they're making -- whether

25    they're meeting the Core Curriculum Content Standards.
```

1          Q     But it doesn't show progress?

2     A     Well, the logic is that as we move along in fourth

3     grade -- what -- what we're expecting with a fourth

4     grader is less than what we're expecting of a fifth

5     grader so she's continued to do at or better because

6     it's a norm referenced test that she's keeping pace

7     with.  So yes, it would be progress.

8          Q     So she did worse in fifth grade then she

9     would have had a little regression?

10    A     Well, it depends on what we -- when you measure,

11    and I'd have to look at the scores and I'd have to look

12    at the standard error of measurement and things like

13    that because that's why we talk about ranges and not

14    specific scores.

15         Q     Okay.

16    A     You know, is she out of the same range because as

17    much as we're able to measure we're not perfect in

18    that.

19              MR. BENTLEY:    I'm just amazed that she

20    hasn't --

21              MS. REISMAN:    (Laughing.)

22    BY MS. REISMAN:

23         Q     Did you speak to anyone from the District who

24    did any of the testing that you reviewed?

25    A     No, I did not.

```
1              MS. REISMAN:   Can I have a couple of

2     minutes, Your Honor?

3              THE COURT:   Sure.

4              MS. REISMAN:   Just to --

5              MR. BENTLEY:   A break?

6              THE COURT:   Pardon?

7              MR. BENTLEY:   Off the record?

8              THE COURT:   Off the record, I assume.  Off

9     the record?

10             MS. REISMAN:   Yes.

11                  (BRIEF RECESS)

12             THE COURT:   I -- I certainly will -- I'll

13    call on it.  I did mention it before but we'll see what

14    we can do.  Usually, it's off over the weekend and it

15    comes back on on Monday so -- all right.  You may

16    continue.

17             MS. REISMAN:   Yes, Judge.

18    BY MS. REISMAN:

19        Q    I -- exhibit R-13 which was -- is that the

20    assessment you reviewed?

21        A    Yes.

22        Q    And on this assessment the -- the gray bar is

23    the target goal, correct?

