UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
_____

| | |
|---|---|
| H. M. by her parents B. M. and R. M., and B. M. and R. M. individually, | : **Document Electronically Filed** |
| | : |
| | : DOCKET NO. 1:09-cv-04293-NLH-AMD |
| Plaintiffs, | : |
| | : CIVIL ACTION |
| vs. | : |
| | : |
| Haddon Heights Board of Education, | : **RETURNABLE:  APRIL 18, 2011** |
| | : |
| Defendant. | : |

_____

**DEFENDANT'S RULE 56.1
STATEMENT OF MATERIAL FACTS**
_____


CAPEHART & SCATCHARD, P.A.
A Professional Corporation
Laurel Corporate Center
8000 Midlantic Drive, Suite 300 S
Mount Laurel, N.J.  08054
(856) 234-6800
Attorneys for Defendant, Haddon
Heights Board of Education
JFB8646

Pursuant to Local Rule 56.1, Defendant, Haddon Heights Board of Education submit the following Statement of Material Facts:

1.    The Haddon Heights Board of Education ("Board") is a Type II public school board of education organized under Title 18A of the New Jersey Statutes.

2.    Plaintiff, H. M., is a resident of the school district served by the Board.  Currently, H. M. is in eighth grade.

3.    Plaintiffs R. M. and B. M. are H. M.'s parents.

4.    The relevant time period at issue in this litigation begins with the 2006-2007 school year during which H. M. was in 4th grade at the Board's Atlantic Avenue Elementary School.  Any allegations regarding previous school years are barred by the applicable statute of limitations.

5.    Some background that precedes the 2006-2007 school year is necessary, however.  H. M. was classified as a child eligible for special education and related services under the category "Specific Learning Disability" under N.J.A.C. 6A:14-3.5(c)(12), more particularly the areas of basic reading skills and mathematics computation.  **OAL Op. p. 3.**

6.    On May 14, 2008, during H. M.'s 5th grade year, the Board's child study team determined that H. M. was no longer eligible for special education.  This recommendation to

declassify was unanimous among from all members of the Board's Child Study Team ("Team")and H. M.'s teachers.

7.    On June 5, 2008, plaintiffs filed a Due Process Petition ("Petition") with the New Jersey Department of Education, Office of Special Education.  The issues in the Petition were limited to:  Whether the Team's decision in May, 2008 finding H. M. no longer eligibility for special education was correct; 2) Whether the services provided to H. by The Cooper Learning Center during the summer of 2008 qualify as Extended School Year ("ESY") services such that the parents should be reimbursed; and 3) Whether H. was denied a free appropriate public education ("FAPE") for the 2006-2007 and 2007-2008 school years, thus leading to an award of compensatory education.  The matter was transferred to the Office of Administrative Law and the Honorable Joseph F. Martone, A.L.J. was assigned the matter.

## H. M.'S EDUCATIONAL BACKGROUND AND INFORMATION LEADING TO THE DECISION TO DECLASSIFY

### 2006-2007 school year

8.    H. M. received all A's and B's on her 4th grade report card.  **Exhibit 13**.

9.    On the 4th Grade ASK testing, H. M. was proficient in Language Arts Literacy, and Advanced Proficient in Mathematics and Science.  **Exhibit 13.**

**2007-2008 school year**

10.  Leslie Ruffalo was H. M.'s 5th grade (2007-2008 school year) teacher.  **Exhibit 1, 29:6-8**

11.  Brenda Baals became H. M.'s special education teacher in November 2007.  **Id. at 140:4-6**

12.  Mrs. Alice Kay Morris is the Team's social worker. She was the social worker directly involved with working with H. M. and H. M.'s case manager.  **Exhibit 2, 74:21-75:4**

13.  Mrs. Ruffalo testified that H. M. was very motivated, focused, dedicated and wants to learn.  **Id., 30:4-5; OAL Op. p. 3, ¶1b.**  H. M. participated in all aspects of the day and was an active participant in the classroom.  **Id., 31:12-19; OAL Op. p. 3, ¶1c**  Indeed, H. M. would volunteer to read out loud in Mrs. Ruffalo's class.  **Id., 32:12-15**

14.  Mrs. Ruffalo further testified that in 5th grade it is more important to be able to read independently and comprehend because that is what students are being asked to do more and more as the students get into upper elementary grades.  **Id. at 33:7-16**

