IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

H.M., by her Parents, B.M.
and R.M., and B.M. and R.M.,
individually,

    Plaintiffs,

    v.

HADDON HEIGHTS BOARD OF
EDUCATION,

    Defendant.

CIVIL NO. 09-4293(NLH)(AMD)

**OPINION**

---

**APPEARANCES:**

CATHERINE MERINO REISMAN
REISMAN CAROLLA LLP
19 Chestnut Street
HADDONFIELD, NJ 08033-1810

    On behalf of Plaintiffs

JOSEPH F. BETLEY
CAPEHART & SCATCHARD, P.A.
LAUREL CORPORATE CENTER - SUITE 300
8000 MIDLANTIC DRIVE - C.S. 5016
MOUNT LAUREL, NJ 08054

    On behalf of Defendant

**HILLMAN**, District Judge

    This matter involves an appeal of a decision of an administrative law judge (ALJ) who affirmed the Haddon Heights Board of Education's "declassification" of H.M. as a student with a "Specific Learning Disability" requiring special education. Before the Court is plaintiffs' motion for summary judgment and defendant's cross-motion for summary judgment. For the reasons

expressed below, plaintiffs' motion will be denied, and defendant's motion will be granted.

## I.   <u>BACKGROUND</u>

Plaintiffs B.M. and R.M. are the parents and legal guardians of H.M., who attends school in the Borough of Haddon Heights, Camden County, New Jersey.  Defendant, Haddon Heights Board of Education ("Board" or "school district"), is a public body charged with the conduct, supervision and management of Haddon Heights public schools.  H.M. began attending Kindergarten in September 2002 in the Haddon Heights public schools.  Her parents obtained a private evaluation of H.M. highlighting her learning disability which they provided to H.M.'s Child Study Team (CST).  In May 2005, the Board's CST classified H.M. with a disability eligible for special education services based upon H.M.'s learning disability in reading and mathematical calculation.  The CST developed individual education plans (IEP) for H.M. in May 2005 through May 2008.  In May 2008, at a reevaluation and IEP meeting, the CST determined that H.M. did not require special education to progress in the general education curriculum, and that she did not meet the criteria for special education services.  As a result, over the objection of H.M.'s parents, the CST declassified H.M.  After the declassification, H.M.'s parents enrolled H.M. in a home-based reading fluency program through Cooper Learning Center where H.M. received instruction in "word identification, word attack, passage

comprehension, sight word efficiency and phonemic decoding efficiency."

## II.  <u>PROCEDURAL HISTORY</u>

On June 5, 2008, plaintiffs filed a complaint with the New Jersey Department of Education, Office of Special Education, for a due process hearing.  Plaintiffs' complaint demanded an order requiring defendant to re-classify H.M. and provide appropriate special education and related services; compensatory education for the 2006-2007 and 2007-2008 school years; and tuition reimbursement for extended school year ("ESY") programming at Cooper Learning Center.  The matter was transmitted to the Office of Administrative Law (OAL) on July 7, 2008 for a hearing.  In his opinion dated May 28, 2009, the Administrative Law Judge (ALJ) affirmed defendant's determination that H.M. was no longer eligible for special education and related services.[1]

As a result of the ALJ's decision, plaintiffs filed this case alleging that defendant violated their rights under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131, *et seq.*, and New Jersey Special Education Law and Regulations.

---

[1] The loss of eligibility for special education services was considered a threshold issue and consequently the ALJ did not address plaintiffs' claims for compensatory education and tuition for the extended school year.

Specifically, plaintiffs claim that the ALJ erred as a matter of law in concluding that H.M. was no longer eligible for special education in May 2008.  Plaintiffs also contend that defendant did not meet its burden of proving that the 2006-2007 and 2007-2008 IEPs provided a free appropriate public education ("FAPE").

In addition, plaintiffs moved to have the record supplemented with progress reports and expert opinions regarding the additional instruction that plaintiffs independently obtained for H.M.  The Court granted plaintiffs's motion to supplement the record, but did not at that time attribute any weight to the proffered evidence.