24        A    Yes.

25        Q    And the -- the scores that H.M. achieved in
```

1    the February administration of the DIBELS were below

2    the target goal, correct?

3    A    It appears so.  If the target goal is -- well,

4    it's not a very accurate graph so we have, as I'm

5    reading it, under oral reading fluency fifth grade

6    would correspond to somewhere between 100 and 120, so

7    we could say 110, perhaps.

8         Q    Well, actually, if you -- you're right.  It

9    is a difficult to read graph.  I think if you look at

10   February, fifth grade -- put a piece of paper under-

11   neath where the bottom of that target is you see 120.

12   A    Let me look at February.  Okay.  Yes.  And I would

13   say in that particular administration she was below.

14   She had, it looked like 107 -- accurately.

15        Q    Administration -- her fluency is below the

16   target goal?

17   A    By this administration it looked to be.  Yes.

18        Q    And there are no other administrations?

19   A    That's correct.  That I saw.

20        Q    Okay.  In the progress monitoring you

21   reviewed were her report card grades?

22   A    Do this -- (shuffling papers) -- what I said in

23   the conclusions were that I looked at her -- at the NJ

24   ASK scores, and as well as throughout the progress

25   monitoring would have been her report card grades, her

Williams - Cross                          108

1      -- in teacher comments, things that I had gleaned from

2      reports from reading the child study team records.

3           Q    So you based your -- your conclusion on the

4      records that had been provided to you by the child

5      study team, not the actual progress reporting that

6      underlay those records?

7      A    Right.  No, that is not correct.  I based my

8      conclusions upon every -- the file was perhaps this

9      thick, so I tried to base my conclusions upon

10     synthesizing all of the information that I felt was

11     relevant.  To say that "A" was to "B" that "B," it was

12     -- it was an overall impression based upon the

13     preponderance of the data.

14          Q    Okay.  And the progress monitoring was then

15     report card grades.  And do you recall any other

16     progress monitoring that was in the file?

17     A    Well I consider -- any -- any assessment would be,

18     I compared the 2005 to 2008 to looking at her report

19     cards to looking at the NJ ASK scores.  You know, I

20     guess it's -- it depends upon how we define progress

21     monitoring.  If we look at it as an instrument that is

22     purely designed just to monitor progress then I didn't

23     see any other DIBELS.  I only saw one DIBELS at this

24     point in time.  There were -- but I would consider the

25     generic progress monitoring to be all of the data all

1      together.

2            Q    And that would be the -- the data including

3      just the comments of teachers?

4      A     Everything.  Teacher comment, test results, group

5      tests, individual tests, norm referenced tests --

6      reference tests.

7            Q    Or -- or just comments that have no -- that

8      are not norm referenced or criterion referenced?

9      A     Well, part of doing any kind of an assessment or

10     any kind of background -- gathering background

11     information is that we look at, you know, reports from

12     people who have worked with the youngster.

13                MS. REISMAN:   That's all I have.

14                THE COURT:   Any redirect?

15     REDIRECT EXAMINATION BY MR. BENTLEY:

16           Q    Dr. Williams, in the learning assessment, I

17     think it's R-31, I believe you still have that in front

18     of you.

19     A     Yes, I do.

20           Q    You were asked some questions regarding the

21     test for reading fluency that's on page five.

22     A     And I'm sorry.  What was --

23           Q    I'm sorry.  The test for reading fluency.

24     A     Okay.

25           Q    You testified about that.

Williams-Redirect                          110

1    A    Oh, the Grey Oral Reading?

2         Q    Right.  And I believe you said that was the

3    result -- the result of that test which were in the

4    average range.  Do you -- do you -- and based upon your

5    understanding of that test and how it was administered,

6    was that a timed test?

7    A    It would have been, and as reported here because

8    it was -- it was measuring what the issue as it appears

9    to be which is reading fluency, the rate and accuracy.

10   And as it was explained it said that it was based on

11   her reading -- H.M. reading out loud and noting the

12   time and seconds that it takes her to read a passage.

13        Q    Right.  And on page four of the assess -- of

14   R-31 there's a -- there's a reading fluency subtest

15   within the --

16   A    Woodcock-Johnson.

17        Q    Woodcock-Johnson.  Is that correct?

18   A    Yes.

19        Q    Do you know of, and based upon the results of

20   -- from the learning assessment, what were H.M.'s

21   results, what were her scores for the reading fluency

22   subtest for --

23   A    Well --

24        Q    -- the Woodcock-Johnson?

25   A    Okay.  The reading fluency test has a standard

1    score of 106 and the -- then range, the confidence

2    intervals, would be 99 to 113 which would be a

3    percentile rank of 66 which would be average.

4         Q    So she's average in read -- reading fluency?

5    A    Based on these two measures, yeah.

6         Q    Is there any other standardized test scores

7    which indicates that there is a severe discrepancy

8    regarding reading fluency for H.M.?

9    A    Not that I saw.  Standardized test.  No.

10        Q    And are you aware of the reasons why the --

11   the DRA, the second DRA that was administered, I think

12   that is R-13.  I know we always get -- we always mix

13   these things up, us attorneys.

14   A    Here's one.

15        Q    Okay.

16   A    One is -- and that -- right.

17        Q    Okay.  I said R-13.  I misspoke.  R-11.

18   A    Eleven.

19        Q    Okay.  Do you -- are you aware of the reasons

20   why Brenda Baals elected to go forward with the -- with

21   testing, the DRA in R-11?

22   A    I -- I don't know.  I didn't ask her.  I have not

23   spoken to her, but I can tell you that again in --

24             MS. REISMAN:  Objection.  She's going to --

25   she said she doesn't know.

1          THE COURT:   Well -- do you -- do you know or

2   do you know why she decided to go ahead?

3          THE WITNESS:   No, I don't know.

4          THE COURT:   Okay.  Next question.

5   BY MR. BENTLEY:

6      Q    Next question.  Do you know who Brenda Baals

7   is?

8   A    According to this she is a special education

9   teacher.

10     Q    Would it be -- would it be appropriate for a

11  special education teacher who -- who has said she knows

12  ~~H.M. and has said that there's no way H.M.'s~~

13  independent reading was at a second grade reading

14  level, to use that as a reason for going forward with

15  the DRA?

16  A    I might have myself done that if I didn't feel

17  like this was -- the results purely reflected -- you

18  know, you can typically do one of two things.  You can

19  continue on to, as I mentioned earlier, to test the

20  limits or you could redo at another time.  Again, these

21  are just indicators of one moment in time.

22     Q    Okay.  All right.  So given the fact that you

23  had this particular student and knew her independent

24  reading level was much higher based upon working with

25  that student, would you feel comfortable in moving

Colloquy                              113

 1   forward beyond the DRA's explicit instructions?

 2            MS. REISMAN:   Objection to the form of the

 3   question.  There -- there is no -- that Ms. Baals had

 4   known H.M. for approximately one month at that time,

 5   knew her in any intimate way that would -- I mean,

 6   there's just no testimony to support the foundation of

 7   that sentence.

 8            MR. BENTLEY:   I believe that's incorrect.

 9   I believe she has only worked with her for I think

10   about a month, that is true.  She also testified that

11   given that month she is well aware of what H.M.'s

12   reading levels are.  In fact, she said there was no way

13   she was being -- her instructional level was at second

14   grade so that's why she questioned the results of the

15   DRA and that's why she made the decision to move

16   forward.

17            MS. REISMAN:   This witness also --

18            THE COURT:   Well --

19            MS. REISMAN:   -- said she's not a reading

20   specialist and we're -- we're asking about, you know,

21   administration of a particular reading assessment.

22            MR. BENTLEY:   Well, then --