15.  In 5th grade, H. M. was on the fifth grade instructional level of reading and was reading at grade level. **Id. at 36:24-37:2; Id., 78:22-79:2**

16.  Mrs. Ruffalo indicated that H. M. did very well in Math and that it was a strong area for H. M.  **Id. at 39:5.**

4

17.   In her Individualized Education Plan ("IEP") (Exhibit 11) for 5th grade, H. M. did not have any special education goals or modifications in Math, except for extra time to do fact drills, which were rarely assigned. **Id. at 39:21-40:6**

18.  With regard to spelling and writing modifications, Mrs. Ruffalo did not grade spelling unless H. M. was given time to proof read and check for errors. **Id. at 40:15-19**  H. M. was also given an opportunity to self check her spelling tests prior to it being graded. **Id. at 44:1-6**  Mrs. Ruffalo also removed the bonus spelling pages that were assigned each week and H. M. was not required to complete them. **Id. 53:20-54:2**

19.  H. M. received A's and B's during her 5th grade school year. **Exhibit 6**.

20.  H. M. improved her decoding skills, her punctuation and grammar and writing skills from quarter to quarter during her 5th grade year. **Exhibit 1 at 74:16-76:4**

21.  The grades given to H. M. during her fifth grade year were her grades based on the work she did and were not watered down grades. **Id. at 76:5-9**

22.  H. M. enjoyed reading since she read more than she was required to for class purposes. **Id. at 78:12-16**

23.  Since H. M.'s education was governed by and delivered within the general education curriculum, her goals and objectives in her 5th grade mirror the goals and objectives of

the core curriculum content standards for the grade that she is in. **Exhibit 2, 92:29-24**

24. An alternative and/or replacement education program was never proposed for H. M. because could function within the general education curriculum. She was assessed as all other students are in the general education curriculum as to how they progress through: teacher progress reports, report cards and achievement on standardized testing. **Id**. at 93:8-15

25. H. M. was able to read and participate in the fifth grade literacy circles without difficulty. **Id**. at 84:9-13

26. When H. M. was questioned about her comprehension and ability to "read between the lines" in the literacy circle book assignments, she was fully able to comprehend the meaning in the books. She could answer critical higher level questions about her reading. **Exhibit 1 at 145:9-24**

27. H. M. was on grade level in math, social studies and science. **Id**. at 86:17-25

28. H. M. knew how to decode and had the building blocks to figure out an unfamiliar word and comprehend the word. **Id. at 88:1-19**

29. H. M. did not portray any type of frustration in Mrs. Ruffalo's classroom. **Id**. at 114:1-4

30.   Compared to other special education students at the Atlantic Avenue School, H. M. received the least amount of services.   **Id. at 141:1-14**

31.   H. M. did not show any signs of having organizational problems.   **Id. at 141:15-142:16**

32.   In January 2008, Mrs. Baals met with R. M., H. M.'s mother.  During this meeting, R. M. requested information about "replacement reading" programs that could be used for H. M. as opposed to continuing H. M. in the general education reading program that H. M. had been participating in and benefitting from.  Mrs. Baals did not believe that a replacement program was warranted because replacement programs are for students that are not performing at grade level and H. M. was performing at grade level.  Mrs. Baals believed that H. M. would be bored using a replacement program.  **Id. at 154:22-155:17**

**2008 Reevaluation and Decision to Declassify**

33.   On February 28, 2008, the Team and the plaintiffs attended an evaluation planning meeting to consider the extent of any re-evaluations needed for determining whether H. M. continued to be eligible for special education under the New Jersey Administrative Code.  During this re-evaluation plan meeting, a concern was raised that if H. M. was re-evaluated, she might not meet the criteria for special education services.  **Exhibit 1 at 203:23-204:5.**

34.  Despite this concern, it was Mrs. Baals opinion that H. M. needed to be re-evaluated to make sure that H. M. was receiving an appropriate program and proper services, and the Team proceeded to perform the re-evaluation.  **Id. at 203:10-13**

35.  Patricia T. Woodland is the Learning Consultant for the Board's Team.  **Exhibit 3, 85:23-25.**  The Learning Consultant's job responsibilities include:  evaluating children for the child study teams, look at their learning skills, their academic levels and what needs to be done for them with regards to whether they're eligible for special education and related services and what types of programming is best for the student.  **Id. at 90:2-11**35.