III. **DISCUSSION**

    **A.   Jurisdiction**

Plaintiffs brought this case pursuant to the IDEA, Rehabilitation Act, and the ADA, and therefore, this Court has jurisdiction over plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  This Court has jurisdiction to review the decision of the state educational agency under 20 U.S.C. § 1415(i)(2).  Plaintiffs are entitled to bring this civil action because they have exhausted the requirement of administrative review under the IDEA.  See 20 U.S.C. § 1415(e)(2).[2]

--------

    [2] The IDEA states in relevant part:

      Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and

4

**B.    IDEA**

The IDEA obliges states in receipt of federal funding under the statute to guarantee a free and appropriate public education ("FAPE") to all children with disabilities.  20 U.S.C. § 1412(a)(1)(A).  The IDEA instructs states to develop an individual education plan, known as an "IEP," for every disabled child. 20 U.S.C. § 1412(a)(4).  "An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." <u>D.S. v. Bayonne Bd. of Educ.</u>, 602 F.3d 553, 557 (3d Cir. 2010) (citations omitted). A disabled child is entitled to "such services as are necessary to permit the child 'to benefit' from the instruction." <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 188-189 (1982). The IEP must provide a "'basic floor of opportunity,' but not necessarily 'the optimal level of services.'" <u>Holmes v. Millcreek Twp. Sch. Dist.</u>, 205 F.3d 583, 589-90 (3d Cir. 2000)(quoting <u>Carlisle Area Sch. v. Scott P.</u>, 62 F.3d 520, 533-34 (3d Cir. 1995)).  However, "although the state

> any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

20 U.S.C. § 1415(e)(2).

is not required to 'maximize the potential of handicapped children,' ... a satisfactory IEP must provide 'significant learning' and confer 'meaningful benefit.'" <u>T.R. v. Kingwood Twp. Bd. Of Educ.</u>, 205 F.3d 572, 577 (3d Cir. 2000).

The IDEA also requires that a disabled child be educated in the "least restrictive environment." 20 U.S.C. § 1412(a)(5)(A). The least restrictive environment has been defined as "... one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." <u>Carlisle Area Sch.</u>, 62 F.3d at 535.

## C.   Standard of Review

The Third Circuit has recently outlined the standard of review of district courts when reviewing an appeal from the ALJ under the IDEA:

> When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as "modified de novo" review. Under this standard, a district court must give "due weight" and deference to the findings in the administrative proceedings. Factual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why. The "due weight" obligation prevents district courts from imposing their own view of preferable educational methods on the states.

<u>D.S. v. Bayonne Bd. of Educ.</u>, 602 F.3d 553, 564 (3d Cir. 2010)

(citations omitted).

Even applying the modified de novo standard of review, the ALJ's credibility determination is given "special weight" because the ALJ has heard live testimony and determined that one witness is more credible than another witness.  Id. (citing Shore Req'l High Sch. Bd. of Educ., v. P.S., 381 F.3d 194, 199 (3d Cir. 2004)). "Specifically, this means that a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.' " Id. (citations omitted).  "... [T]he word "justify" requires that the applicable standard of review be essentially the same as that a federal appellate court applies when reviewing a trial court's findings of fact."  Id.  The school district bears the burden of proof and of production at the due process hearing before the ALJ. See N.J. Stat. Ann. § 18A:46-1.1.

### D.  Analysis

Plaintiffs seek summary judgment on their claims of violations of the IDEA, Rehabilitation Act, and the ADA for: (1) the Board's decision to declassify H.M.; and (2) the Board's implementation of H.M's IEP for 2006-2007, and 2007-2008.  Plaintiffs also seek compensatory education and reimbursement for the ESY services provided by the Cooper Learning Center.  Defendant filed a cross-motion for summary judgment arguing that: (1) plaintiffs' expert opinion should be stricken; (2) the decision that H.M. is not

eligible for special education must be affirmed; (3) the IEPs met all of the requirements of the IDEA, the Rehabilitation Act and the ADA; (4) H.M. does not qualify for extended school year services and, therefore, is not entitled to reimbursement for the Cooper Learning Center; and (5) that plaintiffs are not entitled to a compensatory education.

### 1.   Plaintiffs' Expert Opinion

As a threshold matter, we address defendant's argument that the opinion of plaintiffs' expert, Dr. Margaret Kay, must be stricken because: (1) she opined as to issues that predate the litigation and violate the statute of limitations; (2) the additional discovery provided by plaintiffs is outside the scope of their motion to supplement the record; and (3) the conclusions in the report constitute "net opinions."  As explained below, although Dr. Kay's report will not be stricken in its entirety, certain portions of the report will be stricken as either irrelevant because they relate to claims that are beyond the statute of limitations, or because certain opinions expressed in the report fail to meet the requirements under Federal Rule of Evidence 702, and the standards outlined in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 572 (1993).