23            THE COURT:   Well, wait -- wait, Counsel.

24            MR. BENTLEY:   The rest of the questions

25   then should be stricken from the record.  If Counsel

1    spent about an hour, hour and a half asking her

2    questions about the DRA and DIBELS, and now she's

3    saying she's not a reading specialist, and then I get

4    to ask her a question that she doesn't like the answer

5    to, now she says she shouldn't answer the question.

6            THE COURT:   Counsel, first of all, let's do

7    it this way.  Ms. Baals' testimony stands on its own,

8    speaks for herself.  My recollection is somewhat in

9    accordance with yours.  I'm going to have to look at my

10   notes to do that, number one.  Number two, this witness

11   I think has expressed her opinion previously on this

12   whole -- this whole area.  I don't think it's necessary

13   to get further involved with it.

14           MR. BENTLEY:   Okay.

15           THE COURT:   And third, your motion to strike

16   is denied.

17           MR. BENTLEY:   Okay.  Big surprise there.

18   (Laughing.)  All right.  Nothing further, Judge.

19           THE COURT:   Anything else for the witness?

20           MS. REISMAN:   No.

21           THE COURT:   Thank you, Doctor.  You can step

22   down.  You're free to go.

23           THE WITNESS:   And do I leave these things

24   here and let you sort them out or --

25           THE COURT:   Unless there's any of your --

1    anything of yours there.

2                    THE WITNESS:   No.

3                    THE COURT:   Just leave them there.

4                    THE WITNESS:   Okay.

5                    THE COURT:   The attorneys have a way of

6    sorting things -- sorting through things.

7                    MR. BENTLEY:   We have a way of stealing

8    things.  (Laughing.)

9                    THE COURT:   (Laughing.)  Yeah.  Well, that

10   too.

11                   MR. BENTLEY:   Losing them.

12                   THE COURT:   It's now 12:00 noon.  Should we

13   take our lunch recess now?

14                   MR. BENTLEY:   Yes.

15                   MS. REISMAN:   That sounds --

16                   THE COURT:   All right.  We'll come back

17   1:00?

18                   MR. BENTLEY:   Yes.

19                   THE COURT:   Or thereabouts.  Okay.  See you

20   at 1:00.

21                        (BRIEF RECESS)

22                   THE COURT:   Okay.  We're back on the record.

23   All right.  Counsel, we had a brief discussion.  I have

24   to indicate what we briefly discussed, the witness

25   order -- the order of witnesses being called.  And

Colloquy                                    116

1    Counsel may reach some agreement on that during the

2    recess of this matter or by the next time -- the next

3    session.  So in the meantime if you would call your

4    next witness.

5              MR. BENTLEY:   Jane Elfreth, please.

6              MS. REISMAN:   I would like -- to --

7    testimony.

8              THE COURT:   You -- you can come up.  Request

9    for an offer of proof concerning the testimony that's

10   being elicited.

11             MR. BENTLEY:   Yes, Your Honor.  Jane -- is

12   ~~the specialist employed at Haddon Heights Atlantic~~

13   Avenue School.  She had a -- some involvement in the

14   administration of the DRA, the second DRA that we heard

15   testimony about regarding conversations that she had

16   with Brenda Baals about that.  Obviously, I'm going to

17   ask her about that.  But the primary focus of her

18   testimony will be the types of services that can be

19   provided to someone like H.M. in the general ed

20   curriculum.

21             There's always a concern in these particular

22   cases and I think Dr. Williams addressed it briefly in

23   her examination as well as in her report that after a

24   decision is made to declassify a student, what happens?

25   Will she be -- is there any type of services that can

1    be provided in -- in general education?  And the tests,

2    as you know, for determining eligibility is do you need

3    special education services, special -- services to be

4    able to advance in a general ed curriculum?

5             This witness is -- is being offered to -- to

6    let the Judge know what type of services will be

7    provided to -- to H.M. in the general ed setting if you

8    -- if -- if the Court agrees with our determination of

9    -- of not being eligible for special education.  So she

10   is here as a reading specialist at the Atlantic Avenue

11   School offering testimony to you as to what types of --

12   of supports and so forth that would be -- that would be

13   available to H.M.

14             MS. REISMAN:   And our response is that the

15   -- obviously the testimony regarding Ms. Baals -- DRA

16   -- but the question of whether a student is eligible

17   for special education services is -- is not dependent

18   upon what the District has in its general education

19   program.  It's irrelevant to the issue here and that I

20   don't -- I don't see any relevance to the issue at

21   hand.

22             THE COURT:   Yeah.  I tend to agree with

23   that.  I mean, if someone is -- is -- requires special

24   education and related services the fact that they may

25   get those same services outside of special education is

1   not relevant.  I -- so I -- I don't know why that would

2   be of any interest to --

3          MR. BENTLEY:   Just -- just to -- if -- if

4   the Court had any kind of concerns as to whether or not

5   H.M. would be left with no supports whatsoever, that's

6   why we're offering -- again, a reading specialist

7   employed at the District in that particular school

8   working with general education kids.  The offer of

9   proof would be that this is what would be provided if

10  she does have some -- any type of other needs.

11         If the Judge doesn't feel it's necessary --

12  determination is -- we can --

13         THE COURT:   I'm trying -- I suppose to say

14  it a different way is if certain kinds of services are

15  provided to regular education students as a matter of

16  course, that those should not be considered special

17  education services.  But I -- I don't know.  I'm -- I

18  just don't know that this would have any kind of impact

19  on my determination of the -- of H.M.'s eligibility for

20  special education services.

21         MR. BENTLEY:   Can I have one second?

22         THE COURT:   Sure.

23         MR. BENTLEY:   Okay.  Whatever your ruling

24  is, Judge.

25         THE COURT:   Yeah.  My ruling is it's

1    irrelevant.

2              MR. BENTLEY:    Okay.  And I'll --

3              THE COURT:   But you may proceed.

4              MR. BENTLEY:    I'll be a lot brief than it

5    was.  Okay.  All right.  (Laughing.)

6              THE COURT:   To the side of benefit or

7    detriment, I'm not sure which but --

8              MR. BENTLEY:    (Laughing.)

9              MS. REISMAN:    (Laughing.)

10             MR. BENTLEY:    In this case it's kind of a

11   benefit I guess.

12             THE COURT:   All right.

13             MR. BENTLEY:    The -- of --

14             THE COURT:   Let me have the witness sworn.

15   If you could raise your right hand to be sworn.

16   J A Y N E   E L F R E T H, RESPONDENT'S WITNESS, SWORN

17             THE COURT:   And your full name, please?

18             THE WITNESS:   Jayne Elfreth.

19             THE COURT:   And the spelling of your last

20   name?

21             THE WITNESS:   E-L -- "F" as in "Frank" --

22   R-E-T-H.

23             THE COURT:   Thank you, ma'am.

24             THE WITNESS:   And if I may add Jayne is

25   spelled J-A-Y-N-E.

Elfreth - Direct                                    120

1                  THE COURT:   Oh, thank you.

2                  MR. BENTLEY:   I didn't know that.

3                  THE WITNESS:   (Laughing.)

4                  MR. BENTLEY:   Thank you.

5    DIRECT EXAMINATION BY MR. BENTLEY:

6          Q    Ms. Elfreth, good afternoon.

7    A    Good afternoon.

8          Q    Who are you employed by?

9    A    The Haddon Heights Board of Education.

10         Q    In what capacity?

11   A    As a reading specialist.

12         Q    And when were you hired as a reading

13   specialist?

14   A    I was hired in December of 2006.  I'm thinking.

15   It's been like a year and a half.

16         Q    A year and a half?  Okay.  Okay.  Are you

17   assigned to a particular school or are you a reading

18   specialist throughout the district?  What exactly are

19   your duties?

20   A    Right now I'm assigned to Atlantic Avenue School.

21         Q    That the school where H.M.'s a student at?

22   A    Yes.

23         Q    And have you been assigned to the Atlantic

24   Avenue School exclusively since December of 2006?

25   A    Yes.

Elfreth - Direct                                    121