36.  As part of the re-evaluation, H. M. was administered a variety of standardized assessments by Ms. Woodland culminating in her April 2, 2008 Learning Assessment.  Some highlights of the Assessment include:

- In the Oral Language cluster of the Woodcock Johnson III Test of Achievement ("WJ-III"), "H.'s sampling of spontaneous oral language indicates little difficulty with vocabulary and word retrieval, syntax and grammar."

- In the same Oral Language cluster of the WJ-III, "H.'s overall oral language standard score is within the average range…"

- In the Reading cluster of the WJ-III, H.'s "Broad Reading cluster fell within the average range with a standard score of 100…"  This part of the WJ-III assessed, *inter alia*, decoding skills, reading speed and reading comprehension skills, all areas that the

Plaintiffs assert are disabilities that justify special education for H.

- "She was able to correct herself when asked to look at the whole word again."  This ability to self-correct was also cited by H.'s classroom teacher and special education teacher as a significant and positive skill utilized by H. that was either downplayed by the Plaintiffs or ignored altogether.  Moreover, it illustrates that H. has the necessary tools to read fluently and to comprehend at her grade instructional level.

- In the "Instructional Implications" section, Ms. Woodland notes: "H.'s appears to possess the academic skills to achieve at age level.  H. would benefit from reminders to slow down and carefully review work presented."

- In the Reading Comprehension subtest, "H.'s standard score was within the average range (percentile rank of 51; standard score of 92 to 109) for her age."

- "H. received an average rating in Reading Fluency subtest with a standard score of 106 (standard score range of 99-113) with a percentile rank of 66."

- "The WJ-III Academic Skills cluster is a measure of reading decoding, math calculation and spelling providing an overall level of basic achievement skills.  H. received an average rating with a standard score of 93 (standard score range of 88-98) with a percentile of 32.  Specifically, her sight reading ability and spelling are average.  Her math calculation skill is low average to average.

- The WJ-III Academic Fluency cluster combines an individual's performance on the reading, writing, and math fluency subtest providing an overall index of academic fluency with a school setting.  H. received an overall average rating with a standard score of 106 (standard score range of 99-112) and a percentile rank of 64.  The fluency with which H. performs academic tasks is average to advanced.  For example, her fluency with reading and writing tasks is average to advanced.  Her fluency with mathematics problems is average."

**Exhibit 5.**

37.   In addition, Ms. Woodland used the Gray Oral Reading Tests-Diagnostic, which is also a formal, timed, standardized, professionally accepted diagnostic instrument that is tied directly into the Administrative Code special education eligibility criterion of Reading Fluency.  She reported the following as to H.:

> On the Paragraph Reading subtest, a series of graded passages are read aloud by the student.  The examiner records the number of deviations from print that are made and notes the time in seconds that it takes to read the passage.  Two scores, rate and accuracy, are derived from this procedure. In addition, comprehension questions are asked, and the comprehension score is added to the rate and accuracy scores to derive a paragraph reading score.  On the Paragraph Reading subtest, H. received a standard score of 8, a percentile rank of 25 and a grade equivalent of 5.0, which places her within the average range.  Many of H.'s miscues consists of vowel sound confusion (fire/fierce), words that have more than one pronunciation (present/present, live/live).  While H. experienced difficulty with oral fluency accuracy, her comprehension of the stories was not significantly impacted. H. appeared to understand what had occurred in the story. When redirected to read a word, H. was able to self correct on 90% of the words presented.  When reminded to use the phonetic rule, she was able to appropriately read the word.  Accuracy improved when H. was directed to take her time and look at the words carefully.

**Exhibit 5.**

38.   Ms. Baals and Ms. Ruffalo also pointed to H.'s tendency to move too quickly in her work, resulting in careless errors. Rather than a Specific Learning Disability being at the root of H.'s mistakes in reading, the evidence overwhelmingly suggest that her carelessness and rushing through text and/or assignments are more in play.

39.  Ms. Woodland conducted a classroom observation of H. M. as part of the re-evaluation.  Ms. Woodland noted:

> . . .her behavior was like everyone else in the classroom, she was attentive, she's appropriate, she's alert, very involved.  She doesn't have her head down.  When you look -- when children have learning problems or can't cope in the classroom they tend to sometimes be inattentive, distracted, not involved in the lesson, really pulled back.  She was very involved in everything that was going on.