### a.   Statute of Limitations

The IDEA has a two year statute of limitations, which states:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

20 U.S.C. § 1415(f)(3)(C).  The Third Circuit has held that the two year limitations period also applies to claims for education under the Rehabilitation Act.  See P.P. ex rel. Michael P. v. West Chester Area School Dist., 585 F.3d 727, 736 (3d Cir. 2009).

Plaintiffs have confirmed that they are not seeking to recover for any claims that arose prior to the limitations period. Plaintiffs filed their petition on June 5, 2008 and, therefore, may seek recovery for claims that arose after June 5, 2006, which generally include the 2006-2007 (fourth grade) and 2007-2008 (fifth grade) school years.  Some portions of Dr. Kay's expert opinion or testimony is in support of claims that predate June 5, 2006.  Such claims are barred by the statute of limitations, and therefore will not be considered by the Court.  Specifically, the following claims are barred: (1) any claim based on Dr. Kay's opinion in "Question 1" that the Board violated its "Child Find" obligations under IDEA in May 2005; (2) any claim based on Dr. Kay's opinion in "Question 2" that the IEP designed on May 31, 2005 was not reasonably calculated to ensure meaningful educational benefit in light of H.M's intellectual potential; (3) any claim based on Dr. Kay's

9

opinion in "Question 7" that H.M. is at an increased risk for harm as a result of inappropriate or inadequate instruction based on the first three years of her schooling; and (4) any claim based on Dr. Kay's opinion in "Question 8" that H.M.'s kindergarten, first, and second grade education was deficient and affected her rate of academic progress.  With regard to "Question 8," Dr. Kay also provides an opinion regarding the instruction received by H.M. at the Cooper Learning Center.  Such opinion pertains to a claim that arose within the limitations period and, therefore, that portion will be considered by the Court.[3]

Thus, Dr. Kay's opinions for Questions 1, 2, 7 and 8 (regarding any deficiencies in H.M.s kindergarten through second grade education) are in support of claims that arose beyond the limitations period and, therefore will not be considered by the Court.

### b.   Scope of Supplemental Record

Defendant argues that much of Dr. Kay's report is beyond the scope of plaintiffs' request to supplement the record with "progress reporting and expert testimony to demonstrate how specially designed instruction specifically targeting reading fluency allowed H.M. to progress in that area."

---

[3] Defendants also seek to have Dr. Kay's opinion in "Question 3" stricken on statute of limitations grounds.  That request is denied.  Question 3 is addressed in the following section under defendant's Rule 702/Daubert challenge.

This Court has discretion in deciding what to consider as supplemental evidence.  See Susan N. v. Wilson School District, 70 F.3d 751, 760 (3d Cir. 1995) ("...the question of what additional evidence to admit in an IDEA judicial review proceeding, as well as the question of the weight due the administrative findings of fact, should be left to the discretion of the trial court.").  The standard applied in considering the additional evidence is whether the evidence would assist the court in ascertaining whether Congress's goal in enacting the IDEA (i.e., to ensure "that each child with disabilities has access to a program that is tailored to his or her changing needs and designed to achieve educational progress) has been and is being reached for the child involved. Id.  This Court has already decided that plaintiffs would be permitted to offer additional evidence not submitted in the underlying administrative hearing.  Although plaintiffs have submitted some additional evidence that goes beyond their initial request, it is not so beyond the scope as to warrant disregarding plaintiffs' expert report.  Also, the additional evidence does not run afoul of the balance between assisting the Court in implementing Congress's goal under the IDEA, and avoiding undermining the purpose and value of the underlying administrative proceedings.  Id.  Therefore, defendant's request to strike the report as beyond the scope of plaintiffs' request will be denied.

11

### c.  Weight Afforded to Facts in Dr. Kay's Opinion

Defendant argues that Dr. Kay's opinion should be stricken because it is a "net opinion."  A "net opinion" is a rule applied under New Jersey law and which dictates exclusion of expert testimony that contains "bare conclusions, unsupported by factual evidence."  See Holman Enter. v. Fidelity & Guar. Ins. Co., 563 F.Supp.2d 467, 472 n. 12 (D.N.J. 2008) (citing Buckelew v. Grossbard, 87 N.J. 512, 435 A.2d 1150, 1156 (N.J. 1981)).  "The 'net opinion' rule is neither an evidentiary rule under the Federal Rules of Evidence nor a factor in the Daubert analysis."  Id. (citing Zeller v. J.C. Penney Co., No. 05-2546, 2008 WL 906350, at *7 n. 13 (D.N.J. Mar. 31, 2008)).  "The net opinion rule is merely a restatement of the well-settled principle that an expert's bare conclusions are not admissible under [the fit requirement of] Rule 702 of the Federal Rules of Evidence."[4]  Id.