```
 1          Q     And what are your normal duties and so forth
 2    as a reading specialist?
 3    A     Right now I am considered literacy support for
 4    students in grades one through six as well as assisting
 5    classroom teachers in the administration of a balanced
 6    literacy program.
 7          Q     And what is a balanced literacy -- is it
 8    balanced literacy --
 9    A     Approach.
10          Q     What is balanced literacy?
11    A     Balanced literacy is addressing all aspects of
12    reading including reading and writing through Reader's
13    Workshop and Writer's Workshop.
14          Q     And that is -- that's what's in place at the
15    Atlantic Avenue School --
16    A     Yes.
17          Q     -- at the present time?  Okay.  What is --
18    what is your certifications?
19    A     I have a masters in reading and writing from Rider
20    University along with a New Jersey certificate of
21    reading -- in reading -- as a reading specialist.
22          Q     And briefly what is your employment history
23    within Haddon Heights?
24    A     This is my 26$^{th}$ year of employment in Haddon
25    Heights.  The previous 23 were in instrumental music in
```

Elfreth - Direct                              122

 1    grades four, five and six.

 2         Q    When did you get your masters in reading and

 3    writing?

 4    A    In May of 2007 it -- well, I graduated, actually,

 5    in December, December of 2006.

 6         Q    Okay.  What --

 7    A    Ceremony was in May of 2007.

 8         Q    Okay.  Was there any type of reading

 9    specialist for Atlantic Avenue School before you were

10    hired?

11    A    No.

12         Q    I'm going to draw your attention to a -- a

13    DRA.  First of all, have you ever assessed H.M. or ever

14    had any type of assessment of her?

15    A    Yes.

16         Q    What -- in what capacity?

17    A    I assessed her this year in the administration of

18    the QRI.

19         Q    Did you administer any other tests of her in

20    fifth grade?

21    A    No.

22         Q    Okay.  What's the QRI?

23    A    It's called a Qualitative Reading Inventory and

24    it's assessment of -- right now it's a -- it's a multi-

25    assessment, but we are using it in Haddon Heights for

Elfreth—Direct                                    123

```
 1        -- trying to understand where students read at what

 2        grade level in regards to comprehension.