**Exhibit 3, 117:14-21**

40.  Ms. Woodland further noted that she observed H. M. reading allowed and indicated that, "It was appropriate.  She didn't stumble, she was able to read what she had written."  **Id. at 117:22-118:1**

41.  Ms. Woodland also observed H. M. during literature circle time.  H. M. was reading a book that other non-special education students were reading and was able to fully participate.  At one point, H. M. was required to defend her position on an issue in the book and was able to go to the book, find a passage that supported her position and read it out loud.  Ms. Woodland noted that she had strong comprehension of the book.  **Id. at 118:4-120:22.**

42.  Mrs. Morris testified that after having reviewed all of the parents' concerns, having reviewed the testing that the parents provided and reviewing the testing that was completed during the evaluation process, H. M.'s academic record, her

teachers' reports, etc., Mrs. Morris came to the conclusion that H. M. was no longer eligible for special education and related services.  **Exhibit 2, 188:22-189:12**

43.  34.  Mrs. Ruffalo indicated her agreement with the decision to declassify H. M. on the basis that H. M. was performing at grade level in her classroom during the 2007-2008 school year and the testing agreed that there was no discrepancy.  **Exhibit 1 113:7-19**

**Plaintiffs' Expert Testimony at the Due Process Hearing**

44.  Dr. Richard Selznick, one of the Plaintiffs' experts from the Cooper Learning Center, offered no opinion as to the Team's decision on eligibility for special education.  His testimony was limited to the self-described "enrichment services" disguised as ESY services provided by the Cooper Learning Center in the form of the Wilson Reading Program during the summer of 2008, which was provided by staff with no special education certification.  **Exhibit 16, pgs. 36-37**

45.  Dr. Anthony Applegate, another expert that testified on Plaintiffs' behalf in the administrative hearing, also did not opine on the core issue of eligibility, but rather gave irrelevant testimony as to the superiority of his Critical Reading Inventory ("CRI") method of evaluating reading ability.

46.  Dr. Applegate rejected a highly structured, phonemic-based program like the Wilson Reading Program for H. M. that her

parents were advocating.  Dr. Applegate, like Ms. Baals, believed H. M. thrives in a literature-based reading environment, which she will receive in the general education setting as a regular education student at Haddon Heights.

**Exhibit 17, pgs. 49-50**

**The Decision of the Honorable Joseph F. Martone, A.L.J.**

47.  Judge Martone found that while H. M. had weaknesses in oral reading fluency, work attack and decoding skills, her instructional level was average or above average on a fifth grade level and she did not exhibit a severe discrepancy between her intellectual ability and achievement. **Pg. 23, para. 4**

48.  The New Jersey ASK assessments are state-wide assessments of academic proficiency of students in New Jersey tied into the Core Curriculum Content Standards.  Judge Martone particularly noted that on these assessments, H. M. was shown to be "Proficient" in language arts and literacy , and "Advanced Proficient" in math and science. **Id. at para. 5**

49.  Judge Martone found that the H. M.'s Woodcock-Johnson III test results were generally in the average range and the testing concluded that H. M. has the ability to function at her grade level.  Judge Martone further noted that with respect to reading fluency, H. M. was found to have the ability to read and comprehend and while she has weaknesses, they are not disabilities.  **Id. at para. 6**

50.   There is no finding of a severe discrepancy between H. M.'s verbal comprehension index and her current achievement in basic reading skills and mathematic computation.   H. M. continues to demonstrate an average ability in all subjects. **Id. at para. 12**.

51.   Judge Martone held that H. M. is not eligible for classification as a special education student.   **Pg. 24, para. 9.** The determination to declassify H. M. was appropriate under the circumstances and should be affirmed.   **Id. at para. 25**.

**H. M.'s Progress Since the Due Process Hearing**

52.   H. M.'s 7th grade report card shows that she received A's and B's in all subject areas, including a final grade of 91 in language arts.   **Exhibit 7**

53.   H. M.'s 8th grade first quarter report card shows that she received A's in B's in all subjects, including a 93 in language arts.   **Exhibit 8**

54.   On the 7th grade ASK testing, H. M. scored a 222 on the Language Arts Literacy Portion and was considered Proficient. She scored a 231 on the Mathematics portion and was also considered Proficient.   **Exhibit 9**