The Court will address each of defendant's challenges to Dr.

---

[4] Rule 702 provides,

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Kay's opinion under the standards of Rule 702 and <u>Daubert</u>.[5]
Plaintiffs did not address each of the challenges raised by
defendant but simply disagreed that Dr. Kay's opinion is a net
opinion that should be excluded.

As stated above, Dr. Kay's opinion regarding Questions 1, 2
and 7 involve claims that arose outside the limitations period.  In
addition, the portion of Dr. Kay's opinion in "Question 8" that
pertains to H.M.'s education prior to June 5, 2006 is similarly
barred.  Thus, since those portions are stricken on statute of
limitations grounds, the Court will not reconsider them under a
Rule 702/<u>Daubert</u> challenge.

With respect to Dr. Kay's opinion in "Question 3," regarding
whether H.M.'s IEPs for 2006-2007 and 2007-2008 contained
measurable goals and objectives meets the requirements under Rule
702/<u>Daubert</u> and will be considered by the Court.  Likewise, Dr.
Kay's opinion regarding "Question 4" on whether the Board erred in

---

[5]  In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S.
579, 572 (1993), the Supreme Court analyzed Rule 702, and
instructed that a two-step analysis is to be used to assess the
admissibility of the proffered expert testimony on scientific
issues under Rule 702.  The expert testimony must be reliable, so
that it must be "scientific," meaning grounded in the methods and
procedures of science, and it must constitute "knowledge,"
meaning something more than subjective belief or unsupported
speculation.  <u>Daubert</u>, 509 U.S. at 590.

declassifying H.M. as an eligible student under the IDEA in May 2008 is sufficient to meet the requirements under Rule 702/Daubert and will be considered by the Court.

Dr. Kay's opinion in "Question 5" that the administrative law judge erred as a matter of law is a legal conclusion. "[T]he District Court must ensure that an expert does not testify as to the governing law of the case." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006). An expert witness is prohibited from rendering a legal opinion. Id. Therefore, the opinions expressed in "Question 5" will not be considered by the Court.

Dr. Kay's opinion regarding "Question 6" does not meet the requirements of Rule 702 or Daubert. Dr. Kay reaches the conclusion, assuming the ALJ erred as a matter of law (which assumption as stated above is a legal conclusion not within the purview of an expert), that H.M. is at an increased risk of harm as a result of inappropriate educational programming. The only facts she cites in support is the failure to refer H.M. to the Board's CST, the failure to identify H.M. as learning disabled, and the failure to provide H.M. with appropriate special education programs. Dr. Kay does not, however, give any context to these statements. It also raises some confusion since H.M. was

14

identified as learning disabled in 2005 and provided with a CST and special programs at that time.  Dr. Kay also states that H.M.'s learning disabilities were not addressed through an IEP until third grade.  This alleged fact addresses "inappropriate educational programming" in the school years prior to third grade and, as explained above, claims that arose prior to June 5, 2006 are barred by the statute of limitations.  Dr. Kay's other reference to H.M. is a general statement that "she was not provided with an appropriate program of specially-designed instruction that was specifically tailored to meet her needs" without any specific facts cited in support.  Unsupported conclusions do not meet Rule 702 or Daubert requirements and will not be considered by the Court.

Although a portion of Dr. Kay's opinion regarding "Question 8" concerns claims beyond the statute of limitations, the portion of this opinion as it pertains to the instruction received at the Cooper Learning Center has not been stricken on limitations grounds.  The Court finds that the opinion concerning instruction received at the Cooper Learning Center meets Rule 702 and Daubert requirements.  Finally, Dr. Kay's opinion regarding her calculation for compensatory education in response to "Question 9" also meets the requirements of Rule 702 and Daubert.

Thus, the Court will consider Dr. Kay's opinion with regard to

15

Question nos. 3, 4, 8 (limited to the instruction received at the Cooper Learning Center) and 9.  The remaining opinions will be stricken and given no weight by the Court.