 3             Q    And what were the results of H.M.'s

 4        assessment?

 5                  MS. REISMAN:   Objection.  This assessment

 6        occurred this school year and we've had objection from

 7        the other side to events that occurred after the team

 8        made its decision.  This -- this wasn't the basis of

 9        the team's decision for the 2008/2009 school year.

10                  MR. BENTLEY:    But there's been -- sorry.

11                  THE COURT:   Go ahead.

12                  MR. BENTLEY:    There's been evidence

13        questions on cross examination of my expert witness of

14        things that may have happened in sixth grade.

15                  MS. REISMAN:    The -- the parents haven't

16        even seen copies of the results of this assessment.

17        It's -- it's --

18                  MR. BENTLEY:    But I'm sure they know --

19                  THE COURT:   2008.

20                  MR. BENTLEY:    I'm sure they know what the

21        results are and that's why they don't want the Judge to

22        know what they are.

23                  MS. REISMAN:   Actually, we don't know.

24        (Laughing.)  It's not that we don't want the Judge to

25        know what they are, it's that this is not something
```

1     that the team had at the time it made its decision.

2              THE COURT:   You know, the usual -- the usual

3     type of case that I have is one where there is -- a

4     child is placed in an educational program and I'm to be

5     asked to decide whether a specific IEP is appropriate

6     and -- and usually after events had -- after the fact

7     are allowed in because it's important to the child's

8     interests -- in the best interests of the child to

9     determine really what is -- you know, what the proper

10    determination should be.

11              This is different, though.   This is a

12    ~~determination that was made at a point in time that~~

13    H.M. is not qualified or not eligible for special

14    education and related services.   I'm not sure that it

15    would be fair to consider after -- events that occurred

16    after the fact.   And to the extent that this is a test

17    that occurred after the fact I'm going to -- going to

18    exclude it.

19    BY MR. BENTLEY:

20         Q    Ms. Elfreth, were you involved in a -- a DRA

21    assessment of H.M. back in --

22         A    Did I administer one, are you asking?

23         Q    Were you involved in -- in any capacity?

24         A    Yes.

25         Q    Okay.   In what -- in what capacity?

Elfreth   Direct                                125

```
 1     A     Ms. Baals approached me showing me the assessment

 2     that was -- the DRA, I should say, that was given by

 3     another teacher -- that was given to H.M. by another

 4     teacher and Ms. Baals was upset by it since she felt

 5     that that was not a true assessment of what H.M. could

 6     do or how she could do.

 7           Q     Okay.  What, if anything, did you do in --

 8     Brenda Baals coming to you?  Also, did she say why she

 9     was coming to you?

10     A     Because I'm the reading specialist in the building

11     and she felt that I may know -- I may be able to direct

12     her in -- you know, as to -- regarding her concerns.

13           Q     Okay.  And did you offer direction to Ms.

14     Baals regarding her concerns?

15     A     I did.

16           Q     And what did you tell her?

17     A     I asked her first what her feelings were as far --

18     before I -- I directed her I asked her why she was

19     concerned about the results and she said that she felt

20     that that particular assessment that H.M. although may

21     have had oral reading fluency issues, that

22     comprehension wise she did not believe, due to her work

23     with H.M., that that was a true assessment as to where

24     she was reading.

25           So I questioned her further and I said may I ask
```

Elfreth - Direct                                     126

1    you how you would know, what -- what types of methods

2    were you coming to me with.  And she said well I know

3    that she is reading books on her grade level and that

4    she, Ms. Baals, has also read them and has had

5    conversations with H.M. in regard to vocabulary in the

6    book as well as in regard to matter within the book,

7    meaning, and she said she really felt that that DRA was

8    not a true assessment.

9        At that point I suggested that she re-administer

10   the DRA, which is not unusual to do, to see whether or

11   not that -- the results were the same or different.

12       Q    Were you aware that the DRA in its -- in its

13   instructs tells the test giver to stop at a certain

14   point in time when --

15   A    Yes.

16       Q    -- certain miscues are generated?

17   A    Yes.

18       Q    Are you aware of that?  Have you administered

19   the DRA?

20   A    Yes.

21       Q    What did you advise Ms. Baals regarding

22   stopping or not stopping at a particular point?

23   A    I advised her to go on because I felt that she

24   really knew her student more than one assessment in a

25   matter of time -- at a point in time.

Elfreth - Direct                    127

```
 1          Q     Did you -- were you aware that DRA results

 2   that were delivered -- were administered by Brenda

 3   Baals?

 4   A     Yes.

 5          Q     Did you have a chance to talk to either Mom

 6   or Dad about the results of that DRA?

 7   A     Yes.

 8          Q     The second -- the second --

 9   A     Yes.

10          Q     Okay.  Tell us about that.

11   A     I believe that I spoke with Mr. M. in regard to

12   his concerns with H.M. and her oral reading fluency and

13   that we spoke at length about what is the point to

14   reading and the fact that oral reading fluency in a

15   student of the fifth grade, actually the fourth, fifth

16   or sixth grade on up level is, even though it is -- I'm

17   trying to think of the word.  Even though it may cause

18   H.M. -- even though H.M. may have difficulty in it, the

19   true point to make -- to reading is to make meaning and

20   that H.M. has demonstrated that she can make meaning

21   through what she reads.