**2.    Decision of the ALJ that H.M. did not have a "specific learning disability."**

Plaintiffs are requesting judicial review of the ALJ's decision that H.M. is not eligible for special education and related services under the "specific learning disabled" classification.  In particular, plaintiffs argue that the ALJ erred in not finding that H.M. had a specific learning disability in the area of "reading fluency."

**a.    "Specific Learning Disability"**

Pursuant to the New Jersey Administrative Code related to the determination of eligibility for special education and related services,

> [a] student shall be determined eligible and classified 'eligible for special education and related services' under this chapter when it is determined that the student has one or more of the disabilities defined in (c)1 through 14 below; the disability adversely affects the student's educational performance and the student is in need of special education and related services. Classification shall be based on all assessments conducted including assessment by child study team members and assessment by other specialists as specified [].

16

6A:14-3.5(c).

This provision sets up a three part test for determination of eligibility: (1) the student has one or more of the disabilities defined in 6A:14-3.5(c)1 -14; (2) the disability adversely affects the student's educational performance; and (3) the student is in need of special education and related services.

With regard to the first prong of the test, plaintiffs claim that H.M.'s disability is "specific learning disability" (listed as number 12 under 6A:14-3.5(c)) which is defined as:

> ..."perceptually impaired" and means a disorder in one or more of the basic psychological processes involved in understanding or using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.
>
> i. A specific learning disability can be determined when a severe discrepancy is found between the student's current achievement and intellectual ability in one or more of the following areas:
>
> (1) Basic reading skills;
> (2) Reading comprehension;
> (3) Oral expression;
> (4) Listening comprehension;
> (5) Mathematical calculation;
> (6) Mathematical problem solving;

17

```
            (7) Written expression; and
            (8) Reading fluency.
```
6A:14-3.5(c)(12).

Under "specific learning disability," plaintiffs claim that a severe discrepancy is found between H.M.'s current achievement and intellectual ability with regard to "reading fluency," particularly, oral reading fluency.

**b.   ALJ Determinations**

The ALJ determined that H.M. did not have a "specific learning disability" and, therefore, did not meet the first prong of the test.  In making this determination, the ALJ heard testimony from: Ms. Leslie Ruffalo, H.M.'s fifth grade regular education teacher; Ms. Brenda Baals, H.M.'s special education teacher from November 2007 to the end of H.M.'s fifth grade year; Ms. Alice Kay Morris, a social worker, Child Study Team member, and H.M.'s case manager; Ms. Patricia Woodland, a learning disabilities teacher and consultant ("LDT/C") employed by the school district and who tested H.M.; Ms. Nina Mattie, a school psychologist who performed a psychological assessment of H.M.; Barbara Bole Williams, Ph.D., who testified as an expert for the school district; Ms. Jayne Elfreth, a reading specialist employed by the school district; Richard Selznick and Anthony J. Applegate, Ph.D., experts who testified on

behalf of plaintiffs; and H.M.'s mother.  The ALJ did not make any findings that any of the witnesses were not credible and this Court accepts the credibility findings of the ALJ.

The ALJ noted that in May 2005 the CST determined that H.M. was eligible for special education with a specific learning disability in basic reading skills and mathematics computation and, therefore an IEP was developed.  The ALJ also noted that three years later at H.M.'s reevaluation and IEP meeting on May 14, 2008, the CST determined that H.M. no longer required special education and declassified H.M.  Based on the testimony and evidence, the ALJ acknowledged that H.M. has weaknesses in "oral reading fluency, word attack and decoding skills" but felt that while it had "some impact on her reading comprehension, her instructional level was average or above average on a fifth grade level and she did not exhibit a severe discrepancy between her intellectual ability and achievement."  The ALJ found that H.M. is meeting the benchmarks outlined in the New Jersey Core Curriculum Content Standards for her grade as evidenced by the NJ-ASK 4 and NJ-ASK 5, and by her fifth grade report card indicating high achievement.  Although the ALJ acknowledged that H.M. has issues with specific skills, he felt her weaknesses were not an educational disability.  As a result, the ALJ affirmed the decision to declassify H.M.

19

Plaintiffs argue that the ALJ erred in affirming the decision to declassify H.M.  They state the decision was wrongly decided because the results of the first Developmental Reading Assessment ("DRA") showed that H.M. was only able to read independently at the second grade level.  Plaintiffs state that when the Case Manager re-administered the DRA test, the oral fluency portion was omitted in order to achieve a fourth grade independent reading level. Plaintiffs also state that the NJ-ASK test does not reflect H.M.'s silent reading fluency because it is taken under un-timed conditions, and that H.M.'s grades are not a good indicator because they are subject to differing criteria and personal bias.