22          I also suggested that, in our conversation, that

23   it is very rare for students in fourth grade on up

24   through adulthood to read anything orally without

25   having time to rehearse it.  If they are asked to
```

Elfreth - Cross                                    128

1     perform in some manner that they would have time to

2     rehearse it.  And I suggested reading, you know, going

3     over different plays and whatnot at home to be able to

4     -- to encourage growth in that area.

5              MR. BENTLEY:   Nothing further, Judge.

6     Thank you.

7              THE COURT:   Cross.

8              THE WITNESS:   You're welcome.

9              THE COURT:   Cross examine.

10    CROSS EXAMINATION BY MS. REISMAN:

11       Q    When Ms. Baals came to you it was prior to

12    January 22nd of -- of this year, prior to her

13    administration of DRA?

14    A    Prior to Ms. Baals' administration?

15       Q    Yes.

16    A    Yes.

17       Q    Okay.  So it was -- is R-11 up there?

18    Exhibit R-11.

19              THE COURT:   What is it?  The -- the --

20              MS. REISMAN:   It's the DRA.

21              THE WITNESS:   Yes.

22              THE COURT:   It should be.  Yes.

23    BY MS. REISMAN:

24       Q    And that was -- that was administered on

25    January 22, 2008, correct?

Elfreth                  Cross                        129

1    A    Yes.

2         Q    Okay.  At that point in time you had not

3    worked with H.M., correct?

4    A    That's correct.

5         Q    Okay.  And you were relying upon what Ms.

6    Baals told you regarding this -- her student, what she

7    knew about the student, correct?

8    A    When you say that I was relying on --

9         Q    Well, I believe, unless I misunderstood your

10   testimony, you -- you said that she came to you because

11   she was concerned about the results of -- of the first

12   administration of the DRA and you -- you felt that as a

13   person who knew the student that her -- that she -- her

14   concerns should be addressed.  I -- I believe that's

15   what you said.

16   A    I also looked at the copy of the -- the first DRA

17   that was given, not by Ms. Baals.

18        Q    Okay.  Did you see problems with the first

19   DRA?

20   A    I saw problems in the area of oral reading

21   fluency.

22        Q    That you saw that H.M. exhibited problems in

23   the area of oral reading fluency?

24   A    According to the DRA it looked that way.

25        Q    Okay.  And I believe you testified that one

1    of Ms. Baals' concerns was that H.M. was reading books

2    at her grade level and was comprehending, correct?

3    A    From what Ms. Baals told me H.M. was reading books

4    on her grade level and comprehending.  Yes.

5         Q    Do you know or did you ask the parents if

6    H.M. was using books on tape at all during the fifth

7    grade year to assist her in comprehension?

8    A    On her independent reading books?

9         Q    Yes.

10   A    Did I ask the parent?  No.

11        Q    Okay.  So you don't know whether she was or

12   not?

13   A    That's correct.  I do not know.

14        Q    Would it affect your determination regarding

15   whether she has a reading problem if you knew that she

16   was using --

17             MR. BENTLEY:   Objection.  There has been no

18   testimony regarding her conclusions of the reading

19   problem.  All she said was she -- Brenda Baals to do on

20   the DRA, re-administer the test.

21             MS. REISMAN:   I'll -- I'll withdraw the

22   question.

23             THE COURT:   Okay.

24   BY MS. REISMAN:

25        Q    And when you told Ms. Baals to re-administer

1    the test you told her not to follow the instructions on

2    the test?

3    A    I didn't tell her to not follow the instructions.

4    The DRA does -- is not a standardized test form and

5    there are times in my training that I was told that not

6    -- that you can certainly re-administer if you felt

7    that the first test was invalid.

8         Q    Okay.  Could you turn to page -- the second

9    page of R-11 and look at the bottom of the page?

10   A    Okay.

11        Q    And there's a place where the person

12   administering the test is to circle the number of

13   miscues and she circled, "12 or more," and if you go to

14   the next page and the teacher analysis of oral reading

15   it indicates the number of miscues that are not self-

16   corrected were "22."  Correct?

17   A    Yes.

18        Q    And self-corrected were "6?"

19   A    Yes.

20        Q    Okay.  And turning back to the -- to the

21   second page, that -- that clearly falls within the area

22   of "12 or more," correct?

23   A    Yes.

24        Q    Miscues -- okay.  Now underneath that it

25   states, "The student score -- if a student's score

Elfreth Cross                                              132

1     falls in one or both of the shaded areas above stop

2     this assessment and reassess with the lower DRA text

3     level at another time."  Did you tell Ms. Baals not to

4     follow that direction on this test?

5     A     Did I say, "Do not follow this?"

6          Q     Yes.

7     A     No.

8          Q     Okay.  Did you tell her that she should

9     follow the directions of the people who wrote the test?

10    A     No.

11         Q     Okay.  Did you give her any guidance on

12    ~~whether or not she should follow the directions related~~

13    to the number of miscues on the test?

14    A     We talked about the fact that the -- that it says

15    in here that when you get to a certain number of

16    miscues as it does, at the very bottom of the page, to

17    stop the assessment.  We talked about that.  Yes.  But

18    I said to her that in some cases if you really feel, if

19    a teacher, the professional teacher, really feels that

20    that is not an adequate assessment for the one time

21    administration by a teacher who was not H.M.'s teacher

22    also that I would, as a professional, I would encourage

23    her to re-administer.

24         Q     When you say, "Re-admin --

25    A     Give another --

1        Q     But she didn't re-administer, she continued

2    with the test.

3    A     Well, when I say, "re-administer," I mean, "Do not

4    stop with this one."

5        Q     Okay.  So you told her that notwithstanding

6    the instructions on the -- the form of the test itself,

7    that she should continue in spite of the number of

8    miscues?

9    A     Yes.  Because miscues are one portion of this

10   particular assessment.

11       Q     Right.  They're the portion that measures

12   fluency?

13   A     Yes.

14       Q     And there's a portion that measures

15   comprehension?

16   A     Correct.

17       Q     Okay.  And so if you ignore the miscues then

18   you -- you get information about comprehension in spite

19   of miscues, correct?

20   A     Correct.

21       Q     But you don't get information about fluency?

22   A     Correct.

23       Q     Okay.  Are you aware that the Core Curriculum

24   Content Standards for the State of New Jersey require

25   that students read independently for comprehension as

Elfreth - Cross                            134

```
 1      -- and also fluent --

 2                  MR. BENTLEY:    Objection.   Beyond the scope

 3      of cross.   The witness is offered for a very limited

 4      purpose.