### c.  H.M.'s Reading Fluency

Plaintiffs criticize the ALJ's decision on the ground that H.M.'s weaknesses in reading fluency qualifies her as having a "specific learning disability."  In particular, they point to H.M.'s result on the first DRA given in December 2007 which evaluated H.M. to be reading at a second grade level while in the fifth grade.

The term "reading fluency" is not defined in the IDEA and the parties differ on what constitutes "reading fluency."  Defendants define "reading fluency" as "the speed and accuracy of reading in

general intertwined with comprehension, not whether a student struggles to publicly read unfamiliar text."  Although plaintiffs do not offer a specific definition, they stress that the ability to read out loud is an important part of "reading fluency." Following basic cannons of statutory construction, a court should construe statutory language so as to avoid interpretations that would render any phrase superfluous.  See U.S. v. Cooper, 396 F.3d 308, (3d Cir. 2005) (citing TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001)).  Here, the statute lists "reading comprehension" separate from "reading fluency."  To interpret reading fluency to be the ability to comprehend text, then the separate listing for reading comprehension would be considered superfluous.

Another cannon of statutory construction is that words in a statute are to be given their ordinary meaning unless the context clearly suggests otherwise.  See Dewalt v. Sullivan, 963 F.2d 27, 30 (3d Cir. 1992).  The word "fluency" is defined by Merriam-Webster as "the ability to speak easily and smoothly; especially the ability to speak a foreign language easily and effectively;" also, "the ability to do something in a way that seems very easy (a dancer known for her fluency and grace; He plays the piano with speed and fluency)."  The word fluency, therefore, can mean both the ability to speak easily and smoothly, and an ability to do

21

something seemingly with ease.

Taking into consideration the words of the statute and the plain meaning of the word "fluency," the Court finds that "reading fluency" contains a decidedly oral component, although not exclusively oral in its meaning.  Therefore, oral reading must be considered in assessing H.M.'s reading fluency, along with other measures that show her ability to read easily such as comprehending what she reads.

Based on the record below, H.M. had a problem or weakness with oral reading.  Per the findings of the ALJ, Ms. Baals, H.M.'s special education teacher, Ms. Morris, her social worker, Ms. Woodland, the LDT/C, as well as plaintiff's expert and H.M's mother, all testified that H.M. showed a weakness or deficiency in oral reading.  However, witnesses for the school district qualified their statements that H.M.'s overall reading fluency, when taking into consideration reading comprehension, was at her grade level.

Although H.M. had problems reading out loud, several tests administered indicated that she was able to read and comprehend what she had read.  For example, the second DRA test administered which tested comprehension (the first tested oral reading) showed H.M. reading at "the independent reading level."  The Fry's Instant Word Criterion Test indicated H.M. was able to read at a fifth

22

grade level.  Ms. Woodland testified she administered the Woodcock-Johnson III test and the Gray Oral Reading Test and determined that H.M. understood what she had read.  Dr. Williams testified that H.M. is meeting the benchmarks outlined in the NJ CCCS for her grade based on her results on the NJ-ASK 4 and NJ-ASK 5.

In addition to H.M.'s test results, witnesses for the school district also testified that H.M.'s oral reading ability was sufficient.  Ms. Ruffalo, H.M.'s fifth grade teacher, stated that H.M. read out loud at "average or above average."  Ms. Woodland stated that she observed H.M. twice and that she "... volunteered to read and did so well... Her oral reading was appropriate and she did not stumble... She read aloud, was able to read orally, and her comprehension was strong."  Dr. Williams stated that H.M.'s ability to read out loud was "acceptable."  Moreover, H.M.'s fifth grade teacher stated that H.M. instructional level was on a fifth grade level and was average or above average and that she received A's and B's.

Conversely, plaintiffs' expert, Dr. Selznick assessed H.M. and found "fairly significant weaknesses" in reading fluency.  Dr. Applegate, plaintiffs' other expert at the hearing, stated that H.M. has severe comprehension problems, but could be taught at the fifth grade level.  H.M.'s mother testified that H.M. has

23

difficulty with reading and needs study guides and extra help. Plaintiffs' supplemental expert report written by Dr. Kay states that the second DRA test was invalid because it omitted the portion that measured oral reading fluency.