 5                  THE COURT:    Yeah.   What?

 6                  MR. BENTLEY:    We -- we went down this road

 7      before about the Core Curriculum Content Standards.    I

 8      don't know we need it from this witness.

 9                  THE COURT:    Yeah.   What's --

10                  MS. REISMAN:    Okay.   That's fine.

11                  THE COURT:    Yeah.

12      BY MS. REISMAN:

13          Q    And when you said the advice you gave to Ms.

14      Baals it's -- her professional opinion as the teacher

15      who knew H.M., do you know how long she had known H.M.

16      at the time that she came -- that she came to you

17      regarding the administration of the DRA?

18      A    I don't know number of days, what I know is that

19      she met with her everyday that she was employed by our

20      District in regard to H.M.'s education.

21          Q    Do you know when she became employed by your

22      district?

23      A    I don't really.

24                  MS. REISMAN:    That's all I have.

25                  THE COURT:    Any redirect?
```

Rafferty Direct                              135

1              MR. BENTLEY:    No, Your Honor.

2              THE COURT:    Thank you, ma'am.

3              THE WITNESS:    Thank you.

4              THE COURT:    You may step down.

5              MR. BENTLEY:    Can we go off the record?

6              THE COURT:    Sure.

7                          (BRIEF RECESS)

8              THE COURT:    Okay.

9              MR. BENTLEY:    Okay.  George Rafferty.

10             THE COURT:    Good afternoon, Mr. Rafferty.

11             THE WITNESS:    Good afternoon.

12             THE COURT:    You can please -- please raise

13    your right hand to be sworn.

14    G E O R G E    R A F F E R T Y, RESPONDENT'S WITNESS,

15    SWORN

16             THE COURT:    You may be seated and please

17    state your full name for the record.

18             THE WITNESS:    George Rafferty.

19             THE COURT:    The spelling of your last name.

20             THE WITNESS:    R-A-F-F-E-R-T-Y

21             THE COURT:    Thank you, sir.  Counsel, you

22    may proceed.

23    DIRECT EXAMINATION BY MR. BENTLEY:

24        Q    Mr. Rafferty, who are you employed by?

25        A    Haddon Heights School District.

1          Q     In what capacity?

2     A     Director of special education.

3          Q     And how long have you held that title?

4     A     For approximately seven months.  Since March 2008.

5          Q     Welcome to the fire.  (Laughing.)  Briefly,

6     your educational background?

7     A     I have a bachelors of -- I have a bachelors of

8     arts degree in special education with a double major in

9     academic psychology.  I also have an associates degree

10    from Hanuman University and an associates degree in

11    science.

12         Q     And your certifications?  Is that it?

13    A     I did my graduate work at Rowan University and I

14    took some graduate coursework at Temple University.  I

15    earned a master of arts in school psychology and

16    subsequently went on and earned an education specialist

17    degree with a specialty in school psychology as well.

18         Q     Okay.  I take it you've been a school

19    psychologist before you became the director at Haddon

20    Heights?

21    A     Yes.

22         Q     In what -- what district and for how long?

23    A     I was hired as a school psychologist with the

24    Pennsauken School District for approximately four

25    years.  I worked at their high school and case managed

1     students as a child study team case manager.

2         Q     How long have you been a member of the child

3     study team?

4     A     Actually, an actual member of the child study team

5     I functioned as my role as a school psychologist at the

6     Pennsauken High School.

7         Q     Okay.

8     A     I've been overseeing and supervising child study

9     teams for approximately eight years.

10        Q     Your -- you may have touched upon this but

11    your certifications are New Jersey certifications or --

12    A     I hold New Jersey certifications in teacher of the

13    handicapped, elementary school teacher, school

14    psychologist, student personnel services, supervisor,

15    principal and school administrator.

16        Q     I should have asked you which ones you don't

17    have.

18    A     (Laughing.)

19        Q     It's a lot easier to take notes but okay.

20    A     I think I got them all.

21        Q     Thank you.   (Laughing.)

22    A     I'm also a nationally certified school

23    psychologist as well.

24        Q     Okay.   I have just -- just one -- of

25    questions.   I think you came on board you said at

1     Haddon Heights at what time?

2     A     Actually, my official first day was March 10,

3     2008.

4         Q     Did you have any personal involvement in the

5     decision by the child study team to -- that H.M. was

6     not eligible for special education?

7     A     Personal involvement?

8         Q     Yes.

9     A     In terms of just overseeing their activities or --

10    I had --

11        Q     Yeah.  Sure.

12    A     I had no involvement in the decision.

13        Q     Okay.

14    A     To --

15        Q     That -- that was my question.  Were you

16    involved in -- did you tell them what to say, what not

17    to say?

18    A     No, I do not.

19        Q     Okay.  Were you involved in a -- strike that.

20              MR. BENTLEY:    This is going to be R-34?

21              THE COURT:    R-35.

22              MR. BENTLEY:    R-35?

23              THE COURT:    Yes.

24                                       (R-35 marked for

25                                        Identification.)

Rafferty-Direct                         139

1    BY MR. BENTLEY:

2         Q    Mr. Rafferty, I'm going to show you a

3    document that was marked R-35 for identification for

4    the record.  June -- June 16, 2008 letter to Mr. and

5    Mrs. M.  Take a look at it, please.  Is that your

6    letter, sir?

7    A    Yes.

8         Q    Okay.  Your signature is that the second

9    page?

10   A    Correct.

11        MR. BENTLEY:   I'd like to move R-35 in

12   evidence.

13        THE COURT:   Any objection?

14        MS. REISMAN:   No objection.

15        THE COURT:   R-35 in evidence.

16                            (R-35 received in

17                            Evidence.)

18        MR. BENTLEY:   And -- I'm sorry.  Do you

19   have a copy, Judge?  Did I give you a copy?

20        THE COURT:   No.  No.

21        MR. BENTLEY:   Sorry.  Okay.

22        THE COURT:   Thank you.

23   BY MR. BENTLEY:

24        Q    Mr. Rafferty, tell us the circumstances as to

25   why R-35 was written to the M.'s?

1    A    Well, we had -- we had received a report, as

2    indicated in the letter, conducted at St. Joe's

3    University's reading clinic.  This report was provided

4    to the Department and we were asked as to whether the

5    results of that report had changed -- would change the

6    child study team's determination to find the student

7    ineligible for special education.

8         Q    Okay.  Did you share the St. Joe's report of

9    -- by Ms. Caitlin Westcott with the team?

10   A    Yes, I did.

11        Q    Did you have any conversations with the team

12   as to whether or not that particular report would

13   change the eligibility determination?

14   A    Yes.  I asked them to review -- review the report

15   and its results and to consider it in light of their

16   decision made on May 14th.

17        Q    Okay.  And did you have a chance to review

18   the report yourself?

19   A    Yes.

20        Q    Okay.  The letter speaks for itself in that

21   it does not change the eligibility determination, I

22   mean the St. Joe's report.  Is there a reason why?

23   A    Well, the -- the -- the child study team felt and

24   I concurred that the results were not inconsistent with

25   what we had seen across the board in -- in evaluating

1      the student.  They were not contradictory or compelling

2      enough to -- to warrant finding the -- the student

3      would then now become eligible for special education

4      and reverse the determination that they had made

5      previously.

6            Q    Okay.  I know you didn't memorize the St.

7      Joseph's report but maybe you could recall anything

8      today that stood out in your mind as to why it did not

9      generate a reassessment or a re-look at the decision of

10     eligibility?

11     A     Well, from what I can recall the -- the test --

12     the test -- the report was several pages long.  In

13     reviewing those pages and going to the summary section

14     of that report the evaluator had indicated that

15     overall, given the evaluation that they had conducted,

16     that the student could benefit from instruction at the

17     fifth grade level.  And being that the student was in

18     fifth grade at that time we felt that that indicated

19     she continued to fall within a range that was

20     acceptable for a student of her grade level in her

21     grade.

22           MR. BENTLEY:    Okay.  Nothing further,

23     Judge.

24           THE COURT:  Just a minute.  All right.

25     Cross.

1          MS. REISMAN:   What?

2          MR. BENTLEY:   He's cold.

3          MS. REISMAN:   He's cold.  Oh.

4          THE COURT:   We can -- we can move somewhere

5     else but I think it's probably too --

6          UNIDENTIFIED MALE VOICE:   No, no, I'm fine.

7          MR. BENTLEY:   Can't make -- he's cold.

8          MS. REISMAN:   Let me mark this.  What number

9     are we up to?

10          THE COURT:   P -- the next is 21.  P-21.

11                              (P-21 marked for

12                              Identification.)

13          MS. REISMAN:   (Coughing.)

14          MR. BENTLEY:   This is --

15          MS. REISMAN:   This -- this document -- the

16     letter.

17          MR. BENTLEY:   Okay.

18          MS. REISMAN:   (Coughing.)

19     CROSS EXAMINATION BY MS. REISMAN:

20          Q   Mr. Rafferty, could you read P-21, please?

21     A    Yes.

22          MR. BENTLEY:   Would you like him to read

23     the entire thing or just --

24          THE COURT:   No.

25          MS. REISMAN:   No.  But I'm asking him --

1    give him a chance to -- read to ask a question.

2              THE WITNESS:   Just the report?  It looks

3    like there's several pages of parent interview and --

4    BY MS. REISMAN:

5         Q    Right.  That was -- is this what was provided

6    to you in --

7    A    No.

8         Q    -- May of --

9    A    Just the report.

10        Q    Just the report.

11   A    Just the report.

12        Q    Just the --