Based on a review of the administrative record, the supplemental evidence submitted by plaintiffs, and giving due weight and deference to the findings below, the Court affirms the decision of the ALJ that H.M. is not eligible for special education and related services under the "specific learning disability" classification.  Although H.M.'s test results on the first DRA showed that her oral reading skills were at the second grade level, when that one test is viewed in conjunction with the other tests, as well as the observations of her teachers, the larger picture shows that H.M. operates at or near her grade level in overall reading fluency.  H.M.'s weaknesses in oral reading fluency does not adversely impact her educational performance to the extent that she requires special education services.

### 3.   2006-2007 and 2007-2008 IEPs

In addition to challenging the Case Study Team's decision to declassify H.M., affirmed by the ALJ, plaintiffs also argue that the IEPs issued in school years 2006-2007 and 2007-2008 were not

reasonably calculated to provide a meaningful educational benefit
because they were procedurally defective.  Plaintiffs state that
the IEPs were defective because they contained only goal for
reading ("The student will be able to pronounce unfamiliar words
using a variety of word attack strategies.") which was aligned to
outdated 1996 Core Curriculum Content Standards and did not address
all of H.M.'s areas of need to progress appropriately in the
general education curriculum.  Plaintiffs also argue that the IEPs
lacked objective assessment of H.M.'s levels of performance because
the NJ-ASK test results, taken under untimed conditions, do not
reflect an assessment of H.M.'s ability to read fluently, and
because the assessment that H.M. was performing at "grade level"
was based upon the subjective impression of her teachers who did
not take into consideration H.M.'s inability to read fluently.

Finally, plaintiffs argue that the IEPs were not implemented
properly because from September until November, 2007,[6] H.M. did not
have a special education teacher even though the IEP provided for
one.  Plaintiffs state that as a result of the deficient IEPs, H.M.

_____

[6] Although plaintiffs state in their brief that H.M. was
without a special education teacher from September to December,
2007, plaintiffs' statement of material facts states that Ms.
Brenda Baals was H.M.'s special education teacher from November
2007 until June 2008.

25

could not meet certain New Jersey Core Curriculum Content Standards.

"An appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." C.H. v. Cape Henlopen School Dist., 606 F.3d 59, 65 (3d Cir. 2010). "The issue of whether an IEP is appropriate is a question of fact." Bayonne, 602 F.3d at 564 (quoting S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 271 (3d Cir. 2003)(citing Carlisle Area Sch. v. Scott P., 62 F.3d 520, 526 (3d Cir. 1995)). "When parents challenge [the adequacy of] a school's provision of a [free and appropriate public education] to a child, a reviewing court must (1) consider whether the school district complied with the IDEA's procedural requirements and (2) determine whether the educational program was 'reasonably calculated to enable the child to receive educational benefits.'" Id. (citing Mary T., 575 F.3d at 249 (quoting Rowley, 458 U.S. at 207, 102 S.Ct. at 3051)). "But a court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made. Id. at

26

565 (citing <u>Susan N. v. Wilson Sch. Dist.</u>, 70 F.3d 751, 762 (3d Cir. 1995)).

A procedural violation is actionable only if it: (1) "impeded the child's right to a free appropriate public education" (FAPE); (2) "significantly impeded the parents' opportunity to participate in the decisionmaking process"; or (3) "caused a deprivation of educational benefits." <u>Id</u>. (citing 20 U.S.C. § 1415(f)(3)(E)). Thus, not only must there be a procedural violation, that violation must result in a loss or deprivation of a substantive right.

There is no dispute that the ALJ made no factual finding with respect to whether the 2006-2007 and 2007-2008 IEPs provided a free appropriate public education (FAPE). As such, the "modified de novo" review standard does not apply and the Court reviews the evidence "de novo."