13   A    Everything up to where we get to "Parent/Guardian

14   Interview."

15        Q    Okay.  So --

16   A    But I have the report.

17        Q    You did have the report?

18   A    Yes.

19        Q    Okay.  So we -- the last --

20             THE COURT:   Just have him disregard it.

21             THE WITNESS:   Okay.

22   BY MS. REISMAN:

23        Q    Just disregard that part.  Okay.  And you

24   reviewed the entire report as -- and -- on or after May

25   30, 2008?

Rafferty - Cross                                   144

1    A     Yes, I did.

2          Q     Okay.  And turning to -- just to clarify for

3    the record.  So P-21 is the St. Joseph's report that

4    we've been hearing testimony about today.  This is the

5    report that everyone's been referring to, correct?

6    A     Yes.

7          Q     Okay.  On page four if you look at the top of

8    the page it indicates that "H.M. attained an

9    instructional level, the highest level which she can

10   benefit from guided reading at the fifth grade level."

11   Correct?

12   A     Yes.

13         Q     And then it goes on to state that "Her

14   strength and text based comprehension contributed

15   greatly to her overall -- score."  Is that right?

16   A     Yes, I see that.

17         Q     Okay.  And then it -- it discusses some of

18   the other results.  And then at the last few sentences

19   of that paragraph, "It is clear that as she is placed

20   in a classroom that -- text based comprehension she

21   would perform at her grade level.  However, if she was

22   expected to demonstrate strength and higher level

23   thinking performance indicates that she may have

24   considerable difficulty and need extensive explicit

25   instruction and higher level thinking strategies at the

Rafferty - Cross                                  145

1     fifth grade level."  Does --

2     A     Yes, I see --

3          Q     Did you --

4     A     I see that.  Yes.

5          Q     Did the team discuss that finding?

6     A     We -- the -- the team reviewed the report and --

7     and considered what was in it.  We didn't discuss that

8     -- that particular finding specifically or explicitly.

9          Q     Okay.

10               MR. BENTLEY:    I'm sorry, Judge.  Finding

11    that she's at a fifth grade level?  Is that the

12    conclusion or --

13               MS. REISMAN:    No.  The finding that she's

14    --

15               MR. BENTLEY:    -- or the last sentence that

16    you read?  Because I didn't know what it was --

17               MS. REISMAN:    The finding that if she is

18    expected that she will have -- that she may have

19    considerable difficulty and need extensive explicit

20    instruction and higher level thinking strategies at the

21    fifth grade level.

22               MR. BENTLEY:    Okay.

23    BY MS. REISMAN:

24         Q     Now at the -- the recommendations, the -- the

25    part that you cited was that "H.M. would benefit from

Rafferty - Cross                          146

1   instruction at the fifth grade level." Correct?

2   A    Yes.

3        Q    The -- the sentence actually reads "-- that

4   makes use of strong pre-reading focusing on the

5   development of story structure -- to the high level of

6   -- which serve to establish purposes for reading." Is

7   that right?

8   A    Correct.

9        Q    It also indicates that she would benefit from

10  post-reading strategies.  Is that right?

11  A    Yes, I see that.

12            MR. BENTLEY:    Judge, is this witness going

13  to be asked to -- to say what the -- what my adversary

14  is going to read?  I mean, if that's the purpose the

15  report speaks for itself.

16            MS. REISMAN:   Well I --

17            MR. BENTLEY:    I'm not sure the premise of

18  the question.

19            MS. REISMAN:   I can shorten it.

20  BY MS. REISMAN:

21       Q    You testified and -- today that the team

22  focused on the fact that the beginning of that one

23  sentence says that H.M. -- instruction in fifth grade

24  that -- and it goes on.  Did the team consider all of

25  the other information?

Colloquy                                    147

1    A     Yes.  I -- I think that was something that stood

2    out to us as a finding that was -- that was reported by

3    this evaluator.  We felt that the report was not

4    unimportant or unuseful, but that it could help in --

5    form instruction.  We just didn't see the instruction

6    as being special education instruction.  We thought --

7    we felt as thought that what was being recommended was

8    well within the range which -- which could be provided

9    in a general education classroom.

10             MS. REISMAN:   That's all I have.

11             THE COURT:   Any redirect?

12             MR. BENTLEY:   No.  No, Your Honor.

13             MS. REISMAN:   I -- I'd like to move for the

14   admission of P-21 without the pages after the signature

15   page.

16             MR. BENTLEY:   I would object, Your Honor.

17   I believe the -- and having -- should be here to

18   testify to.

19             THE COURT:   There's -- there's two things

20   that are of concern to me.  One -- one is not a concern

21   and I would usually overrule the objection because if

22   this is a document that was considered by the child

23   study team then it should be part of the record in this

24   matter.

25             MR. BENTLEY:   Sure.

Colloquy                                            148

 1            THE COURT:   But it was considered after the

 2   fact.

 3            MS. REISMAN:   It was considered after the

 4   fact and they said it's part of their decision.  It was

 5   considered by their expert.  If -- if you want to wait

 6   until we have the testimony from our expert to come in

 7   and talk about it we can wait until then to move it

 8   into --

 9            MR. BENTLEY:   No, Judge.

10            THE COURT:   No, no, no, no.  I'm just saying

11   if it was considered by the child study team it should

12   be part of the record and it was considered by the

13   child study team, however, in a form which did not

14   include the additional attachments.  Is that my

15   understanding?

16            MS. REISMAN:   I believe that's correct.

17            THE COURT:   All right.  So in any event I'm

18   going to accept P-21 in evidence, but we'll disregard

19   these additional attachments unless there's some

20   authentication or some reason why I have to --

21            MS. REISMAN:   I -- back and get them --

22            THE COURT:   Okay.  That's P-21 in evidence.

23                                    (P-21 received in

24                                    Evidence.)

25            THE COURT:   But now this is an -- this is a

Colloquy                                149

1    document, and I don't know if it's testing those after

2    the fact, but certainly a document that was made known

3    to the child study team after the fact, why -- to be

4    consistent shouldn't I then consider this --

5                MR. BENTLEY:    QRI?

6                THE COURT:    What's that?  QRI, yes.

7                MS. REISMAN:    The child study team never --

8    the QRI.  The parents -- the parents --

9                THE COURT:    Maybe they should.

10               MS. REISMAN:    The parents --

11               MR. BENTLEY:    I would love for them to

12   consider that, Judge.

13               MS. REISMAN:    The parents informed the child

14   study team of the results of this evaluation prior to

15   the eligibility meeting.  They just didn't have the

16   final report.  The final report was sent to Mr.

17   Rafferty on May 30th and as you can see from the

18   document R-35 moved into evidence by respondents the

19   child study team explicitly received and reviewed the

20   report compared by Ms. Westcott and took that into

21   consideration when affirming its determination.  That

22   is not true of the QRI.

23               THE COURT:    All right.

24               MS. REISMAN:    In addition, the child study

25   team were informed of the results of this report prior

Colloquy                                    150

1      to the eligibility meeting -- final report.

2             MR. BENTLEY:    I -- I -- I cannot agree to

3      it, Judge.  There may be evidence from the other side,

4      but I don't have any record of that ever happening or

5      it being communicated to us.

6             THE COURT:  All right.  In any event, I've

7      made my ruling as far as P-21.

8             MR. BENTLEY:    It's in evidence?

9             THE COURT:  It's in evidence.  Yes.

10            MR. BENTLEY:    And the QRI?

11            THE COURT:  Is -- I'm just -- I'm just

12     inquiring why -- if I can consider something after the

13     fact here why it can't be true across the board.

14            MS. REISMAN:    This was -- this was done --

15     okay.  This was done last year.  This -- this CRI was

16     done last year.  The parents also don't have a copy of

17     the QRI --

18            THE COURT:  Okay.

19            MS. REISMAN:    -- that they're talking about.

20            THE COURT:  That's --

21            MR. BENTLEY:    Well, if we can provide the

22     parents a copy of the QRI then --

23            THE COURT:  Then I'll -- I'll readdress it.

24     I'll readdress it.  But until that's done I'm not going

25     to consider it.

1              MR. BENTLEY:    All right.

2              THE COURT:   Okay.  P-21 in evidence after

3    you remove the portions that are -- were not provided

4    to the child study team.  Anything else of Mr.

5    Rafferty?

6              MR. BENTLEY:    No, Your Honor.

7              THE COURT:    Thank you, sir.

8              THE WITNESS:    Thank you.

9              THE COURT:    It wasn't that hot of a seat.

10             THE WITNESS:    No, it was cold, actually.

11             THE COURT:    (Laughing.)  All right.

12   Anything further?

13             MR. BENTLEY:    I don't believe so, Your

14   Honor.  This is in -- right.

15             THE COURT:    All right.  We'll go off the

16   record.  Off the record.

17        {Whereupon, the proceedings were adjourned.}

18                      *  *  *  *  *

19

20

21

22

23

24

25

152

1    STATE OF NEW JERSEY }

2    COUNTY OF MERCER      }

3

4            I, Kelly Sellers, AD/T# 544, assigned

5    transcriber, do hereby affirm that the foregoing is a

6    true and accurate transcript of the proceedings in the

7    matter of <u>R.M. and B.M. o/b/o H.M. v. Haddon Heights</u>

8    <u>Board of Education</u> bearing Docket No. EDS 4902-08,

9    heard on December 8, 2008 before the Office of

10   Administrative Law Court.

11

12

13

14

15

16                          Kelly Sellers

17

18

19

20

21

22

23

24

25