To reiterate, Plaintiffs argue that the 2006-2007 and 2007-2008 IEPs had only one, outdated goal: "The student will be able to pronounce unfamiliar words using a variety of word attack strategies." The fact that a goal remained the same in an IEP from one year to the next does not render it inadequate. <u>See</u> <u>W.R. v. Union Beach Bd. of Educ.</u>, No. 09-2268, 2010 WL 1644138, at *9 (D.N.J. Apr. 22, 2010) ("The fact that the goals remained the same

27

does not compel the inference that no progress occurred, in view of
the evidence in the record indicating that H.R. did in fact make
progress.").   Plaintiffs, however, also question the goal itself,
particularly since there are no goals specific to oral reading.
Plaintiffs suggest that the IEP should have contained goals that
H.M. meet the Core Curriculum Standards in the area of oral reading
fluency, such as: (First grade standard 3.1.1 D)(2) begin to read
simple text with fluency; (3) read with fluency both fiction and
non-fiction that is grade-level appropriate; (Second grade standard
3.1.2 D(2))use appropriate pace; "not choppy" or word-by-word; (3)
use appropriate inflection; (e.g., dialogue, exclamations,
questions); (Third grade standard 3.1.3 D)(1) recognize grade-level
words accurately and with ease so that a text sounds like spoken
language when read aloud; (3)read aloud with proper phrasing,
inflection, and intonation; (Fourth grade standard 3.1.4)(1) use
appropriate rhythm, flow, meter, and pronunciation in demonstrating
understanding of punctuation marks.   Plaintiffs argue that since
H.M. did not meet the standards for reading fluency for the first,
second, third, or fourth grade, her 2007-2008 IEP should have
included those goals.

Defendants argue that since H.M. was in the regular education
curriculum that she can be monitored by regular examinations,

28

grades awarded quarterly, and yearly advancement to higher grade
levels, and that this is an appropriate measure of the student's
progress under the IDEA.  Rather than requiring separate goals in
the IEP, defendants argue that H.M.'s examinations, grades,
progress reports, standardized testing and advancement to the next
grade level fulfilled the requirement that the IEP contain
evaluative criteria and be able to measure progress.

The Supreme Court has provided some guidance on the use of
measurable goals when a child requiring special education is
"mainstreamed" or educated in the regular curriculum:

> The [IDEA] requires participating States to educate
> handicapped children with nonhandicapped children
> whenever possible.  When that "mainstreaming"
> preference of the Act has been met and a child is
> being educated in the regular classrooms of a public
> school system, the system itself monitors the
> educational progress of the child.  Regular
> examinations are administered, grades are awarded, and
> yearly advancement to higher grade levels is permitted
> for those children who attain an adequate knowledge of
> the course material.  The grading and advancement
> system thus constitutes an important factor in
> determining educational benefit.  Children who
> graduate from our public school systems are considered
> by our society to have been "educated" at least to the
> grade level they have completed, and access to an
> "education" for handicapped children is precisely what
> Congress sought to provide in the Act.

Rowley, 458 U.S. at 202-203.

Based on the ruling by the Supreme Court, since H.M. was

educated in the regular curriculum, the use of H.M.'s examinations, grades, progress reports, standardized testing and advancement to the next grade level was a proper substitute for a more elaborate set of goals in the IEP.  Id. at 203-04. ("The IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.").  Therefore, the IEP was not deficient in terms of outlining measurable goals.

Plaintiffs also argue that a special education teacher was not provided from September until November, 2007.  This raises a procedural question of whether the IEP was implemented properly. Although the lack of a special education teacher for approximately two months may be a procedural violation, plaintiffs must also show how this deprivation of a special education teacher lead to a loss of educational opportunity or benefit for H.M., or deprived plaintiffs of their right to participate.

Plaintiffs have not put forth sufficient evidence to show a loss of educational opportunity or benefit, or deprivation of a right to participate.  In fact, plaintiffs state that a meeting occurred in October 2007 with H.M.'s parents regarding H.M.'s

education struggles.  Presumably this meeting afforded H.M.'s
parents the opportunity to participate in H.M.'s IEPs and raise any
concerns at that time regarding the lack of special education
teacher.  The Court also notes that H.M.'s parents signed both the
2006-2007 and 2007-2008 IEPs, indicating their participation in the
process.

Given the above, the Court finds that the Board substantially
satisfied the IDEA's procedural requirements and the IEPs were not
procedurally defective.

Because H.M. does not have a "specific learning disability"
under the IDEA, and because the 2006-2007 and 2007-2008 IEPs were
not defective, we do not reach the issue of whether she is entitled
to compensatory education or tuition reimbursement.

**IV.   <u>CONCLUSION</u>**

For the reasons expressed above, plaintiffs' motion for
summary judgment is denied, and defendant's cross-motion for
summary judgment is granted.

An appropriate Order will be entered.


Date: September 27, 2011              S/Noel L. Hillman
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.

31